**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| SENHICA KLEE | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Case No: 4:20-CV-441 |
| | § | |
| WILLIAM MARSH RICE UNIVERSITY | § | |
| | § | |
| *Defendant.* | § | |

**PLAINTIFF SENHICA KLEE'S FIRST AMENDED COMPLAINT**

COMES NOW, Plaintiff Senhica Klee, and files this First Amended Complaint against William Marsh Rice University, in support thereof would show unto the Court the following:

**I.**
**PARTIES**

**1.**     Plaintiff, **Senhica Klee** (hereinafter Klee) is a resident of Houston, Harris County, Texas.

**2.**     Defendant, **William Marsh Rice University** (hereinafter Rice) is a Corporation based in Texas and organized under the laws of the State of Texas. Service of process was perfected upon Rice pursuant to section 5.201 of the Texas Business Organizations Code, by serving the Registered Agent of the Corporation, **Richard A. Zansitis at 6100 Main St. MS 94, Houston, TX 77005 on February 12, 2020 at 1:56 pm.**  Rice has been successfully served and an extension of time to make their first appearance on or before April 3, 2020 has been granted by Plaintiff.

**II.**
**JURISDICTION AND VENUE**

**3.**     This Court has jurisdiction over the parties under Title IX, 20 USC § 1681.

**III.**
**FACTUAL BACKGROUND**

**4.**     Senhica Klee was a graduate student at Rice University in 2016. He was a performance voice major at the school of music. Klee had never had any disciplinary problems while a student at Rice. Klee

had never had any disciplinary problems at any time in his academic career. Klee had never been charged

with any type of crime in his life. He was an exemplary student nearing completion of his graduate studies.

**5.**     Klee is the son of a retired Staff Sergeant with the United States Army who now serves as a nurse

at a VA hospital in Denver where his mother is also a nurse.

**6.**     On or about September 4, 2016, Klee attended a party at one of his professor's homes. It was an

afternoon affair, attended by both graduate students and undergraduate students in the school of music at

Rice. The party ended in the early afternoon. Klee offered three undergraduate women a ride back to

campus. During that ride, he suggested that the women join him and perhaps some other students later in

the evening. The women agreed. After some discussion, the three women took an Uber ride later that

evening to Klee's off campus apartment to enjoy some social drinking and swim in his apartment's pool.

**7.**     Klee's guests arrived around 8:30 p.m. They first shared a bottle of wine between the four of them

and then started drinking beer from Klee's refrigerator. Klee had stopped at a grocery store on the way

home from dropping the women off on campus. At that time, Klee was hoping to put together a last-

minute gathering at a friend's home that would involve others. He purchased a 30 pack of beer for that

occasion. Unfortunately, his friend was not available to host any type of social event at his home, so what

was first thought to involve many people, dissolved into the three women coming to Klee's home.

**8.**     After finishing off the bottle of wine, Klee and the three women went down to the pool. While

there, some of them had one or two beers, stood in the pool, and just talked.  By all accounts, this was a

calm social gathering of friends enjoying a little wine and a few beers. The three women were adults, but

not yet 21. Klee supplied all the wine and beer for the evening at his home. The women accepted this

hospitality. No one became overly intoxicated. The women were adults, and Klee did not force anyone to

drink any more than they wanted, that night. The single bottle of wine and few beers consumed by each,

took place over the span of two to three hours.

Plaintiff Senhica Klee's First Amended Complaint

**9.**     After a pleasant time in the pool, Klee and his guests decided that they would try and find someplace to go to continue their night. Klee made some calls to several clubs in the Rice Village area, to see if any of them would admit underage people. It was getting late on a Sunday night, and everything was closing. The group decided to return to the Rice Campus and go to the graduate pub called Valhalla.

**10.**    When they arrived at Valhalla, Klee purchased one beer for himself and one beer for two of the three women, and they sat outside. One of the women, who we will call EC, was interested in Klee. All three women had discussed the possibility of "hooking up" with Klee over the course of the evening amongst themselves. As they drank their beers, the two other women decided that they would leave EC to be alone with Klee. One of the women made up an excuse that her roommate was locked out of her dorm and left with the other, so that Klee and EC could explore their mutual attraction that was becoming obvious. However, like any responsible young women out with friends, both of EC's friends specifically asked EC if she would like to leave with them and return to the dorm? EC said no, "I am with Senhica, I will be fine." Both friends, who were with EC all night long, specifically assessed EC's state of sobriety and made the judgment that she was in full control of her decision-making ability. She was not stumbling drunk. She was not slurring her speech. She declined their invitation to go to the dorm with them. Both of EC's friends were very clear, EC appeared fine and able to handle herself. They had no concerns about her, whatsoever, remaining with Klee.

**11.**    Left alone, Klee and EC began to talk and share things about themselves when Klee said to EC, "I can't lie, I am very attracted to you, may I kiss you?" EC readily replied, "Me too and Yes!" After a while they agreed that they should go somewhere more private. Before that happened however, Klee specifically asked EC about her level of intoxication. Klee knew that EC had been drinking. Klee told EC that he wanted to be with her alone, but not if she was too drunk. He asked her repeatedly, "are you sure you are ok?" to which she said, "I am fine" or "I am totally fine."

**12.**     They considered EC's dorm room, but neither liked that option. EC suggested they return to his apartment, but Klee declined because it would involve a drive back to the apartment, and then back to campus to take EC home. Klee asked EC if they could just go to his Jeep for some privacy. EC again, without hesitation, agreed.

**13.**     Around the time Klee and EC were either walking to his car or riding in his car looking for a place to park in private, EC got a text from one of her friends who had gone home. The text said, "Are you Alive?" EC replied, "Yes-I think I am going to hook up with him". Her friend was amazed at this turn of events but did not raise any alarms or tell her she should not do this.

**14.**     Klee and EC found a parking lot on the Rice Campus where there were few cars for privacy. They both got out of Klee's Jeep and opened the back doors. Klee lowered the seat backs in the back seat to make more room. EC climbed in and Klee followed.

**15.**     Klee and EC had sex that night in the back of his Jeep. The sex was consensual. EC and Klee discussed whether or not she wanted to have sex. EC told Klee that she was a virgin. Klee closely questioned EC about whether she wanted to have sex, since this was her first time. Klee also specifically asked EC if she felt  she was sober enough to make this decision. Just as she had indicated to her friends before they left, EC confirmed that she was in control of her faculties and able to make this decision.  EC at first said yes to sexual intercourse and Klee donned a condom. Klee made it clear at the outset, that EC was in "full control" of the situation, her consent was necessary for them to continue and that she could withdraw that consent at any time. Then EC seemed unsure. Klee detected that hesitancy and suggested they just do "other fun adult stuff" and removed the condom. EC agreed to that, and the intimacy continued. They performed oral sex upon each other. As things progressed, they both were without clothes, and EC felt Klee's penis touching her vagina without a condom. At this point, EC said to Klee, "you need to put on a condom." Klee asked her again if this meant she wanted to have sex. EC said yes, without equivocation. They had intercourse for a short while, and then Klee withdrew because

he was having trouble sustaining an erection. After this, EC and Klee continued to give each other oral pleasure. Once EC clearly said, "yes, I want to have sex with you", nothing EC did or said indicated that consent had been withdrawn or called into doubt. To the contrary, her participation seemed willing and active after she gave Klee permission to engage in sex with her. She never said to him, "don't do that" or "I don't like that" or "stop doing that". She never pulled away from him to show him she was withdrawing her consent. She acted like she was getting exactly what she wanted from Klee.

16.     After the sexual encounter ended in Klee's Jeep, they both got dressed and headed back to EC's dorm. It was a short drive. Klee asked EC if she would perform oral sex with him during that drive. EC said yes and leaned over the console, into his lap. Once they arrived, she got out of the car, said a cordial good-bye to Klee, and disappeared into her dorm.

17.     The card keys for the Rice residences use by students, are trackable. Rice determined that EC entered her dorm at 3:12 a.m. The next entry for her card key was 10 minutes later, as she entered the laundry room near her dorm. Soon after Klee dropped EC off, he sent her a confirmatory text asking, "Make it home ok?" to which EC replied, "Yeah, I'm fine thanks". Klee replied a few minutes later, "Glad to hear. Sleep well then! Hope you girls had a good time" and EC replied, "Thanks you too". Klee then texted EC one more time asking, "Are you sure you're ok?" and EC quickly replied, "Yes, I'm fine! Thanks". The next day, EC asked Klee if they could keep their encounter private, in a text that said, "Just do (sic) you know, I'd prefer to keep last night on the down low because people gossip a lot." Klee agreed to this and honored this agreement at all times.

18.     For the next year, Klee and EC seemed to remain friends. They exchanged texts and shared with each other on social media. They saw each other regularly at the Rice School of Music. EC remained friendly and cordial with Klee throughout this entire year.

19.     Unfortunately, the fact that EC had "hooked up" with Klee, did not remain a secret. EC started to hear comments from both undergrad students and graduate students who were speculating about her

encounter with Klee. This was not the fault of Klee. He never told anyone about EC. EC made the mistake of telling several of her fellow Rice women students, including the two who were with her that night that she had sex with Klee. However, she never told any of those people that there was anything wrong or objectionable about what happened that night. Predictably, word got out and EC felt stressed and upset.

20.      On September 7, 2017, a year after he had consensual sex with EC, Klee got an email from the Rice Title IX office asking him to come to the office for an interview. The email did not tell him what the interview was about. Klee had no idea what they wanted to discuss. Klee was immediately placed in a room and interrogated by Lisa DeLaTorre, the Student Justice Program Director at Rice. Ms. DeLaTorre questioned Klee about every detail of that night with EC that had occurred over a year ago. She asked about sexual positions. She asked about EC's level of intoxication. She asked about how much beer and wine Klee's guests, including EC, had consumed. The interview went on for almost 2 hours. Klee was not allowed to have anyone with him during this interrogation. Klee did not have the benefit of knowing what allegations EC was making against him. From his perspective, Klee and EC had engaged in a night of consensual sex that they both enjoyed, and they were still friends. Then during the interview, it became clear, EC was alleging a year later that Klee had penetrated her anus from behind with his penis after engaging in vaginal intercourse with her from behind. EC was also claiming that she was too drunk to give consent to any of the sexual acts she had performed with Klee. The exact nature of what EC was claiming was not revealed at this time, but Klee adamantly contended that consent was knowing and explicit at all times, and never did EC do or say anything to tell him that he had crossed a line or was about to cross a line into non-consensual sexual acts. Klee denied having anal sex with EC and with anyone else, for that matter. When Klee was asked, "Did any part of your body penetrate her anus that evening?". Klee answered honestly, "Yes. We again yes, we did a 69 position she was giving me oral sex while I was licking her vagina and I had two of my fingers in her in her rectum or something like that. And she did not at any point stop me. And actually, in the midst of that I actually do explicitly remember

like does that feel good? Does that feel good? And she was like uh huh. Uh huh. But that wouldn't have lasted very long. Because that's just not something I'm big on." Klee had asked EC if she got pleasure from anal stimulation and she had answered in the affirmative. Klee had told her from the get-go, "you are in control." She didn't stop him when he started this, and she didn't object when he specifically asked her if she liked it. It is important to remember, this was EC's first sexual intercourse experience, and Klee had only started having intercourse a year before he had sex with EC. They were both relatively inexperienced people, sexually. That is important in understanding what actually happened between them that night.

**21.**     DeLaTorre was the Director of Student Judicial Programs at Rice when EC came forward a year after having had consensual sex with Klee. It was her job to investigate whether or not Klee has somehow violated the Rice Code of Conduct. Her investigation methods and statements during this investigation revealed a profound bias in favor of the woman complainant, and against the male accused.  DeLaTorre decided after only talking to EC and Klee, that she would charge Klee with violations of the Code of Student Conduct. She had not interviewed any of the independent eyewitnesses before issuing the charge letter. DeLaTorre simply believed EC, and discounted Klee's account. This would become the theme of this investigation. At every turn, EC was given the benefit of the doubt and Klee was viewed with suspicion and tainted with manufactured inferences of bad intent.  EC's statements were taken at face value and accepted. Klee's version of events were scrutinized, challenged, and in some instances twisted to make it appear that he had predatory intentions toward EC.  The decision to charge Klee was documented in DeLaTorre's charge letter of September 20, 2017. The letter starts with a description of EC's initial complaint. EC's initial complaint was recorded. However, when Klee was later allowed to review the file to formulate a response, this recording was inexplicably missing. The charge letter was the first time Klee was able to see exactly what EC was complaining about. DeLaTorre laid out EC's

account of that night and early morning. Remarkably, there were several admissions by EC that matched Klee's account as follows:

- EC admitted that when she expressed doubts about intercourse, Klee accepted that no answer, and suggested they do other "fun adult stuff" to which she readily agreed.

- EC admitted that before they actually had intercourse, Klee specifically and explicitly asked again if EC was consenting to have intercourse. She admitted that Klee said, "Are you sure". She admitted that she said yes, and only then did they have intercourse.

- EC admitted that at Klee's request, she guided his penis into her vagina.

- EC admitted that Klee told her "she was in total control".

22.    The only significant divergence between EC's version of sexual activity and Klee's version, was that EC claimed that Klee had engaged in anal sex with her. However, EC admitted that although she had been told that she was in total control and Klee had demonstrated that he understood that no means no, she did not say anything to Klee or do anything that would let Klee know that he had entered her anus and she objected. As a justification, EC excused her failure to say or do anything when the alleged anal sex occurred because, "I was too drunk to fully discern what was happening."  EC's claim of being "too drunk" would turn out to be false. DeLaTorre had no way of knowing this was false because she had not yet interviewed the other two women who were with EC and Klee all night, until just before the sexual activity. As a result of her bias in favor of female complainants and against males accused, DeLaTorre just accepted EC's claim of being too drunk to say to Klee, "no I don't want that" as soon as his penis got close to her anus. Klee of course, denied then, and denies now, that he ever penetrated EC's anus with his penis.

23.    DeLaTorre's description of Klee's account about the sexual activity, also reveals her bias. She had taken at face value, EC's version. DeLaTorre prefaced her recounting of Klee's version by stating:

"the various versions below may be inconsistent-or even in conflict-with each other, these are the ways you told the events to us in our meeting with you."

An example of this inherent bias against the male accused, is seen in DeLaTorre's description of Klee's account of the virginity discussion he and EC had before intercourse started:

> You told us that you have not been having sex for a very long time, that you lost your virginity just about two years ago (which would have been about one year before the night at issue). You told us you had never been a woman's first sexual partner before E.C., that you are very religious, and that you felt bad that you would be E.C.'s first sexual partner. I asked what prompted you to ask E.C. if she was a virgin, and you gave many answers. You said it was a "whim;" you said that she is not the first person you have asked "is this your first time;" you said that it is "kind of an unspoken thing;" and you said that you could not give a "scientific reason" why you asked her, but that it is "just a personal thing." You were clear that you were the one who initiated the conversation about her virginity, not E.C. (Later in our meeting you said simply that the reason you asked if she was a virgin is because she was a freshman.)
>
> And then after some time you were the one to bring up the idea of engaging in sexual intercourse: "that's when I started to bring up the idea of 'hey, do you want me to fuck you?'" You then told me that because she was a freshman, you asked her if she was a virgin (note that this is a very different rationale than you first provided when I asked you why you asked her that).

24.     DeLaTorre obviously, as a result of her bias, views these explanations about why Klee asked about EC's virginity as "inconsistencies" worthy of doubt. When in fact, when you listen to the interview, Klee is simply offering several reasons he brought the subject up.

25.     Both Klee and EC agreed that abortion had come up at some point, during their time in Klee's Jeep. A careful listen to Klee's statement does not reveal any statement that the abortion discussion came up before intercourse. He makes it clear, later in his recorded interview, that the abortion issue came up after intercourse. DeLaTorre's biased lens cause her to conclude:

> When you first told us about this conversation about pregnancy and abortion, you said it took place before sexual intercourse. In fact, you mentioned the abortion conversation as support for your belief that the sexual contact was explicitly consensual; after telling us about the abortion conversation you said, "What I'm getting at is there were multiple things that were verbally spoken before any action like that was taken." You told us that immediately after she assured you, she would be ok even though she is not taking birth control, you took out a condom and put it on. Later in our meeting, however, you told us that the conversation about birth control and abortion occurred **after** all the sexual acts, not before.

**26.**     First, this is a mischaracterization of Klee's recorded statement. Klee does not ever say clearly, that the abortion discussion occurred before intercourse.   Second, DeLaTorre's bias is on full display here. She is nitpicking Klee's account and his hazy memory in this ambush interview a year after the fact. She never did that with EC. She simply took EC's account at face value. Even when the independent evidence she later collected from witnesses challenged EC's account, especially on her level of intoxication, DeLaTorre stuck with her conclusion that EC was truthful about being too drunk to consent. Klee gets nit picked. EC gets a pass. This is bias.

**27.**     Another example of DeLaTorre's bias against Klee as a male accused, and in favor of the female accuser, is seen in her description of Klee's account on how much he had to drink that night as follows:

> "You said that the only alcohol you drank that night was one or two beers (one at your apartment, and one at Valhalla). This is not consistent with your earlier statement that you consumed wine when you and the three other students all shared a bottle of wine at your apartment."

DeLaTorre is nitpicking Klee's statement on collateral subjects, stretching to find excuses to justify her bias against him as a male accused. DeLaTorre did not challenge any part of EC's inconsistencies, even after she collected evidence later that called into question EC's version of events on critical core issues.

**28.**     DeLaTorre's bias is again evidenced in her criticism of Klee's memory of all the sexual acts he could remember, a year after the event. She criticizes Klee for not remembering some of the sexual activity, until prompted by statements EC had made. While excusing EC's hazy memory of the exact order of sexual acts, DeLaTorre suggests that Klee is being less than forthcoming about the sexual activity stating:

> "You said that the vaginal intercourse did not last very long because you were not at the top of your prime that night, so you finished very fast. Until I asked you additional questions about additional acts (based on the report I received from E.C.), this was your total description of all the sexual acts and touching you engaged in that night. Notably, you did not talk about the oral sex, the mutual oral sex, the digital vaginal penetration, or the anal penetration until I specifically asked you about each reported act."

29.     When prompted by EC's account, Klee was forthcoming and honest and disclosed that he penetrated EC's rectum with two of his fingers during mutual oral sex. He told DeLaTorre that he specifically asked EC if she enjoyed this type of stimulation and her oral response, as well as physical response, told him she enjoyed it. By EC's admission, she had been told by Klee that she was "in total control" over what type of sex they would have that night.

30.     DeLaTorre's bias is once again on display when she writes the following in the charge letter:

> "I then asked you, whether at any point that evening, E.C. was positioned on her hands and knees, while you were penetrating her from behind. You said yes. Because this was now the third variation of the night that you told us, I asked you to give me a chronological narrative of the intimate and/or sexual acts, starting from the moment you parked the car."

31.     This description of "the third variation of the night" is patently untrue and demonstrates bias against the male accused in favor of the female accuser. Any fair summary of Klee's account of that night demonstrates a young man's struggle to recall events that occurred over a year ago. His memory is being refreshed over the course of the interview. He is being prompted by the memory of EC. No fair or unbiased observer would characterize his recall, over the time of the interview, as deceptive, uncooperative, or untruthful.

32.     DeLaTorre's assault on Klee's credibility in the charging letter continued. DeLaTorre claims that Klee's final version of the "order of events" at the end of the interview, after Klee's memory had been refreshed by learning EC's allegations and they had discussed the incident for over an hour, was somehow suspicious, stating:

> "Notably, this final chronology of multiple sexual acts, positions, and conversations engaged in surrounding the sexual acts, is very different from your initial description of the sex between the two of you, when you said only, 'that's when we proceeded to have a very short amount of sex.'"

This is patently unfair and unequivocal evidence of DeLaTorre's bias. Klee had said that the intercourse portion of the sexual encounter was brief because of his lack of maintaining an erection. He never said the entire sexual experience was short. DeLaTorre is taking this description completely out of context, in an

attempt to prejudge Klee, in a way that is consistent with her bias. At the same time, DeLaTorre accepts wholesale the account of the female accuser. DeLaTorre demonstrates in her charge letter that she intends to discount Klee's account at every possible turn, even if it means intellectual dishonesty and manipulation of the facts.

33.     DeLaTorre charged Klee with three counts of violation of the Rice Code of Conduct. Penetration of EC's rectum without consent, sexual activity when EC was too drunk to give consent, and providing alcohol to minors. She did this before interviewing EC again to get her reaction to Klee's denials and version of events. In other words, she believed EC and because of her bias against male accused students, didn't believe Klee. DeLaTorre charged Klee before interviewing any of the other participants in the party in question. That would turn out to be a problem for DeLaTorre, that would further expose her prejudice and bias.

34.     DeLaTorre's constant critique of Klee's "memory" and "inconsistent statements" is most powerfully demonstrated in her comments to EC about her admitted "hazy" memory of the events of that night. DeLaTorre can be heard saying to EC during her recorded interviews that were preserved, that her flawed memory is not problem at all as follows:

> **DeLaTorre to EC**: So, in your written statement, you describe that you know a number of different sexual acts took place. ***But the recollection is fuzzy, so you're not sure the order of events.*** One of the acts that you then, that you talked about in your statement, kind of right after that ***fuzzy recollection qualifier,*** was you were undressed. And this is something we talked about the last time that you were undressed, and he was on top of you. And just to be clear, were you on your back at that point?

> **EC**: Like, no, I mean what part are we talking about? This is like the beginning of when stuff started happening.

> **DeLaTorre to EC**: Okay and after you told him to put on a condom, what happened then? Well let me pause you there. I'm going to read to you, you said, "I freaked out. I told him, he needed to put a condom on. He kept saying that he wanted to be inside me. So, I decided it would be easier to have sex with him than to listen to him go on and on." And so, I guess that's the time period I want to talk about, in between you told him put on a condom and when he actually did put on a condom. What actually transpired?

> **EC**: Right, okay, so, I think that I got it a little backwards.

**DeLaTorre to EC**: Again. ***It is, it is completely okay if you don't remember the order of things,*** and again I'm going to keep asking, do you remember, do you remember, do you remember, and when you don't remember, just say no.

**DeLaTorre to EC**: ***Alright so then, in this same paragraph, you said again the order of sexual acts is unclear***. But you said you do recall there being oral sex given and received by both. Do you recall whether you gave him oral sex before or after he ever use the condom at night?

**EC:** Yeah, yeah. I think that I gave oral sex before there was a condom use. And he also gave oral sex before there was a condom used.

35.    DeLaTorre discovered that the EC's card key times did not match up with her original story about what she did after she got out of Klee's car and entered the dorm. EC said she went straight to her dorm room and took a shower. EC's card key showed that she entered the dorm at 3:12 a.m. and then went to the laundry room at 3:22 a.m. When objective evidence discounted EC's account, EC did not get the same level of scrutiny and suspicion as Klee:

**DeLaTorre to EC**: So, it looks like you slipped into the laundry room at 3:22 and then back into the building. And I don't know exactly which door.

**EC**: I mean that would make sense if it was that I would have done my laundry that day because there was no class. I always do my laundry on the weekends so. I don't remember that though.

**DeLaTorre**: ***Doesn't have anything to do with anything either way.*** I'm just trying to figure it out. So, you did not have a recollection for instance that you took off your clothes from that night didn't put them in the washer at 3 a.m.

**EC**: Uh uh

**DeLaTorre**: No? ***Okay***.

**EC**: I don't think I did that, but I don't even remember going to the laundry room.

36.    EC had originally claimed to have had "several glasses of wine" at Klee's apartment. When confronted with the statements of her two female companions about that night, EC changed her story to "When I got to his apartment, I had – I think that I had 3 glasses of wine. It could have had 2. It was 2 to 3." This obvious exaggeration by EC did not phase DeLaTorre. She did not pounce on this inconsistency

or give it the same level of scrutiny as she gave to her perceived inconsistencies stated by Klee. This is evidence of her bias. Attack the male accused, give the benefit of the doubt to the female accuser.

37.    DeLaTorre was told by both of the other women there, that Klee brought 6 or 8 beers from his apartment to the pool. Klee said it was a few beers. After learning that, DeLaTorre asked EC how many beers Klee brought down to the pool, and she answered, "A lot. I don't know. It was a case." This is another example of where EC is shown to be exaggerating but DeLaTorre does not pounce upon this exaggeration, like she did at every turn with Klee.

38.    DeLaTorre stated the double standard between how she was treating Klee and how she treated EC. DeLatorre said to EC during one of her recorded interviews, that was not destroyed:

> "And just to be clear. Everybody remembers things differently and remembers different details and any contradictions doesn't necessarily mean someone is wrong or that there is some kind of bad motive behind it."

That was the standard for EC. It clearly was not the standard for Klee. Klee is a male. EC is female. DeLaTorre is the director of Student Judicial Programs. She is demonstrating the bias of Rice's programs. That being, to give female accusers a pass on inconsistencies and hazy accounts and accused males the third degree and negative inferences as to guilt for the same memory deficiencies.

39.    DeLaTorre interviewed EC after the charge letter was issued. DeLaTorre had not interviewed anyone other than Klee and EC regarding the charges. In this interview, EC gave DeLaTorre permission to speak to the other two women about the events of that night. DeLaTorre responded as follows:

> **DeLaTorre**:  Thank you for that….that's something that I assumed would come up later, that I would have to ask you about…ah…I was just going to wait till we got there.  I really do think that, based on everything that I have heard so far, based on what you told me and what is in your written statement and based on my meeting with him, I really do think at some point your level of intoxication on that night will become an important issue as we look at whether the code of conduct was violated. I want to take a minute to explain what I mean by that, what I mean by that is not in the sense of did you did anything wrong by consuming alcohol, I just want to be really clear about that, that's not what we are talking about,  but as you read the code of conduct as I hope  made it clear in the letter, obviously in the Rice sexual conduct policy, when we talk about consent, and consenting to sexual activity or intimate conduct, all those things, there is a place where a person can get to where they are not able to consent right… and that could be passed out because of

medication, it could be sleepy, it could be not of legally a person is not of legal age to give consent, right… sometimes it is from alcohol intoxication, all of these different things can contribute to that, so at a certain point in this case, based on what you have told me, I am concerned, and it is written in the letter,  that you may have been intoxicated to the point where you were unable to consent that night.  And so, I will need to look for more information about that. And I think the other two women who were with you that night will potentially be a good source of information about that. How much do they know do you think about what's is going on?

DeLaTorre is coaching EC on what to say to make her case against Klee. She is telling DeLaTorre that the key to your case is proving that you were too drunk to consent. You can almost hear the wink and nod between DeLaTorre as she says, "And I think the other two women who were with you that night will potentially be a good source of information about that." Their hope was that those two women would confirm that EC was very intoxicated that night. However, their conspiratorial hope was soon to be dashed on the rocks.

**40.**    EC also told DeLaTorre that she had no idea that Klee had penetrated her anus with his fingers during mutual oral sex. DeLaTorre never asks her whether Klee made the statement at the time, "do you like that?". DeLatorre never asked EC whether she responded in the affirmative either orally with a "hmmm...hmmm" or through non-verbal signs of assent. DeLaTorre now knows that the digital anal penetration by Klee was most likely a breakdown of communication between Klee and EC. He thought she was telling him "yes, I like that" and she didn't know he was touching her anus. This does not deter DeLaTorre. She presses on in her crusade to find something or some way to make her charges stick to Klee. She is an advocate for women who report sexual abuse, not an objective fact finder, as she claims.

**41.**    DeLaTorre interviewed both women who were at Klee's apartment with EC. Those women, while close friends of EC, plowed huge holes through EC's account. Most notably on her claim that she was too drunk to consent. We will refer to these two women as Georgia and Madeline.

**42.**    Georgia told DeLaTorre, that EC was not too intoxicated to give consent, or take care of herself:

**DeLaTorre**: Okay. And then how did [EC] seem that that point? Did she seem intoxicated?

---

Plaintiff Senhica Klee's First Amended Complaint

**Georgia**: I think maybe we were all like, like we had all been drinking, so we were all like a little like… Like, but I wouldn't even say like tipsy but like giddy like a little bit more. Like, like, like loosey-goosey but, she was, ***I definitely didn't ever think like ohh like we need to go home like. I definitely never thought like aww she's drunk.***

**DeLaTorre**: Okay. All right so then you're back in the car. It's seems that Senhica was probably fine to drive. [EC], did it seem she was excessively drunk or anything.

**Georgia**: No. ***No there was never a moment that I was like when we get back to campus like we're leaving. It was never like she's too drunk or if anyone was too drunk.*** I just remember we drove, we were just like blasting music and singing.

**DeLaTorre**: Okay.

**Georgia**: Yeah. Actually no. Actually, I did actually get a beer. I do remember that. Because I remember he gave me my change. I think I said I wanted a drink that I definitely didn't finish it. I think. So, I left on the table when we… But what happened was, even eventually when they came back. They were drinking. And Madeline, Madeline was like oh my God my roommate locked herself out of our room. And I was like, oh my God that is so annoying. I have to go let her in. Like I can just like say no. She was like, do you want to come with me? I don't want to walk back alone. And I said yeah. I said I'll go with you. But we said [EC] let's go. And [EC] was like no I want to stay. Like I'm drinking. ***And we kind of asked her like are you sure? Do you want us to just tell Jennifer, which is the Madeline's roommate. I'm pretty sure that's her name. Do you want us to tell Jennifer that like she has to go sit in the Commons of the college? She said no, I'll be fine. I'm with Senhica.*** And we were both like… yeah don't worry. And until we eventually left. And then, Madeline eventually told me either that night or the night after that like that was just a ploy to like get away.  Like she was just felt like weird and she just wanted to leave.

**Interviewer**: Can you tell me more about that?

**Georgia**: I think Madeline just like, like felt like awkward. Like she thought it was like, she wasn't going to do it anymore drinking. Like I wasn't planning on doing more drinking. And I think she was just like, like it was like, maybe like right before midnight. Maybe after I don't remember specifically. But we were just like sitting at Valhalla. We were like one of the only people, like groups left.

**Interviewer**: Okay.

**Georgia**: The campus was empty. Like that was truly nothing going on.

**Interviewer**: Okay.

**Georgia**: So, I think she probably made the decision like let's go. And I was like yeah, I'll go back with you. Like I didn't really want to walk back alone. And we both lived in North colleges because I'm at Martel and she's at Brown. And [EC] is at Wallace, so we could have walked together. ***And we definitely asked… we were like [EC] are you sure? She said yeah and I, we truly did not think anything of it.*** And we left. And we just like left and the night was over. I definitely just went back and slept. Yeah.

**Interviewer**:  Okay. At the point when you left, how... did [EC] seem drunk to you?

**Georgia:**  I would say she was definitely like, yeah like. I would say she was like drunk. But I would not even say she would…. was like impaired in any decision-making. From my knowledge. From what I can remember. She definitely wasn't… Like it was nothing to worry about.

**Interviewer**: Okay.

**Georgia**: *She definitely could handle herself. I definitely didn't think that, like I definitely thought both of them could handle themselves. Like I didn't see anything.*

43.   Madeline also disputed EC's claim that she was so drunk she didn't understand what was going on:

**DeLaTorre**:  So, we talked about, kind of your perception that [EC] was drunk on the drive over because of the singing and acting goofy. And then you also said the reason you text her at 1:30, um 1:34 because when you left you thought she was pretty drunk so you wanted to make sure that she was okay. What about the time you spent at Valhalla? What did you, so you already told me that she and Senhica was already talking and connecting, what did you observe about her behavior at Valhalla?

**Madeline**:  *I feel like she was, I definitely think she was drunk but it wasn't like to the point where I was worried about her. She was definitely laughing and it was obviously that she was tipsy and not drunk but, oh no..I would say I feel like she was drunk. Sorry. I do feel like she was drunk. But it wasn't like old [EC] really needs help or anything like that.*

**Interviewer**:  Right.

**Madeline**:  But yeah was like the same type of behavior like laughing and being goofy, it's just joking around stuff like that.

44.   DeLaTorre now had a serious problem. Her bias had led her to conclude that EC was truthful about her level of intoxication. Independent witnesses, in fact EC's friends, had now shown that to be untrue. In fact, Klee's contention that he had asked EC if she was alright and able to give consent to any sexual exploits that might follow was true. Now she knows that EC, in accordance with the preponderance of the evidence standard, had probably exaggerated her level of intoxication and awareness that night. This calls into question EC's account about anal penetration and her ability to say no, if in fact, Klee even tried to have anal sex with her. DeLaTorre and Rice had to find a fallback position to make this charge stick on Klee. Their bias and determination to find in favor of EC, the female accuser, against Klee, the male accused will become more strained and divorced from the known facts. Their tortured reasoning for

sanctioning Klee, in spite of this revelation, exposes their bias in favor of the female accuser and against the male accused.

**45.** In addition to the new evidence that EC was not impaired to the point that she could not give consent, the independent evidence also revealed that the alcohol Klee provided to the underage women it was not in excess. EC relented that she had two or three glasses of wine and a couple of beers at Klee's apartment over the course of about three hours. Madeline and Georgia confirmed that the amount of alcohol consumed by the group was limited to one shared bottle of wine and a few beers each. All the witnesses concurred that EC had at most, one beer at Valhalla over the next hour. Faced with this evidence, DeLaTorre decided to take a new tack against Klee, to insure his conviction. She alleged in a follow-up Charge Letter on October 6, 2017, as follows:

> I would like to make you aware of additional information I have gathered in student meetings regarding your behavior at your apartment. Specifically, multiple sources have reported that at your apartment you repeatedly offered alcoholic beverages, so persistently that at least one of the underage students became annoyed by your behavior. To be clear, you are not being charged with having "annoyed" another student; rather, I want to draw your attention to the information that is available. That is, current information indicates that your behavior went beyond your description that you did "not stop anyone from taking alcoholic beverages." In fact, information from multiple sources indicates that you encouraged the underage students to drink at your apartment, and that you searched the internet for drinking games you could play with beer and wine. I have also heard reports that you made telephone calls to multiple bars (at least four), to ask whether the underage students would be allowed to enter the bar. I have also heard reports that you encouraged the underage students to find friends who look similar to them, so they could borrow an identification card for the purposes of misrepresenting their age to gain entry into a bar with you.

**46.** DeLaTorre is essentially alleging that Klee tried, unsuccessfully, to get his female guests drunk. To make this allegation she ignores substantial evidence that this is not true:

- Klee and the girls discussed drinking games and may have even searched the internet for some games to play, but all witnesses, including EC, said a mutual decision was made that they didn't want to do that and Klee did not argue with this decision.

- The evidence supports the fact that Klee did make some calls to find a bar or club that would admit underage patrons but the evidence from the independent witnesses confirms that Klee's intent was to find an establishment that would allow under age patrons to come in but not drink.

•       Madeline did report that she became annoyed with Klee's persistent offers of having a beer or some wine, but she made it clear to him that she did not want to drink anymore, Klee respected that decision, and stopped making those offers.

**47.**     DeLaTorre's obvious biased inference, in contravention of the objective evidence, is that Klee had an intent to get one or all of his female guests drunk. She ignores the undisputed record that establishes that at most, this was a couple of glasses of wine and a few beers over the course of a about three hours. She ignores the fact that none of the women, including EC,  became drunk enough to impair their ability to give consent to any advances by Klee.

**48.**     DeLaTorre doubled down on her biased conclusion that EC was too drunk to give Klee consent. This, in spite of DeLatorre's knowledge that EC's friends, Madeline and Georgia, had told her that EC was not too drunk to make decisions.  DeLatorre wrote in her follow up charge:

> "I also want to make you aware of additional concerns I have about your behavior toward E.C. in your car that night. While the September 7, 2017, charge letter specifically draws your attention to the anal penetration, and E.C.'s intoxication as the possible violations, there is now additional behavior I am concerned about. I remain concerned about whether E.C. was able, in general, to consent to the various sexual activities that night. That is, the charge that she may have been to (sic) drunk to consent remains, but I am now additionally concerned that regardless of her level of intoxication, the situation that night was such that she was unable to consent, and/or that consent was not present."

**49.**     DeLaTorre has now entered into the land of fabricated allegations and conclusions driven by her bias in favor of the EC, the female accuser. She knows EC's friends say she was not too drunk to handle herself that night. Otherwise, they have told her, they would not have left her alone with Klee. She knows that the amount of alcohol consumed that night was not excessive called into question EC's assertion that she was too drunk to know what was happening. She knows that even EC confirms that Klee asked her about her level of sobriety and asked her several times about whether she consented to sexual activities. She knows that when EC hesitated about having intercourse, Klee backed off and suggested adult activities short of intercourse and EC agreed that was a "good idea".  What DeLaTorre's investigation has now dissolved into, based on the information in her file, is a swearing match between Klee and EC about anal penetration and consent. EC is making the incredible claim that Klee suddenly put his penis

in her anus. EC says she said nothing, and did, nothing at the time to show Klee that she knew he was doing this or objected. This is not a credible position for EC under any circumstances. Klee denies anal penetration with his penis. Klee is admitting that he stimulated EC's anus during mutual oral sex but obtained consent, when he specifically asked EC if she enjoyed the sensation, and she responded in the affirmative. DeLaTorre knows that EC was never aware that Klee was penetrating her anus with his fingers, so any response to a question about whether she likes that type of stimulation, was in all likelihood just a misunderstanding, in the heat of the moment. Does this cause DeLaTorre to pause? Does she take an objective step back, to assess this new information? No, she doubles down and presses on to her predetermined result, convict the male, help the alleged female victim.

50.     Klee responds to the charges but without the help of counsel, his response is ineffective. He accepted responsibility for having supplied alcohol to underage students.  Klee's response was a fool's errand.  DeLaTorre's mind was made up after she first talked to EC.

51.     On October 24, 2017, DeLaTorre issued the decision of the Student Judicial Program. Klee was found guilty. Some of the statements in her decision letter confirm her bias:

> "Finally, I decline, at this time, to reach a finding as to whether you deliberately misled me or withheld information during the process. While I remain concerned about your pattern of only talking about each additional sexual act after I confronted you with my existing knowledge of the act, a finding on this charge is unnecessary at this time. The other violations will result in a long suspension, and a finding on this charge would not alter that.

> Your first written response explains that you gave various and conflicting accounts of the night in our meeting on September 7, 2017, because you were thinking back and trying to remember the events of a night more than one year prior, and because you felt "shocked" by the allegations. Despite being given the opportunity to review E.C.'s written statement, and despite the time you took to write your written response to the charge letter, you have never clarified which of your various accounts of the night most accurately reflects your recollection of the events of the evening.

> Second, E.C. reported that the order of the acts that occurred is unclear to her, but she recalled various acts of sexual touching and activity."

Klee is penalized for being "unclear" and EC is given a pass on this deficiency. This is a double standard that exemplifies DeLaTorre's bias in favor of the female accuser.

52.     In the final analysis, DeLaTorre has to split hairs to get to her predetermined result. She finds that in the split second between when Klee stimulated EC's anus during oral sex and his question, "do you like that" and her affirmative response, his fingers entered her anus before he asked and therefore Klee violated of the Rice Student Conduct Policy as follows:

> "By your own description, you penetrated E.C.'s anus with your two fingers without her consent, while you two were engaged in mutual simultaneous oral sex ("69"). By your description, during "69," you first penetrated her anus with your two fingers, and then "in the midst of that" you asked her, "Does this feel good?" while your two fingers were in her anus. By your description, you asked this question while you were engaged in performing oral sex on her, an act that seems factually impossible given your description of her position over your body. I note that because neither you nor E.C. mentioned it, I presume that when penetrated her anus (whether with your two fingers as you describe, or your penis as she describes) you did so without the aid of an artificial personal lubricant.

53.     What possible explanation for this tortured logic is there, other than bias of the fact finder? Could this possibly be the standard at Rice or anywhere else for responsible sexual activity? Who would ever think that during that split second, when Klee almost simultaneously penetrated EC's anus while asking if she liked that sensation equals failure to get consent? Is this a realistic approach to sexual conduct? Further, DeLaTorre ignores that at that moment, EC stated that she was unaware of any digital penetration. Klee had told her, by EC's admission, that she was in "total control". Was it not reasonable, with this understanding, that if in the heat of the moment Klee did anything that EC objected to, they had agreed that she would set that boundary? Must a couple at Rice discuss every possible sexual permutation before they start sexual intimacy? Is it not enough to say at the outset to the woman involved, you are in control, let me know if I do something that you don't like?  The ridiculousness of DeLaTorre's rational is the telling fact that her decision in this case was pre-determined by her bias in favor of women accusers. The fact that DeLaTorre is selective in her recognition of some of the evidence and is making findings that are at odds with the totality of evidence t is also indicative of her bias against the male accused and in favor of the female accuser.

**54.**     Notably, DeLaTorre discounts Klee's contention that EC enthusiastically endorsed what Klee was

doing.

> "You described that after you inserted your two fingers into her anus, you asked her if it felt good, that she responded, "Mmm hmm, mmm hmm, mmm hmm," and that you specifically remember her making those affirmative noises. Even if your description is an accurate account of this set of events, you digitally penetrated E.C.'s anus without her consent. Specifically, first you penetrated her anus with your two fingers, then you asked how it felt. Nothing about her words or actions—by your own description— communicated that you had consent. Even if, for the limited purpose of discussion on this specific act, I were to assume she consented to the vaginal intercourse, your actions of penetrating her anus without first securing her consent to do so violated the Sexual Misconduct Policy."

**55.**     DeLaTorre also found that Klee's request for oral sex on the way back to EC's dorm, was a

violation of the Rice Code of Conduct. This in spite of EC's clear admission that she agreed, and did

perform oral sex during the ride back to her dorm. DeLaTorre wrote:

> "Your recollection is slightly different; you said that you asked her to perform oral sex once you had moved the car and parked at the new location near her dorm. Based on your descriptions of where you parked and where you dropped her off, this was approximately one half (.5) mile drive, which takes three minutes to complete (according to Google maps). In summary, after spending approximately 90 minutes parked in the Shepherd School lot, during which time you penetrated E.C.'s mouth, vagina, and anus, and  engaged in various sexual acts in at least three different positions, you requested that she perform additional oral sex on you before she left your car that night: "'Oh, like do you wanna give me head a little bit more or something like that before you leave?'" You said that her initial response was that she said "Now?" or words to similar effect, a question that demonstrated her hesitance. You told me that you pushed the issue: "I egged it on a little bit. Like, yeah, you know, just with words."

> This is another sexual act that by your own description, may have taken place with the absence of true choice. She describes that you pulled your penis out of your pants while driving and asked her to suck it. You describe that you think you were already parked, but that you had to encourage her to perform the act ("egg it on a little bit"). This behavior, "egging" her on to perform an additional sexual act on you, demonstrates you were not concerned about consent or E.C.'s true choice to engage in sexual activity with you. A preponderance of the evidence demonstrates that this particular behavior fell short of the expectations on all students to behave with civility and respect."

This analysis ignores that the ground rules set by Klee and EC at the outset were that "she was in total

control" of what happens and what does not happen. No rational reading of the Rice Sexual Misconduct

Policy lends itself to this interpretation of consent DeLatorre calls "true choice". The policy reads:

---

Plaintiff Senhica Klee's First Amended Complaint

**C. CONSENT.** In order to understand this Policy, and the standards of behavior Rice University expects, it is vital that students and other community members understand the concept of consent. This must be understood and accepted to be a member of the Rice community. Rice defines consent according to the following guidelines:

1**. Consent IS:**
An active, ongoing, and voluntary agreement by each participant to engage in sexual activity or sexual contact, ***communicated by clear actions or words.***

2. **Consent IS NOT present:**
. . . when someone is incapacitated (including due to consumption of alcohol or drugs, lack of sleep or unconsciousness); an incapacitated person cannot consent.

. . . simply because the person has consented to sexual activity in the past; past consent to sexual activity does not imply present or future consent to sexual activity; ***current consent must be communicated by clear actions or words.***

. . . because the other person is silent or does not resist sexual contact; again, ***consent must be communicated by clear actions or words.***

. . . **if the person has withdrawn their consent, which the person may withdraw at any time.**

. . . if there is coercion, force, threats, or the absence of true choice, any of which invalidates consent.

 . . . if the person has consented to sexual activity with one person but others also participate in the sexual activity; consent to one person does not imply consent to others.

 . . . when a person has not reached the legal age to consent or otherwise lacks the legal ability to consent.

3. **Consent can be withdrawn.** ***It is important to reemphasize that a person may withdraw their consent at any time before or during the sexual activity of contact.***

**56.**    Klee and EC had both agreed to this code of conduct. Klee was entitled to rely on EC's expression of consent ***by clear actions or words.*** Klee was entitled to rely upon EC to withdraw consent, pursuant to the policy and her agreement to be in "total control" of what sexual activities they engaged in. EC claims Klee penetrated her anus. There is nothing in this policy that contemplates a couple having to stop and discuss the next step of sexual activity. The policy intentionally contemplates that consent can be given in the heat of the moment by clear action or words. DeLaTorre's "true choice" standard is not contemplated in Rice's Code of Conduct.  DeLaTorre's and Rice's interpretation of their own policy is

simply not applicable to real world sexual relations between two consenting adults. Under DeLaTorre's and Rice's interpretation of their own policy, virtually every sexual encounter would be subject to claims of lack of consent after the fact. The most plausible explanation for this outlandish interpretation of consent is that DeLaTorre and Rice were manipulating the facts and evidence and policy to get a pre-determined result, find for the female alleged victim and against the accused male. This is a bias based on sex.

57.    DeLaTorre again demonstrated her bias against accused men and women accusers as she explained how she made judgments about the credibility of Klee and EC in her findings letter:

> "Here, E.C. explained that she does not remember the exact order of all the various sexual positions and acts because she was intoxicated, but her recollection of how the vaginal intercourse happened has been clear and consistent throughout the process. Her recollection of the pain in her anus that night, and the lingering pain and other after-effects the next morning, was clear and detailed. In contrast, you have offered various accounts of the facts of the night, including how many condoms you used, when you applied the condom(s) in relation to which sexual act or position, where and how you disposed of the condom(s), when the conversation about abortion took place in relation to the vaginal intercourse, etc., and you have not resolved the conflicts between your various stories. Your various and conflicting reports of the timing of the events is significant; at one point in the meeting you explained that the conversation about abortion took place before the intercourse, and you used that conversation as support for the notion that the intercourse was consensual. Later in the meeting, however, you said the abortion conversation was after all the sexual acts in the parking lot were over."

Once again, DeLaTorre admits that EC's memory of the "exact order of all the various positions" was incomplete. She excuses this poor memory by citing EC's claim of intoxication. However, DeLaTorre knew at the time she issued this sanction against Klee, that the evidence was overwhelming that EC was not so intoxicated that she was unaware of her surroundings or unable to take care of herself. DeLaTorre knew that independent eye witnesses had quantified the amount of alcohol she consumed over the course of the night to be a couple of glasses of wine and a few beers. On the other hand, when judging Klee's credibility, DeLaTorre again attacks Klee's September 7, 2016 recorded statement because he had trouble remembering with total clarity what had happened and in what order it had happened. This is a double standard.  DeLaTorre's bias is clearly in favor of the female accuser and against the male accused.

**58.**   DeLaTorre's zealous interpretation of the facts in favor of the female accuser, and against the male

accused, is finally revealed in her final conclusion about Klee's conduct that night stated as follows:

> "Your behavior on September 4-5, 2016, taken as a whole, shows an evening-long effort
> to gather several underage women, provide and serve them alcohol, and ultimately,
> sexually assault one of them."

She then repeats this conclusion as if saying it once was not enough:

> "Taken together, the facts of the night show your premeditated efforts to gather young,
> underage undergraduates, encourage them to drink alcohol, and then eventually you
> sexually assaulted one of them."

The facts in DeLaTorre's investigative file do not in any way support this aggressive conclusion about

Klee's conduct. However, her conclusion does represent her bias against the male accused, precisely

because it is so contrary to the facts in her file.

**59.**   DeLaTorre issued Klee an academic death sentence. She imposed a suspension of six semesters,

effective immediately. She stated, "To be clear, you are suspended for at least the following semesters

(and any summers or other terms in between these semesters): 1) Fall 2017, 2) Spring 2018, 3) Fall 2018,

4) Spring 2019, 5) Fall 2019, 6) Spring 2020". She stated that Rice would "consider a request from Klee

for readmission for Fall 2020." DeLaTorre stated the conditions of readmission as follows:

> "Readmission will not automatically be granted based on the passage of time. You will
> have to provide a strong case that you have received relevant counseling and education to
> address the concerning behavior and have made strides in your life that show you are ready
> to be trusted to return to Rice and live up to the high expectations Rice has for its students."
> Under these facts, Rice is justified in saying the bar will be high and the burden will be on
> you to meet it. If you are allowed to return to Rice, I may impose disciplinary probation or
> other restrictions for some portion or all of your remaining time at Rice."

**60.**   DeLaTorre's bias was indeed unbridled. She apparently felt she was immune from any criticism

from her superiors in the chain of command at Rice University. There was a reason DeLaTorre was so

unabashedly biased and free from any fear of criticism from her boss. DeLaTorre was having an affair

with her direct report supervisor during the time of this investigation. DeLaTorre's boss at Rice was

Associate Dean of Undergraduates Don Ostdeik. Ostdeik was also Rice University's Title IX

Coordinator.  On February 20, 2018, it was announced that DeLaTorre would no longer report to Ostdeik because DeLaTorre had disclosed a romantic relationship between her and Ostdeik to the Dean of Undergraduates at Rice, John Hutchinson. Hutchinson restructured the line of reporting for DeLaTorre so that she reported directly to him instead of Ostdeik. The reason given for the restructuring of the line of reporting was to avoid a conflict of interest for DeLaTorre and Ostdeik. Not surprisingly, Ostdeik announced his "retirement" in June of 2018. DeLaTorre surely had no fear that her bias would be challenged by her superior Ostdeik who she was sleeping with. She was free to wield her biased form of justice in through the Rice Student Justice Program because the Title IX Coordinator for Rice University was her boyfriend. (See **Exhibit A** - 4/17/18 Rice Thresher Article, "SJP structure changed to avoid conflict of interest following relationship."; and **Exhibit B** - 6/16/18 Rice Thresher Article, "Associate Dean of Undergraduates Don Ostdeik retiring.")

**61.**     Klee appealed this decision. The appeal was submitted to Seichi P. T. Matsuda, Dean of Graduate and Postdoctoral Studies of the E. Dell Butcher Professor of Chemistry. Matsuda denied Klee's appeal on February 9, 2018.  Matsuda was presented with a difficult task defending DeLaTorre's findings. The Klee appeal pointed out most of the inconsistencies. Klee once again accepted responsibility for providing alcohol to underage students and urged Rice to reverse DeLaTorre's inflammatory and unfounded claims that he was acting in a predatory manner against EC on the night in question. Matsuda was in a difficult position. He could see that the DeLaTorre finding that Klee sexually assaulted a drunk woman who did not have the capacity for consent was fundamentally flawed. Matsuda acknowledged the facts in the Rice file that were established more probably than not:

> "Had you not been supplying alcohol the entire evening, there are facts that could be used to argue the idea of consent. These include:
>
>   a.   E.C. agreed to leave Valhalla with you to find a more private location.
>
>   b.   She sent a text message to her friends saying, "I think I'm gonna hook up with him."

c. You both related that E.C. voluntarily climbed into the back area of your car with you.

d. There is no indication that you used force to constrain her in your vehicle or in the situation.

e. The campus parking lot was walking distance from E.C's residential college.

f. After expressing some initial reservations about sexual intercourse, E.C. agreed to "do other fun adult stuff instead," in order to continue the evening.

g. You and E.C. had extensive conversations about virginity and abortion while in your car and before intercourse occurred, suggesting her coherence.

h. Later in the encounter E.C. stated, "OK", "We can have sex." She also stated that you then asked for confirmation, "Are you sure, are you sure?" and she confirmed, and said yes."

i. She stated that she tried to guide your penis into her vagina.

j. It is uncontroverted that she received oral sex from you and twice provided you oral sex.

k. There is no suggestion that you forced E.C. into oral sex. While someone might criticize you as boorish for asking for oral sex as you drove E.C. back to her residential college, you apparently asked and she acquiesced, even if her unexpressed motives might have been anything but sexual.

l. Both Madeline Lyon and Georgia Belmont related that, though they believed E.C. was "drunk" that night, they explained that she was able to make decisions for herself. Madeline even concocted a story about an ill roommate as an excuse for her and Georgia to leave E.C. alone with you. Later, Madeline laughed (in a text message) in response to E. C's message saying she was going to hook up with you. Neither friend raised an alarm about E. C's wellbeing or attempted to locate her or forestall any sexual interaction between you and E.C.

62.    However, Matsuda reasoned that he could not look at the issue of consent, divorced from the alcohol violations. Matsuda then listed several false conclusions about Klee's actions and intentions regarding alcohol and his friends at his home that night. Several of his erroneous conclusions and the reasons they are flawed are set out here:

**Matsuda's False Conclusion:** You invited three young women to party with you at your apartment (you claim you intended the party to occur at another student's apartment but I am persuaded that Michael Hewitt's involvement had already been ruled out as early as the drive back to the dorm from the studio party).

Plaintiff Senhica Klee's First Amended Complaint

**Facts:** There is little dispute that making this a larger party was discussed among the group until about the time the women left campus in an Uber headed to Klee's apartment.

> **Matsuda's False Conclusion:** While the students went back to campus to prepare for the party, you searched for an open liquor store and then settled for a grocery store, where you purchased a "thirty-rack" of beer (not a mere six-pack) to offer to the underage women. Obtaining alcohol to provide to underage persons was your first instance of violating the alcohol policy and state law.

**Facts:** The inference that Klee bought a "thirty-rack" of beer (not a mere six-pack) is clearly disputed in the statements of the four who were at Klee's that night. The inference that Klee bought this amount of beer because he wanted to get the women drunk is false. Klee bought the larger amount of beer to take to Michael Hewitt's home should a party at his house develop. This is made clear in many of the statements of the independent witnesses.

> **Matsuda's False Conclusion:** While the women were in the pool, you went back upstairs to reload your backpack with beer.

**Facts:** There is no support in the record for this conclusion.

> **Matsuda's False Conclusion:** When the drinking ended at your apartment, it is unclear how much of the wine and how many of the thirty cans had been consumed by the women. It is safe to say it was a significant quantity given that eighteen- and nineteen-year-olds are not permitted to have any alcohol.

**Facts:** This assumption is false. The facts are the most anyone had was a glass or two of wine out of one bottle shared by 4 people and a few beers each. All the independent witnesses and EC confirmed this fact.

> **Matsuda's False Conclusion:** The evening of drinking at your apartment was apparently not enough for you so you suggested continuing the evening at a club or bar.

**Facts:** Everyone who gave a statement agreed that all Klee was trying to do was find a club where the underage women could be admitted even though they could not be served alcohol. Every Rice professor knows that the Rice Village has many such establishments.

63.     Matsuda's misinterpretation of the Klee party as a beer bust, with people getting highly intoxicated, is not accurate. Nor are his assumptions not supported in the record, that Klee was plying his

---

women guests, to "increase his chances" of having a sexual encounter. Either Matsuda did not realize or he intentionally ignored the compelling evidence that the alcohol consumption, by everyone's account, was minor to moderate. No one was overly intoxicated. Just a fun night hanging out with friends. Matsuda admits in his opinion, that if the party at Klee's apartment was just a couple of friend hanging out and having a beer, that would be a minor infraction. Matsuda compared what he thought the Klee party was, to an acceptable minor infraction of the Rice alcohol policy when he states:

> "Far from a more minor alcohol policy violation (such as when a student provides a beer to an underage classmate while hanging out), your misconduct became very serious when you used alcohol to gain sexual advantage over a fellow student."

To make this conclusion, Matsuda has to ignore the fact that the alcohol consumption was small and no one got so drunk they were unable to make good decisions. If he acknowledges these facts, then by his own definition, what happened on this night was no more than a "minor alcohol policy violation". If he acknowledges these facts, then he knows that there was no causal relationship between EC's level of intoxication and any sexual activity that night. In a continuance of Rice's biased approach to this investigation, Matsuda ignores the facts and concludes:

> "Even if I were to examine only your alcohol misconduct, I would nevertheless conclude there is no reason to overrule or modify the sanction of at least a six-semester suspension."

This is a disproportionate discipline for Klee's conduct. The overwhelming evidence is that the gathering at his home was simply a few friends having some wine and beer and swimming on Labor Day weekend. No one got sloppy drunk. No one got sick. Everyone was in full control of their faculties. It was just like the "minor alcohol policy" Matsuda referenced in his appeal denial letter. Matsuda got it wrong on alcohol. He got it wrong because he was supporting DeLaTorre was on a crusade against Klee because he was a male accused of sexual misconduct. The reason for that crusade was DeLaTorre's bias in favor of women who report sexual misconduct and against men accused. Matsuda had to join this crusade because, as discussed below, Rice had a sexual assault Title IX problem that needed to be addressed.

64.     Matsuda goes on in his appeal denial letter to state that he could not separate the alcohol violations from the sexual misconduct allegations. He adopts DeLaTorre's baseless conclusion that Klee used alcohol to obtain a sexual advantage. There is no evidence of this intent. Finally, Matsuda adopts the "split second" consent theory created by DeLaTorre. Without reference to any part of the Rice Code of Conduct he states that by definition, Klee did not have consent to penetrate EC's anus because he first inserted his fingers and then asked if she liked that sensation. As pointed out above, this is contrary to Rice University's own definition of "consent" for the purposes of sexual activity. The lack of reasonable rational for the "split second" rule is grounds for a valid inference that this reasoning is pre-textual and that the actual reason Rice took this position and suspended Klee, was for discriminatory purposes.

65.     On April 4, 2011, the Obama administration issued a letter to all institutions of higher learning who received Title IX funds. This letter was a game changing directive issued by Secretary of Education Arne Duncan. The letter stated that Title IX required schools to investigate sex assault allegations under a "preponderance of the evidence" standard. The letter made it clear that the office of OCR and the Department of Education would be monitoring compliance of universities with this directive, and if it was found that any university was not compliant with this directive, the school could lose its Title IX funding. Upon information and belief, Rice University was receiving millions of dollars of Title IX funding after April of 2011 and until the time of the Klee/EC investigation. The 2011 directive came in response to reports across the country that universities were unresponsive, and in some cases dismissive of reports of sexual assault on campus. Many of these stories involved cover-ups for star athletes accused of sexual assault on campus. The Rice newspaper, The Thresher, reported that of the 70 students who sought support from the Title IX office for domestic or sexual violence in the 2016-2017 academic year, only seven students reported to Student Judicial Programs, the agency directed by DeLaTorre. This statistic creates the appearance that victims of sexual violence didn't trust the Student Judicial Program to aggressively and fairly investigate and take action on their complaints. Seventy incidences of reported

sexual violence also indicated Rice was not doing enough to protect its students, particularly women. From 2015 to 2016 reported incidents of domestic violence, dating violence, and stalking nearly tripled according to the Rice Clery Safety Report in 2018.  That report also reported that there were 31 rapes on campus in 2016. That number was an increase from 7 in 2015. Rice had a three fold sexual assault problem in 2016. Sexual violence was exploding on the campus. The confidence level in the Student Judicial Program was low. The Department of Education was watching universities who were not doing enough to investigate sexual offenses on campus and threatening to revoke Title IX funding. All this was going on as a backdrop to the Klee investigation. The stakes were high. Title IX money was on the line. The Clery Act required Rice to make these sexual violence statistics public, thereby undermining confidence of parents and prospective students who wanted a safe campus. It is a reasonable inference, that as a result of these economic pressures, Rice made a decision to get more aggressive regarding the prosecution of alleged sexual misconduct. As a result of that decision, they decided to give the female complainants more leeway and less scrutiny regarding the veracity of their complaints and prejudge that the male accused was guilty. In the case of Klee, that decision cost him his academic career and a chance for the post graduate degree he had worked so hard to obtain.

66.     Klee left Rice University. He was just short of obtaining his post graduate degree. That degree would open doors in his chosen field, music. His life's professional plans were now in tatters. Klee did not just go home and give up. He applied to several other universities. He applied to the graduate program at Indiana University. He knew one of the senior professors on the faculty there and she went to bat for him. Indiana at first was glad to accept him and offered him a full ride scholarship. Then, when Indiana learned of Rice's findings in their sham investigation, Indiana revoked their offer and said no. Klee also applied at Yale. He had performed for some of the faculty there in the past. He knew they appreciated his talent. That application died on the vine after Yale started asking questions about Rice. Klee did not quit even then. He knew the director of the University of Carolina School of Arts. The Director invited

his application even after Klee made full disclosure of the Rice debacle. University of Carolina sent him a letter of acceptance and offered a full ride scholarship. Then, several meetings of the faculty were held to discuss accepting Klee. Apparently, after much debate, the offer of acceptance and a scholarship were rescinded. Since being kicked out of Rice,  Klee has been living with his parents doing odd jobs, singing when he can and surviving.

**IV.**
**TITLE IX PRIVATE ACTIONS- RICE DECISION WRONG-MOTIVATED OR CAUSED BY DISCRIMINATORY INTENT**

**67.**     The above referenced paragraphs are incorporated herein for all purposes and in support if this claim that Rice violated Title IX when they suspended Klee and as a proximate result, he has suffered damages in excess of the minimum jurisdiction of this Court. The Rice investigation of EC's complaint against Klee was rife with internal bias in favor of EC and against Klee in whole or in part because EC was a woman making a report of sexual misconduct and Klee, a male, was the object of that report. This bias permeated every aspect of the investigation. Rice professes to conduct fair investigations into reports of sexual misconduct. The investigation of EC's complaint was not conducted in accordance with the Rice policy.  The finding of sexual misconduct in contrary to Rice's policy on sexual conduct. It is a fair inference that the reason the Rice policy of fairness and even handedness was not followed in this case, was in whole, or in part,  a result of an institutional and intentional bias on the part of Rice to appear to be the champions of victims of sexual assault, and to repair their declining reputation as a safe campus. It is a fair inference that the bias throughout the Klee investigation was driven by Rice's fear that if they didn't give women the benefit of the doubt on claims of sexual misconduct and aggressively prosecute males accused, they ran the risk of losing their Title IX money.  The vast majority of complainants of sexual misconduct are women. The vast majority of persons accused of sexual misconduct are men. Rice's actual policy of being biased in favor of alleged victims of sexual misconduct during investigations is a violation

of Title IX and results in intentional discrimination against male students, in particular Klee, who are accused of sexual misconduct.

**V.**
**TITLE IX- DISPROPORTIONATE DISCIPLINE ON THE BASIS**
**OF SEX-ALCOHOL VIOLATIONS**

**68.**     Klee incorporates by reference all paragraphs above in support of this cause of action. Klee provided beer and wine to undergraduate, under-age female students. Rice University has stated that even if EC's complaint had not included a sexual component, Rice would have disciplined Klee in the same manner. Rice admits that casual drinks between students, some of which are of age and some of which are not, is a minor violation. Rice's decision to essentially issue an academic death penalty to Klee for a minor alcohol violation of Rice's Student Conduct Code, is disproportionately severe. The severity of that punishment is the result of Rice's biased investigation and flawed rationale that reveals a bias against men who are accused of sexual misconduct and in favor of women who report sexual misconduct. The vast majority of persons who report sexual misconduct are women at Rice. The vast majority of persons who are accused of sexual misconduct at Rice are men. Rice's biased policy against men accused of sexual misconduct caused it give Klee a much more severe punishment for his alcohol violations compared to others who committed the same alcohol violations.  Rice's claim that the punishment they gave Klee was appropriate for his admitted alcohol violations, is a pretext for discrimination on the basis of sex in violation of Title IX. Rice's disproportionate punishment of Klee was intentional and driven by a bias against men accused of sexual misconduct. Rice's bias against men accused of sexual misconduct was motivated by a need to protect their Title IX funding and repair its declining reputation as a safe campus free from sexual violence. As a result of this violation of Title IX, Klee has suffered damages recoverable under a private action authorized under Title IX.

## VI.
## DAMAGES

**69.**     Klee has suffered greatly as a proximate result of Rice's violations of Title IX. He has suffered economic loss in the past that was proximately caused by Rice's violations of Title IX. In reasonable probability Klee will suffer economic loss in the future as a proximate result of Rice's violations of Title IX. Klee has suffered personally as a proximate result of Rice's violation of Title IX. Klee has suffered compensable mental anguish in the past as a proximate result of Rice's violation of Title IX. Klee will continue, in reasonable probability, to suffer compensable mental anguish in the future as a proximate result of Rice's violations of Title IX. Klee claims all elements of damage allowed under the law controlling a private action under Title IX including but not limited to actual damages, pre-judgement and post judgement interest, attorney's fees and litigation costs and any other remedy, in law or in equity to which he shows himself justly entitled.

## VII.
## JURY TRIAL DEMAND

**70.**     The Plaintiff hereby demands that this case be presented to a jury at the time of trial and that the jury decide all presented issues of fact.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff, Senhica Klee prays that this honorable Court set this case for trial and upon a trial on the merits, award full and fair compensation to Plaintiff Senhica Klee, including all elements of damage allowed under the law controlling a private action under Title IX actual damages, pre-judgement and post judgement interest, attorney's fees, costs of litigation, costs of court, and all other relief to which he may show himself justly entitled.

Plaintiff Senhica Klee's First Amended Complaint

Respectfully submitted,

**MIKE KERENSKY, PLLC**

By: */s/ Michael W. Kerensky* .
  Michael W. Kerensky
  SDOT Bar No: 4446
  SBOT Bar No. 11331500
  The Lyric Centre
  440 Louisiana, Suite 2300
  Houston, Texas 77002
  713-228-5100 office
  713-228-6138 fax
  mike@kerenskylawfirm.com

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that a true and correct copy of the foregoing instrument has been filed electronically via the operation of the Court's electronic filing system following the e-filing protocols for The United States District Court for the Southern District of Texas, Houston Division, serving all counsel of records on March 16, 2020.

Lorinda G. Holloway
Scott D. Schneider
Paige C. Duggins-Clay
HUSCH BLACKWELL LLP
111 Congress Avenue, Suite 1400
Austin, Texas 78701
scott.schneider@huschblackwell.com
paige.duggins-clay@huschblackwell.com
lorinda.holloway@huschblackwell.com

**ATTORNEYS FOR DEFENDANT**
**WILLIAM MARSH RICE UNIVERSITY**

        */s/ Michael W. Kerensky* ____
        **Michael W. Kerensky**