**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **SENHICA KLEE** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **CASE NO: 4:20-CV-441** |
| | § | |
| **WILLIAM MARSH RICE UNIVERSITY** | § | |
| *Defendant.* | § | |

**PLAINTIFF SENHICA KLEE'S RESPONSE TO**
**DEFENDANT WILLIAM MARSH RICE UNIVERSITY'S MOTION TO DISMISS**

Plaintiff Senhica Klee, respectfully requests the Court deny Defendant's Motion to Dismiss

Plaintiff's Complaint, brought forth pursuant to Federal Rule of Civil Procedure 12(b)6.

## <u>Table of Contents</u>

<u>**PAGE**</u>

**TABLE OF AUTHORITIES** ...................................................................................3

**I.   INTRODUCTION** .............................................................................................8

**II.   SUMMARY OF ARGUMENT** .......................................................................8

**III.   STATUTE OF LIMITATIONS** .....................................................................8

**IV.   FAILURE TO STATE A CLAIM** ..............................................................21

    **A.   The Standard**.................................................................................... 21

    **B.   Other Title IX Cases** ....................................................................... 21

    **C.   Evidence of Intention** ...................................................................... 23

    **D.   The "similarly situated female accused"**........................................ 27

    **E.   Courts should not second guess school disciplinary process**......... 28

    **F.   Klee's First Amended Complaint Satisfies the threshold of Twombly/Iqbal**. .............................................................................. 31

**CONCLUSION AND PRAYER** .......................................................................32

**CERTIFICATE OF SERVICE** ........................................................................32

## TABLE OF AUTHORITIES

**Cases** ...........................................................................................................**Page(s)**

*Adler v. Beverly Hills Hosp*.,
   594 S.W.2d 153, 155..........................................................................13

*Alexander v. Sandoval*,
   121 S. Ct. 1511 (2001).......................................................................24

*Arquette v. Hancock*,
   656 S.W.2d 627, 629...........................................................................13

Ashcroft v. Iqbal, 556 U.S.
   662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)..........................18

Bell Atl. Corp. v. Twombly,
   550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ....................18,19

*Bhalli v. Methodist Hosp*.,
   896 S.W.2d 207, 212 ...........................................................................13

*Board of Regents v. Tomanio*,
   100 S. Ct. 1790 (1980)................................................................ 12, 13

*Chance v. Rice Univ*.,
   984 F.2d 151 (5th Cir. 1993) ...............................................................23

*Clark v. Resistoflex Co., Div. of Unidynamics Corp*.,
   854 F.2d 762 .......................................................................................15

*Collick v. William Paterson Univ*.,
   No. 16-471 (KM) (JBC).......................................................................19

*Cordova v. Univ. of Notre Dame Du Lac*,
   936 F. Supp. 2d 1003 (N.D. Ind. 2013) ...............................................18

Corp. v. Inspire Ins. Solutions, Inc.,
   365 F.3d 353, 362 (5th Cir. 2004) .......................................................19

*Cuvillier v. Taylor*,
   503 F.3d 397, 401 (5th Cir. 2007) .......................................................18

*Davis ex rel LaShonda D. v. Monroe Cty. Bd. of Educ.,*
    526 U.S. 629, 648, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999) ...........................27

*Davis v. Monroe Cty. Bd. of Educ.,*
    526 U.S. 629, 648, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999) ............. 21, 26, 27

*Doe v. Baum,*
    903 F.3d 575 (6th Cir. 2018) ...............................................................19

*Doe v. Brown Univ.,*
    166 F. Supp. 3d 177 (D.R.I. 2016) .....................................................19

*Doe v. Columbia Univ.,*
    831 F.3d 46, (2d Cir. 2016) ...............................................................19

*Doe v. Lynn Univ., Inc.,*
    No. 9:16-CV-80850, 2017 U.S. Dist. LEXIS 7528 (S.D. Fla. 2017)..................20

*Doe v. Washington and Lee Univ.*
    No. 6:14-CV-00052, 2015 U.S. Dist. LEXIS 102426 (W.D. Va. Aug. 5, 2015).19

*First Gen. Realty Corp. v. Maryland Cas. Co.,*
    981 S.W.2d 495, 501 .........................................................................13

*Flaim v. Med. Coll. of Ohio,*
    418 F.3d 629, 635 n.1 (6th Cir. 2005) .................................................27

*Floridia v. DLT 3 Girls, Inc.,*
    No. 4:11-cv-3624, 2012 U.S. Dist. LEXIS 61748, at *3-5 (S.D. Tex. 2012) ......18

*Floyd v. Amite Cty. Sch. Dist.,*
    581 F.3d 244 (5th Cir. 2009) ................................................. 5, 6, 7, 8

*Gebser v. Lago Vista Independent School District,*
    524 U.S. 274, 290-91, 118 S. Ct. 1989, 141 L. Ed. 2d 277 (1998).....................21

Goss v. Lopez,
    419 U.S. 565, 574, 95 S. Ct. 729, 42 L. Ed. 2d 725 (1975) ................................28

*Green v. Brennan,*
    136 S. Ct. 1769 (2016).......................................................................11

*Gudgel v. Del Mar Coll.,*
No. 2:16-CV-513, 2018 U.S. Dist. LEXIS 8130 (S.D. Tex. 2018).....................17

*Hartz v. Adm'rs of the Tulane Educ. Fund*,
275 F. App'x 281, 283 (5th Cir. 2008)..................................................14

*Holmes v. Tex. A&M Univ.,*
145 F.3d 681 ........................................................................... 14, 15

*King v. Depauw Univ.,*
No. 2:14-cv-70-WTL-DKL, 2014 U.S. Dist. LEXIS 117075 (S.D. Ind. 2014)...24

*Ledbetter v. Goodyear Tire & Rubber Co.,*
127 S. Ct. 2162 (2007)..........................................................................10

*Manley v. Tex. S. Univ.,*
107 F. Supp. 3d 712 (S.D. Tex. 2015)..................................................24

*Neal v. Colo. State Univ.-Pueblo,*
Civil Action No. 16-cv-873-RM-CBS, 2017 U.S. Dist. LEXIS 22196
(D. Colo. 2017) ................................................................... 19, 21

*New Jersey v. T. L. O.,*
supra, at 342-343, n. 9." ....................................................................29

*Oirya v. Auburn Univ.,*
2019 U.S. Dist. LEXIS 170975 ..................................................... 16, 17

*Pederson v. La. State Univ.,*
213 F.3d 858, 880-881, (5th Cir. 2000)........................................ 20, 21

*Plummer v. Univ. of Hous.,*
860 F.3d 767 (5th Cir. 2017). In *Plummer* ..................................... 27, 28

R2 Investments LDC v. Phillips,
401 F.3d 638, 642 (5th Cir. 2005) ......................................................19

*Ricks v Delaware State College*,
101 S.Ct. at 498, (1980), 504 n.9......................................................6, 8

*Ritter v. Okla. City Univ.,*
No. CIV-16-0438-HE, 2016 U.S. Dist. LEXIS 95813 (W.D. Okla. 2016)..........19

*Roberts v. United States Jaycees,*
  468 U.S. 609, 625, 82 L. Ed. 2d 462, 104 S. Ct. 3244 (1984) .............................21

*Ross v. Univ. of Tulsa,*
  180 F. Supp. 3d 951 (N.D. Okla. 2016) ................................................................21

*Rubin v. O'Koren,*
  644 F.2d 1023 (5th Cir. 1981) ...................................................................... 11, 12

*Soignier v. Am. Bd. of Plastic Surgery,*
  92 F.3d 547, 549-50 (7th Cir. 1996) .....................................................................18

*Tolliver vs. Prairie View A&M Univ.*
  No.1192, 2018 WL 4701571 ..................................................................................15

*Twyman v. Twyman,*
  790 S.W.2d 819, 820-21 .........................................................................................13

*Wells v. Xavier*
  7 F. Supp. 3d 746, (S.D. Ohio 2014) .............................................................. 19, 20

*Williams v. Franklin & Marshall Coll.,*
  No. Civ. A. 99-0234, 2000 U.S. Dist. LEXIS 691, 2000 WL 62316 ...................19

*Wood v. Strickland,*
  420 U.S. 308, 326, 95 S. Ct. 992, 43 L. Ed. 2d 214 (1975) .................................27

## Federal cases

*United Papermakers and Paperworkers v. United States,*
  416 F.2d 980, 996 (5th Cir. 1969) .........................................................................21

*United States v. Balistrieri,*
  981 F.2d 916, 936 (7th Cir. 1992) .........................................................................21

*United States v. Koon,*
  34 F.3d 1416, 1449 (9th Cir. 1994) .......................................................................21

*United States v. Virginia,*
  518 U.S. 515, 533, 135 L. Ed. 2d 735, 116 S. Ct. 2264 (1996) ...........................21

## Statutes

42 U. S. C. § 1981 ........................................................................... 12, 15

Civil Rights Act §1983 ...........................................................................11

## I.   **INTRODUCTION**

Rice claims in its Motion to Dismiss that Klee's case was untimely and therefore barred by the statute of limitations and that his complaint is not sufficient to state a private cause of action under Title IX. For the reasons stated below, that Motion to Dismiss should be in all things denied.

## II.   **SUMMARY OF ARGUMENT**

A.    Plaintiff's Complaint was timely pursuant to *Floyd v. Amite Cty. Sch. Dist*., 581 F.3d 244 (5th Cir. 2009). Further, under the continuing tort doctrine recognized under Texas law, Plaintiff's claim did not accrue until February 9, 2018. Plaintiff filed his Original Complaint on February 8, 2020, within the two-year statute of limitations.

B.    Plaintiff's Complaint sufficiently states facts and allegations that meet the Twombly/Iqbal standard and clearly state a claim for damages under Title IX.

## III.   **STATUTE OF LIMITATIONS**

Rice contends that Klee's Complaint is untimely. Rice relies upon *Delaware State College v Ricks*, 101 S.Ct. 498, (1980) and several cases relying on the reasoning in *Ricks*. Rice claims that the report compiled by Lisa DeLaTorre on October 24, 2017 marks the accrual of all Klee's causes of action and therefore the two-year statute of limitations started running at that time. Rice ignores the fact that Klee's complaint alleges that the Klee's appeal of DeLaTorre's decision concluded on February 9, 2018 and is part of the gender biased discriminatory actions taken by Rice in violation of Title XI. Rice argues that under *Ricks* and its progeny, notice of Rice's allegedly biased findings and the issuance of the suspension in October of 2017 is all that is required to start the statute of limitations clock. Rice is just wrong.

In *Floyd v. Amite Cty. Sch. Dist*., 581 F.3d 244 (5th Cir. 2009), the Fifth Circuit was faced with a nearly identical situation to Klee's. Mr. Floyd was the principal of a High School. He was first suspended on October 10, 2002 and then terminated on November 15, 2002. Floyd appealed

the termination decision to the local school board. The school board issued a confirmation of Floyd's termination on July 11, 2003. Floyd filed his charge of discrimination on October 9, 2003. The district court dismissed Floyd's case finding that he had not timely filed his EEOC complaint relying on the language in *Ricks* that held, "the pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations periods." 449 U.S. 250, 101 S.Ct 498, 506, 66 L. Ed. 2d 431 (1980)" This is the same language relied upon by Rice in support of its statute of limitations argument.

The Fifth Circuit in *Floyd* succinctly stated the question before them, "Therefore, Floyd's charge was timely only if we conclude that the School Board's decision was the relevant "alleged unlawful employment practice" for purposes of commencing the limitations period." *Floyd v. Amite Cty. Sch. Dist.,* 581 F.3d 244, 248 (5th Cir. 2009). The *Floyd* Court correctly distinguished that case from the facts in *Ricks*.

> However, two key factors distinguish this case from Ricks. First, the Supreme Court in Ricks carefully examined the plaintiff's complaint to specifically identify the unlawful employment practice being alleged. Id. at 503-04. Further, the Supreme Court acknowledged the possibility that a "continuing violation" of Title VII might delay the running of the limitations period. Id. at 504. In Ricks, the plaintiff was denied tenure and terminated as a matter of course over a year later, but he only alleged discrimination in relation to the tenure decision. Id. at 501-02. The Court noted:
>
>> If Ricks intended to complain of a discriminatory discharge, he should have identified the alleged discriminatory acts that continued until, or occurred at the time of, the actual termination of his employment. But the complaint alleges no such facts... In sum, the only alleged discrimination occurred -- and the filing limitations periods therefore commenced -- at the time the tenure decision was made and communicated to Ricks. Id. at 504.
>
> In contrast, Floyd specifically alleged that Russ, Davis and others colluded to oust him as coach and principal based on his association with white students. This alleged concerted campaign began with the implementation of the dual position policy and culminated in the School Board's decision to terminate him. Therefore, unlike the plaintiff in Ricks, Floyd does specifically allege that his termination by the School Board was the final act in a continuing violation of his rights.
> *Floyd v. Amite Cty. Sch. Dist*., 581 F.3d 244, 248-249 (5th Cir. 2009)

Plaintiff, Senhica Klee's Response to Defendant's Motion to Dismiss

This exact distinction exists for Klee's allegations. Klee complains that the entire process of the investigation and decision making regarding his suspension was flawed and biased on the basis of gender. He alleges that DeLaTorre's analysis was wrong in October of 2017. He alleges that Dean Matsuda's final decision on Klee's appeal issued on February 9, 2018 was flawed as a result of institutional bias by Rice against males accused in Title IX sexual misconduct. Klee filed his Complaint within two years of the conclusion of his appeal of DeLaTorre's findings to Dean Matsuda.

The *Floyd* Court insightfully noted that in footnote 9 of the *Ricks* decision, the Supreme Court limited its holding to the facts before it and cautioned future courts to carefully consider the facts of each case:

> "Complaints that employment termination resulted from discrimination can present widely varying circumstances. In this case, the only alleged discriminatory act is the denial of tenure sought by a college professor, with the termination of employment not occurring until a later date. The application of the general principles discussed herein necessarily must be made on a case-by-case basis."
> *Ricks v Delaware State College*, 101 S.Ct. at 504 n.9.
> *Floyd v. Amite Cty. Sch. Dist.*, 581 F.3d 244, (5th Cir. 2009) n.2

The *Floyd* Court found a second distinguishing fact from *Ricks*. In *Ricks*, the ultimate authority on granting tenure resided with the Board of Trustees. It was the notification to Ricks that tenure had been denied, ratified by the Board of Trustees at that time, that triggered the running of the statute of limitations. However, the ultimate authority in *Floyd* was the local school board, the entity to which he appealed for relief. Therefore, the recommendation to fire Floyd by the local superintendent was not the official position of Floyd's employer. It was only after his appeal had concluded with the local school board that the final decision was issued on his termination by the final authority.

The same is true for Klee. DeLaTorre was an investigator and director for the Rice Student Judicial Program. Her decision was subject to review, amendment and/or reversal upon appeal to

the final decision maker in the Rice administration, Dean Matsuda. DeLaTorre's letter in October of 2017 clearly states this.

> You have 10 business days from the date of this letter to appeal the decision. Any appeal should be limited in page length to eight pages (the number of pages of this decision letter) and addressed to the dean of graduate and postdoctoral studies, matsuda@rice.edu, cc'ed to sjp@rice.edu, and ugdean@rice.edu. Failure to follow these instructions for your appeal may impact consideration given to your appeal. **Disciplinary sanctions are not stayed during the appeal; your suspension begins immediately, even if you choose to appeal.** This means you are prohibited from having any involvement in any Rice activities, on or off campus, including any production, rehearsals, performance, lessons, tutorials, etc. While more information about appealing a decision is available in the Rice University Code of Student Conduct, the bases for appeal are outlined below:

>> F. APPEALS. Decisions can be appealed by the student charged and, in some cases, by the reporting student.

>> 1. Bases for appeals. If an appeal is not based on one of these reasons, the appellate official may dismiss the appeal, at the official's discretion:

>>> a. to determine whether the decision by the University Court, College Court, or Student Judicial Programs was reached fairly in the light of the charges and information available;

>>> b. to consider new information that might have altered the result but was unknown to the University Court, College Court, or Student Judicial Programs, and could not have been reasonably discovered at the time of the adjudication;

>>> c. if the information submitted to the University Court, College Court or Student Judicial Programs did not support the decision; or

>>> d. if the sanctions imposed were inappropriate. (Ex. 1; October 24, 2017 DeLatorre Letter)

The Rice Code of Student Conduct states that when an investigation is handled by the Student Judicial Programs branch of the university, its decisions are appealable to the Dean of Graduate and Postdoctoral Studies in cases involving graduate students. (Ex. 2; Rice Code of Conduct, P. 23, (F)(6). This is not the case for all matters adjudicated under the Rice Code of Student Conduct. Appeals from a "University Court" decision are made to the Director of Student

Judicial Programs, ie…DeLaTorre. (Ex. 2; P 23, (F)(2)(3)). "College Court" decisions are appealed to a person called the "Magister". ((Ex. 2; P 23, (F)(4)). Decisions by a Magister are appealed to the Director of Student Judicial Programs, except for decisions to "rusticate" which can be appealed only to the Dean of Undergraduates. ((Ex. 2; P 23, (F)(5)) Under this Code of Student Conduct, sometimes DeLaTorre is the final decision maker and sometimes she is not. In the Klee case, DeLaTorre was not the final decision maker or authority for Rice. By Rice's own Code of Student Conduct, Dean Matsuda had that sole power. Just as the local school board had the final authority in *Floyd*, Matsuda had the final authority for Klee.

In fact, Dean Matsuda did exercise that power and modified Rice's final position regarding Klee. (Ex. 3, 2018-02-09, Matsuda Final Appeal Decision) Among other changes, Matsuda conceded that the Klee/EC encounter was in all probability consensual and that EC did not lack the power to consent because of intoxication. Despite these concessions, Matsuda confirmed the sanction recommended by DeLaTorre. Matsuda unquestionably had the power to alter the sanctions or overturn DeLaTorre's findings in their entirety. He did not and Klee specifically alleges that his decision to not reverse the severe sanctions against Klee was part and parcel of the entire biased investigation against Klee. Further, Klee alleges that in view of Matsuda's concession that simply providing some beers to an undergraduate was a minor infraction, he issued the severe sanction of suspension for multiple semesters. Klee alleges that this punishment was disproportionate and a result of bias against him as a male accused of sexual misconduct.

The 5th Circuit in *Floyd* went on to find that the date of resolution of Floyd's appeal to the school board regarding his termination was the operative date for determining when Floyd's cause of action accrued. Therefore, Floyd's EEOC filing was timely and the District Courts dismissal

based upon the statute of limitations was reversed.[1] The same is true for Klee. His cause of action,
accrued on February 9, 2018 and his complaint was filed less than two years after that date.

The application of the two-year statute of limitations to Title IX cases is a fact intensive
process that does not lend itself to cut and dried rules wrongfully applied in this case by Rice. The
U.S. Supreme Court acknowledged that in the *Ricks* decision. Congress has also recognized this
problem. When the Supreme Court affirmed the finding of *Ricks* and applied it to the situation in
*Ledbetter v. Goodyear Tire & Rubber Co.*, 127 S. Ct. 2162 (2007) the result was harsh. In applying
the *Ricks* rule to the *Ledbetter* facts, the Court denied Lilly Ledbetter her ability to make her fair
pay claim. Congress was so aggrieved by this result that they passed the Lilly Ledbetter Fair Pay
Act of 2009".  Congress specifically found and wrote into this law the following:

> The Supreme Court in Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618
> (2007), significantly impairs statutory protections against discrimination in
> compensation that Congress established and that have been bedrock principles of
> American law for decades. The Ledbetter decision undermines those statutory
> protections by unduly restricting the time period in which victims of discrimination
> can challenge and recover for discriminatory compensation decisions or other
> practices, contrary to the intent of Congress. 42 USC 200e-5; Public Law 111-2,
> 111th Congress

The U.S. Supreme Court has also endeavored, beyond its admonition in the *Ricks* opinion,
to warn courts not to stretch the application of the ruling of *Ricks* too far. In *Green v. Brennan*,
136 S. Ct. 1769 (2016), a wrongful termination case, the Supreme Court distinguished the ruling
in *Ricks* from the facts in Green and further explained the rational and limitations of the ruling in
*Ricks*:

> In Ricks, for example, the Court considered the discrimination claim of a college
> faculty member who was denied tenure and given a 1-year "'terminal'" contract for
> his last year teaching. 449 U. S., at 258, 101 S. Ct. 498, 66 L. Ed. 2d 431. The
> plaintiff's claim accrued—and he could have sued—when the college informed him
> he would be denied tenure and gave him "explicit notice that his employment would
> end" when his 1-year contract expired. Ibid. The Court held that the limitations
> period began to run on that date, and not after his 1-year contract expired. That final

---

[1] The 5th Circuit in *Floyd* affirmed the dismissal of Floyd's case based on a failure to state a claim.

year of teaching was merely an ***inevitable consequence*** of the tenure denial the plaintiff claimed was discriminatory. (emphasis added)
*Green v. Brennan*, 136 S. Ct. 1769, 1780-81 (2016)

The result of Klee's appeal of the DeLaTorre findings was not an "inevitable consequence". Matsuda could and did modify DeLaTorre's findings. Further, Klee has alleged that Rice's entire investigation and all findings and sanctions against him, including the appeal process and Matsuda's findings, were biased and in violation of Title IX. This distinguishes the Klee facts from an application of the *Ricks* rule. Klee filed his Complaint prior to the two-year anniversary of the Matsuda final appeal determination. For these reasons alone, Rice's statute of limitations argument fails, and Klee's complaint was timely filed.

The Fifth Circuit has long recognized that certain fact situations are not controlled by the *Ricks* rule. In *Rubin v. O'Koren*, 644 F.2d 1023 (5th Cir. 1981) the timeliness of the filing under Alabama's one-year statute of limitations was at issue. *Rubin* was a wrongful termination case under the Civil Rights Act §1983. On February 14, 1975, the university notified Rubin that upon expiration of her current contract in September of 1975, it would not be renewed for the succeeding year. Rubin remained employed until March 12, 1976. On October 11, 1977, Rubin filed her complaint. Citing the *Ricks* rule, the district court dismissed the case, stating that the notice of the dismissal in February of 1975 started the running of the one-year statute of limitations. The Fifth Circuit disagreed and refused to apply the *Ricks* rule. The Court recognized that:

> Unlike the complaint in Ricks, Rubin's complaint alleges numerous injurious acts that occurred in the period between, and including, her termination notification on February 14, 1975, and her last day of employment on March 12, 1976. The Ricks Court found that the limitations period began to run upon initial notice and not upon the last day of employment because "the only alleged discrimination (injurious act) occurred … at the time the tenure decision was made and communicated to Ricks." 101 S. Ct. at 504. Such is not the case with Rubin.
> *Rubin v. O'Koren*, 644 F.2d 1023, 1025 (5th Cir. 1981)

The same distinguishing facts are present in Klee's case. Klee complains that the appeal process after DeLaTorre's October 2017 letter was also tainted with illegal gender bias and discriminatory conduct.

The Fifth Circuit also recognized in *Rubin* that the application of a state's statute of limitations to a federal cause of action must also include the state's common law provisions tolling the statute of limitations or defining when a cause of action accrues, citing *Board of Regents v. Tomanio*, 100 S. Ct. 1790 (1980).  Following *Tomanio*, the Fifth Circuit in *Rubin* drew on the Alabama statute that tolled the statute of limitations during the pursuit of a grievance procedure. *Tomanio* commands that Courts look to the general laws of the governing state regarding the application of statutes of limitations:

> In another action subject to §1988, we held that the state statute of limitations and the state tolling rules governed federal actions brought under 42 U. S. C. § 1981 except when "inconsistent with the federal policy underlying the cause of action under consideration." *Johnson v. Railway Express Agency, Inc*., supra, at 465. We there restated the general principle that since there was no specifically stated or otherwise relevant federal statute of limitations for the federal substantive claim created by Congress in that case, "the controlling period would ordinarily be the most appropriate one provided by state law." 421 U.S., at 462, and cases cited therein. We went on to observe that this "borrowing" logically included rules of tolling:
>
>> "Any period of limitation . . . is understood fully only in the context of the various circumstances that suspend it from running against a particular cause of action. Although any statute of limitations is necessarily arbitrary, the length of the period allowed for instituting suit inevitably reflects a value judgment concerning  the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones. In virtually all statutes of limitations the chronological length of the limitation period is interrelated with provisions regarding tolling, revival, and questions of application. In borrowing a state period of limitation for application to a federal cause of action, a federal court is relying on the State's wisdom in setting a limit, and exceptions thereto, on the prosecution of a closely analogous claim."
>> Id., at 463-464.
>
> *Bd. of Regents v. Tomanio*, 100 S. Ct. 1790, 1795-96 (1980)

Texas has recognized the doctrine of continuing tort. Under the continuing tort doctrine, the tortious action of a defendant can include more than one act over time. A "continuing tort" does not accrue until the tortious activity ceases. *First Gen. Realty Corp. v. Maryland Cas. Co.,* 981 S.W.2d 495, 501 (Tex. App.--Austin 1998, pet. denied); see *Twyman v. Twyman*, 790 S.W.2d 819, 820-21 (Tex. App.--Austin 1990), rev'd on other grounds, 855 S.W.2d 619, (Tex. 1993); see also *Arquette v. Hancock*, 656 S.W.2d 627, 629 (Tex. App.--San Antonio 1983, writ ref'd n.r.e.) (civil rights violations); *Adler v. Beverly Hills Hosp*., 594 S.W.2d 153, 155 (Tex. Civ. App. 1980, no writ) (false imprisonment cases).  However, the doctrine only applies if the last tortious act falls within the limitations period. *Bhalli v. Methodist Hosp*., 896 S.W.2d 207, 212 (Tex. App.--Houston [1st Dist.] 1995, writ denied); see *First Gen. Realty Corp*., 981 S.W.2d at 501.[2]

The continuing tort doctrine has applicability here. The investigation of Klee started in September of 2017. Klee has alleged that the manner in which the investigation and appeal was conducted from start to finish was indicative of a gender bias against him in violation of Title IX. The initial finding that Klee had violated the student conduct code at Rice came on October 24, 2017. Klee alleges in his complaint that the findings and discipline given at that time were discriminatory and biased on the basis of gender. The investigator, fact finder and disciplinarian from the start of the investigation to October 24, 2017 had been DeLaTorre. Rice Student Code of Student Conduct provided for an appeal to the Rice administration. Klee reasonably hoped and believed that DeLaTorre's biased findings and sanctions would be overturned by the Rice Administration. Certainly, it is reasonable to believe that the Rice administration would not endorse DeLaTorre's discriminatory behavior. Klee sought redress from the Rice administration and specifically from Dean Matsuda. Matsuda found flaws in DeLaTorre's findings but did not alter the result. Klee alleges that Matsuda's final decision to ratify the sanctions issued by

---

[2] the Texas Supreme Court has reserved judgment on whether it would recognize the continuing tort concept. See *Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 815, (Tex. 2005)

DeLaTorre while admitting that DeLaTorre was largely wrong in her factual findings, was biased on the basis of gender. Matsuda's final decision was issued on February 9, 2018. Klee filed his Original Complaint on February 8, 2020, within two years of Matsuda's final decision. Klee's Complaint clearly alleges that the entire process of Rice's investigation, findings, sanctions and appeal of those sanctions was all driven by a gender bias against Klee as a male accused of sexual misconduct. This is a continuing tort and provides a second basis for denying Rice's Motion to Dismiss based on a limitations defense.

Rice's authority is largely based on cases that mechanically applied the *Ricks* rule. *Hartz v. Adm'rs of the Tulane Educ. Fund*, 275 F. App'x 281, 283 (5th Cir. 2008), notably decided before *Floyd v. Amite Cty. Sch. Dist*., *supra*, is such an example. In *Hartz*, the plaintiff was denied tenure. She appealed her denial of tenure and initially won that appeal, only to have the new provost review her file and again deny her tenure again. Professor Hartz argued that this distinguished her case from the *Ricks* rule. Had the court applied the *Floyd* analysis to *Hartz*, it should have reached a different result. Unfortunately, the 5th Circuit simply stated that *Ricks* rule, however unfair to Professor Hartz, was the rule, and dismissed her case. The same is true for the Pre-*Floyd* opinion of *Holmes v. Tex. A&M Univ*., 145 F.3d 681 (5th Cir. 1998) Holmes filed both an EEOC complaint and pursued a grievance with the board of regents regarding his termination. Holmes argued that his claim did not accrue until the board of regents confirmed his termination. The Holmes Court relied heavily upon the rule stated in *Ricks*, ""the pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations period." *Holmes v. Tex. A&M Univ*., 145 F.3d 681, 685 (5th Cir. 1998). There is no analysis of whether Holmes plead as part of his claim that the decision by the Board of Regents to uphold his termination was discriminatory. An application of the *Floyd* analysis and a more reasoned application of the true holding and limitations of the *Ricks* opinion might have led to a different result. In *Tolliver vs. Prairie View A&M Univ.* No.1192, 2018 WL 4701571 (S.D. Tex. Oct. 1,

2018), Judge Rosenthal did not do any analysis about whether the *Ricks* rule was applicable. She simply stated, "Tolliver's request to overturn the expulsion did not delay the accrual of his claims arising from the expulsion." Of note, the university never responded to Tolliver's request for review, so we don't know if Prairie View A&M had a formal appeal process or not. Nor do we know if Tolliver alleged that the appeal process was part of the discrimination claim he asserted. The scope and application of the *Ricks* rule has evolved. Courts that have tried to apply the *Ricks* rule have increasingly heeded the admonition of the Supreme Court that each statute of limitations issue must be determined with a fact intensive review. Courts have also moved toward recognizing that the *Ricks* opinion should be viewed in light of the limited pleading of *Ricks*, alleging only that the decision to deny tenure, not the refusal of his appeal, was the discriminatory act.

Rice also cites to *Clark v. Resistoflex Co., Div. of Unidynamics Corp*., 854 F.2d 762 (5th Cir. 1988). If read carefully, *Clark* supports Klee's position on the statute of limitations. In *Clark*, the district court dismissed on summary judgment a wrongful termination case based on the untimely filing of an EEOC complaint. The district court found that when Clark's supervisor said he was, "going to terminate" Clark, that was a clear articulation of the official position of the company and Clark should have known at that time his claim had accrued. The district court relied on *Chardon v Fernandez*, 102 S. Ct. 28, (1981) which had relied upon the *Ricks* rule, stating, "While the termination was not effective until another date, the decision to 'terminate' had been made and communicated at this point." The 5th Circuit said:

> "The inquiry does not end here however. Circumstances surrounding Freed's phone message, coupled with mixed official signals conveyed to Clark afterwards by the company's personnel office, are collectively sufficient to cast doubt upon whether a reasonable employee in Clark's position should have known that he had been discharged."

The 5th Circuit went on to note that the supervisor who told Clark he was "going to fire him" had questionable authority to terminate Clark. Also relevant was the fact that the employer had no formal procedure for issuing termination notices. The personnel office had sent Clark a

letter after he was told by his boss that he was going to be fired saying that they would "clarify his status with the company" at a later date in a letter. These facts, the 5th Circuit found, raised a fact question and a jury could reasonably find that Clark was not on notice of his termination until he got the clarifying letter from the company. If the claim accrued on the date of the letter rather than the day his boss said he was going to fire Clark, that would render Clark's EEOC filing timely. The 5th Circuit reversed the trial court's summary judgement on limitations. The lesson of this case is simple. Deciding when a cause of action accrues does not lend itself to the type of cookie cutter rule advocated by Rice. It is a fact intensive, equitable inquiry that must consider all pleadings, circumstances, events, state law regarding limitations and the context of the claims asserted.

Rice also relies upon *Oirya v. Auburn Univ.*, 2019 U.S. Dist. LEXIS 170975. *Oirya* demonstrates that deciding when a cause of action accrues is a fact intensive exercise. Oirya applied and was accepted to Auburn as a graduate student transfer. Unfortunately, Auburn accepted him before getting his transcripts from BYU. Oirya had been expelled from BYU for sexual misconduct. The Auburn student transfer policy required that he be in "good standing" with BYU at the time of the transfer. Auburn caught their mistake and required that Oirya produce the BYU transcripts showing he was in good standing with BYU at the time of the transfer. Oirya refused that request or delayed compliance. Auburn progressively severed ties with Oirya. In February of 2015, he was removed from his teaching assignments. In March of 2015, he requested and was denied accommodations to allow him to keep teaching and he was given notice that his admission was being rescinded and his graduate assistantship was being terminated. Still he was given more time to produce the BYU documentation of good standing. However, by May of 2015, he had not provided the BYU documents and Auburn then notified him that he would no longer be allowed to enroll in classes. The 5th Circuit held that his cause of action accrued in May of 2015 upon notification of ineligibility to enroll in classes. Since Oirya did not file suit under Title VI and Title IX until October of 2017, his claims were barred. A mechanical application of the *Ricks*

rule, as advocated by Rice in this case, would have yielded an accrual date as early as February of 2015 but the 5th Circuit engaged in this fact intensive exercise and found accrual only at a time when Oirya "knew he was injured and knew who inflicted the injury". *Oirya v. Auburn Univ*., P. 33. Klee did not know he was injured when DeLaTorre issued her October 2017 findings. He still had a chance to reverse the DeLaTorre decisions on appeal. Klee did not know fully who had inflicted the injury because the tortious activity of Rice was continuing. He did not know that Matsuda and the Rice administration would participate in the gender bias demonstrated by DeLaTorre.

*Gudgel v. Del Mar Coll.,* No. 2:16-CV-513, 2018 U.S. Dist. LEXIS 8130 (S.D. Tex. 2018), cited by Rice, has nothing to do with the issues before this Court. Gudgel was expelled from Del Mar nursing program. He appealed his expulsion and was reinstated. On October 9, 2014. Gudgel filed a complaint with Del Mar alleging Title IX discrimination. Gudgel left DelMar of his own accord on October 28, 2014. Gudgel then filed suit on October 24, 2016. Gudgel did not argue that his appeal had anything to do with the accrual of his cause of action. Judge Head correctly ruled that Gudgel's cause of action accrued on October 9, 2014 when he filed his internal complaint with Del Mar alleging Title IX violations, not on October 26, 2014 when he withdrew from school. Therefore, the filing of his Federal Court Complaint on October 24, 2016 was untimely.

In *Cordova v. Univ. of Notre Dame Du Lac*, 936 F. Supp. 2d 1003 (N.D. Ind. 2013), also cited by Rice, Cordova did argue that her statute of limitations was tolled because of various appeals he filed regarding denials of requests for reasonable accommodations under the ADA. Cordova filed her complaint in Federal Court on March 30, 2012. She was notified that he was no longer a student on August 25, 2009. She appealed that decision and those appeals concluded on April 1, 2012. The District Court, ruling that her complaint was untimely, relied on Seventh Circuit case law that strictly followed the *Ricks* rule. *See; Soignier v. Am. Bd. of Plastic Surgery*, 92 F.3d 547, 549-50 (7th Cir. 1996) Cordova argued a continuing tort including the appeals process.

*Cordova* and *Soignier* are in conflict with 5th Circuit law, specifically *Floyd, Rubin* and *Clark*

supra that have rejected this mechanical application of the *Ricks* rule.

## IV.   FAILURE TO STATE A CLAIM

### A.   The Standard

This Court is well aware of the standard by which Rice's Motion to Dismiss must be

judged. In *Floridia v. DLT 3 Girls, Inc.*, No. 4:11-cv-3624, 2012 U.S. Dist. LEXIS 61748, at *3-

5 (S.D. Tex. 2012) this Court succinctly stated the standard:

> To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed
> factual allegations,' but must provide the plaintiff's grounds for entitlement to
> relief—including factual allegations that when assumed to be true 'raise a right to
> relief above the speculative level.'" Cuvillier v. Taylor, 503 F.3d 397, 401 (5th Cir.
> 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167
> L. Ed. 2d 929 (2007)). That is, "a complaint must contain sufficient factual matter,
> accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v.
> Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting
> Twombly, 550 U.S. at 570). A claim has facial plausibility "when the plaintiff pleads
> factual content that allows the court to draw the reasonable inference that the
> defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at
> 556).  [*4] The plausibility standard is not akin to a "probability requirement," but
> asks for more than a sheer possibility that a defendant has acted unlawfully. Id. A
> pleading need not contain detailed factual allegations, but must set forth more than
> "labels and conclusions, and a formulaic recitation of the elements of a cause of
> action will not do." Twombly, 550 U.S. at 555 (citation omitted).
>
> Ultimately, the question for the court to decide is whether the complaint states a
> valid claim when viewed in the light most favorable to the plaintiff. The court must
> accept well-pleaded facts as true, but legal conclusions are not entitled to the same
> assumption of truth. Iqbal, 129 S. Ct. at 1950 (citation omitted). The court should
> not "'strain to find inferences favorable to the plaintiffs'" or "accept 'conclusory
> allegations, unwarranted deductions, or legal conclusions.'" R2 Investments LDC v.
> Phillips, 401 F.3d 638, 642 (5th Cir. 2005) (quoting Southland Sec. Corp. v. Inspire
> Ins. Solutions, Inc., 365 F.3d 353, 362 (5th Cir. 2004)).

### B.   Other Title IX Cases

For each case cited by Rice where a court decided that the Plaintiff had not satisfied the

Twombly-Iqbal standard, there is one where the court did not dismiss or the dismissal was

reversed. *Wells v. Xavier* 7 F. Supp. 3d 746, (S.D. Ohio 2014);. *Doe v. Washington and Lee Univ.*

No. 6:14-CV-00052, 2015 U.S. Dist. LEXIS 102426 (W.D. Va. Aug. 5, 2015); *Doe v. Columbia Univ.*, 831 F.3d 46, (2d Cir. 2016); *Doe v. Brown Univ.,* 166 F. Supp. 3d 177 (D.R.I. 2016); *Ritter v. Okla. City Univ.,* No. CIV-16-0438-HE, 2016 U.S. Dist. LEXIS 95813 (W.D. Okla. 2016);*Neal v. Colo. State Univ.-Pueblo*, Civil Action No. 16-cv-873-RM-CBS, 2017 U.S. Dist. LEXIS 22196 (D. Colo. 2017); *Collick v. William Paterson Univ*., No. 16-471 (KM) (JBC), 2016 U.S. Dist. LEXIS 160359 (D.N.J. 2016) *affirmed Collick v. William Paterson Univ.,* 699 F. App'x 129 (3d Cir. 2017*)*; *Neal v. Colo. State Univ.-Pueblo*, Civil Action No. 16-cv-873-RM-CBS, 2017 U.S. Dist. LEXIS 22196 (D. Colo. 2017);   *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018)( Since the disciplinary board credited exclusively female testimony and rejected all of the male testimony, the circumstances suggested the university acted with bias based on gender.) See also *Williams v. Franklin & Marshall Coll.,* No. Civ. A. 99-0234, 2000 U.S. Dist. LEXIS 691, 2000 WL 62316, at *1-2 (E.D. Pa. Jan. 13, 2000) (alleged "a witch-hunt against male students on a totally unfounded belief that date-rape activities were rampant .... [which] crusade culminated in utterly false allegations of misconduct against plaintiff," "that males were treated differently from females in disciplinary matters," and the school violated its regulations); *Doe v. Lynn Univ., Inc*., No. 9:16-CV-80850, 2017 U.S. Dist. LEXIS 7528 (S.D. Fla. 2017) at *5; (allegations that university possessed communications evidencing bias against males accused of sexual misconduct, and use of plaintiff to demonstrate to DOE and the public that the university would aggressively discipline accused males); *Wells v. Xavier Univ*., 7 F. Supp. 3d 746, 747, 751 (S.D. Ohio 2014) (alleged procedural shortcomings; school made the disciplined male a "scapegoat" in reaction to DOE investigations of the school;  and a "pattern of decision-making" reflecting bias on the basis of male gender).

 The truth of the matter is each case stands or falls on the factual allegations made by the plaintiff. Each case, whether cited by Rice or cited above, is at best instructional, none are

dispositive. Plaintiff stands on his Original and First Amended Complaint as the best evidence that he has met the Twombly/Iqbal standard and stated a plausible Title IX claim against Rice.

## C.   **Evidence of Intention**

Rice is right that a disparate impact theory under Title IX is unavailing. However, what is required to plead sufficient intention on the part of Rice is in dispute. Rice would have you require that Klee plead some smoking gun admission by Rice that they intentionally discriminated against Klee on the basis of his gender. In *Pederson v. La. State Univ*., 213 F.3d 858, (5th Cir. 2000) the 5th Circuit was confronted with the question; what is necessary to plead and prove the necessary intention to discriminate under Title IX? In *Pederson,* suit was filed on behalf of all women student athletes at LSU. The suit alleged that LSU was discriminating against women athletes regarding athletic facilities and funding. An audit of LSU's Title IX compliance confirmed that the university was de facto discriminating against the women athletes, but the University claimed that the violations were unknowing and unintentional. The 5th Circuit rejected this argument:

> It bears noting that the provisions of Title IX and its attendant regulations are not merely hortatory; they exist, as does any law, to sculpt the relevant playing field. Consequently, Appellees' alleged ignorance of the law does not preclude our finding that LSU acted intentionally. Appellees need not have intended to violate Title IX, but need only have intended to treat women differently. Cf. Local 189, United Papermakers and Paperworkers v. United States, 416 F.2d 980, 996 (5th Cir. 1969) (holding that "intent" under Title VII requires only that "the defendant meant to do what he did" and did not behave "accidentally"); United States v. Koon, 34 F.3d 1416, 1449 (9th Cir. 1994) (applying the same test to constitutional violations), aff'd in part and rev'd in part on other grounds, 518 U.S. 81, 135 L. Ed. 2d 392, 116 S. Ct. 2035 (1996); United States v. Balistrieri, 981 F.2d 916, 936 (7th Cir. 1992) (holding that a defendant need not actually know that he is violating the Fair Housing Act in order to be found to have discriminated). Appellees' outdated attitudes about women amply demonstrate this intention to discriminate, and the district court squarely found that LSU's treatment of women athletes was "remarkably outdated," "archaic," and "outmoded." 912 F. Supp. at 918-20. Well-established Supreme Court precedent demonstrates that archaic assumptions such as those firmly held by LSU constitute intentional gender discrimination. See, e.g., United States v. Virginia, 518 U.S. 515, 533, 135 L. Ed. 2d 735, 116 S. Ct. 2264 (1996) (holding that an institution's refusal to admit women is intentional gender discrimination in violation of the Equal Protection Clause because, inter alia, of "overbroad generalizations about the different talents, capacities, or preferences of males and females"); Roberts v. United States Jaycees, 468 U.S. 609, 625, 82 L.

Ed. 2d 462, 104 S. Ct. 3244 (1984) (warning of the dangers posed by gender discrimination based on "archaic and overbroad assumptions"). We conclude that, because classifications based on "archaic" assumptions are facially discriminatory, actions resulting from an application of these attitudes constitutes intentional discrimination.
Pederson v. La. State Univ., 213 F.3d 858, 880-881, (5th Cir. 2000)

In *Ross v. Univ. of Tulsa*, 180 F. Supp. 3d 951 (N.D. Okla. 2016) a woman who accused a male of sexual assault sued the university under Title IX. The woman claimed that University of Tulsa's investigation of her allegations were a sham. The court held that "intentionally biased student conduct proceedings, or clearly unreasonable methods of handling student reports of sexual violence" would come within the parameters of *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999) and *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 290-91, 118 S. Ct. 1989, 141 L. Ed. 2d 277 (1998). Ross, 180 F. Supp. 3d at 970. *Gebser* and *Monroe* recognized that a school district could be held liable under Title IX for ignoring reports of peer on peer sexual harassment. In *Neal v. Colo. State Univ.-Pueblo*, Civil Action No. 16-cv-873-RM-CBS, 2017 U.S. Dist. LEXIS 22196 (D. Colo. 2017) the court applied the *Ross*, *Gebser* and *Monroe* standard to a claim by a male accused of sexual conduct violations who alleged that the investigation into his guilt or innocence was intentionally biased because of the unreasonable methods of handling the investigation. In finding that Neal had plead a valid Title IX action, the court relied upon inconsistencies in the investigation that showed a bias against Neal stating:

> Applying these legal standards to Plaintiff's allegations, Wilson's alleged failures to (among other things) consider that Jane Doe told Wilson the sexual encounter was consensual, the physical or documentary evidence in which she consistently said the same thing, her motivation to not be disciplined by her department for her prohibited relationship with a football player, the Clarks' conflicts of interest, Wilson's failure to question any witnesses favorable to Plaintiff (e.g., Coach Wristen), and Wilson's failure to identify to Plaintiff the witnesses against him before completing the investigation all suggest bias and inaccuracy in the outcome. *Neal v. Colo. State Univ.-Pueblo*, Civil Action No. 16-cv-873-RM-CBS, 2017 U.S. Dist. LEXIS 22196, at *27-28 (D. Colo. 2017)

In other words, the proof is in the pudding. If the investigation is rife with obviously gender biased decisions, interpretations of competing evidence, statements tinged with bias by the investigators or intentional indifference to the disparity between how the male accused is being treated compared to the female accuser, allows for a permissible inference, by this Court or a jury, that those actions amount to intentional discrimination on the part of Rice.

If, as Klee alleges,  the investigation was driven by a need to bend over backwards to find in favor of a woman accuser and against the male accused regardless of whether or not the male is guilty, that is intentional bias and discrimination on the basis of gender. It does not matter what the motivation is to do that. If the motivation is to protect women who accuse men of sexual assault from having to ask difficult questions, while the accused is required to submit to intense interrogation with no protections against predetermined presumption of guilt, that is intentional discrimination. If the reason is to keep from running afoul of federal regulations, that is intentional discrimination. If the reason is because you are trying to make your campus look safe for prospective enrollees and their parents, that is intentional discrimination. Discrimination springs from more than just an animus against the class that is discriminated against. Discrimination can be about power as in Jim Crow laws and suffrage. Discrimination can be about money as in funding of school districts and unequal pay decisions. The motivation for the discrimination is not as important as the bias in the actual acts themselves. To discriminate against women, does not necessarily mean you have to hate women or think they are less. You can discriminate against women because you think it is important that they stay at home for the sake of the nuclear family and shouldn't be taking away a job from a man who has a family to support. The reason is irrelevant. It is the act of discrimination that is the litmus test. You don't have to hate black people to discriminate against them. The tired defense of the racist, "Some of my best friends are black" does not address whether the person engages in discriminatory behavior. It is still intentionally discriminatory when you try to keep a black family from buying a house in your neighborhood

because you are afraid the property values will go down. It is equally discriminatory to pre-judge as guilty, men who are accused of sexual assault by women while at the same time presuming that the woman accuser is telling the truth regardless of evidence to the contrary. Arguably, even if Rice's reason for treating female accusers with kid gloves and giving them every benefit of the doubt to protect them, that construct is a result of an archaic stereotype that women are weak and victims and in need of chivalrous protection from boorish behavior. That is not today's women, that is yesterday's women. Such an archaic motivation that leads to throwing accused men under the bus regardless of guilt or innocence is exactly the type of intentional discrimination the 5th Circuit described in *Pederson*.

Rice points this Court to several cases regarding intent that are inapplicable to the issues before this Court. *Chance v. Rice Univ.*, 984 F.2d 151 (5th Cir. 1993) was an equal pay case. It is also an appeal of a directed verdict. Chance was pro se in this case. While the Chace did allege the discriminatory pay at Rice was a violation of Title IX, after a full discovery opportunity and presenting her case to the trial Court, Chance did not have enough evidence of discriminatory pay decisions let alone intent to discriminate. This case is of no help to this Court. In *Manley v. Tex. S. Univ.*, 107 F. Supp. 3d 712 (S.D. Tex. 2015) a male minority applicant to the law school claimed that reliance on standardized scores in school admission and recruiting policies had a discriminatory effect. This allegation was a disparate impact theory by definition. Not surprisingly, the trial court pointed out to the law school aspirant that Title IX did not provide a private cause of action for disparate impact claims and dismissed the case. *Alexander v. Sandoval*, 121 S. Ct. 1511 (2001), also relied upon by Rice, was a Title VI case where the plaintiff alleged that a policy of administering driver's license examinations only in English discriminatorily impacted non-English speakers based on national origin. Again, this was a classic disparate impact theory of discrimination and the U.S. Supreme Court rightly held that a private action for discrimination under Title VI must allege intentional discrimination, not disparate impact, therefore there could

be no recovery for the plaintiffs. Klee does not allege a disparate impact theory in any way. Klee alleges that the Rice investigators and administration intentionally or as a result of conscious indifference to the facts as described in *Pederson*, conducted a gender biased investigation that led to a wrong result and disproportionate discipline under the circumstances. *Alexander,* therefore, is not helpful. It only states and stands for the obvious; disparate impact claims do not support a private cause of action under Title IX. *King v. Depauw Univ*., No. 2:14-cv-70-WTL-DKL, 2014 U.S. Dist. LEXIS 117075 (S.D. Ind. 2014) is one of those Title IX cases that was dismissed but has little similarity to Klees allegations. King relied upon paltry "statistics" alleging that 10 out of 12 men accused of sexual assault at Depauw were found to have violated the student code of conduct. Those allegations pale when compared to Klee's allegations. The *King* court did find that the numbers cited by the plaintiff, even if true, were simply an allegation of a disparate impact on males and that such a disparate impact might be attributable to something other than discriminatory intent such as men are accused more than women of sexual assault. *King,* therefore, does not provide this Court with any sort of guide about what is sufficient to plead intentional discrimination. That opinion only demonstrates that King's allegations, much different from Klee's, were insufficient.

**D.**    **The "similarly situated female accused"**

The idea that for Rice's treatment of Klee to be intentionally discriminatory, you must show that they treated a woman who was accused of sexual misconduct more favorably, is patently ridiculous. How could that be done? Obviously, the incidence of women being the accused if sexual misconduct is miniscule. How do you make that comparison when the sample of women accused of sexual misconduct is virtually non-existent? Does that mean that Rice cannot act in a way that is discriminatory against men because there are no or too few women accused of sexual assault for comparison? Does this mean Rice can be as biased and unfair as they please against a male accused because there are no accused women with which to compare that discrimination? If

this is the law, discrimination of many types and shades will prevail in our community because we have set the bar impossibly high for proof of intentional discrimination.

Gender discrimination is about differential treatment between men and women.  However, the differential treatment in this case comes in the form of how the investigative process treats men and women. It is undeniable that in almost all instances the accuser will be a woman and the accused will be a man. It is a false comparison to say Klee must find a female accused with which to compare his treatment and show differences. The true comparison is how ***women's claims of guilt*** are treated different than ***men's claims of innocence*** in Rice's investigative process. That comparison demonstrates whether or not Rice's investigative process is discriminatory. When the woman accuser is given wide latitude and every benefit of the doubt regarding the veracity of her claims and the male accused is treated exactly the opposite, that is a process that is intentionally discriminatory. It is a process divorced from any intent to reach a fair and objective result. It is a process that is intentionally designed to reach a predetermined result, believe the woman, convict the man. Especially with intimate physical contact, when it is many times a duel between her version versus his version, this tilting of the credibility scale between men and women yields a process that will find the male to have committed the acts alleged by a woman without reference to what really happened.  This is intentional discrimination and Klee has alleged that he was the subject of this type of discrimination on the basis of gender.

**E.      Courts should not second guess school disciplinary process**

Rice also argues that this Court should not engage in "second guessing" the accuracy of its investigative process. Rice relies on two cases for this proposition. The first case, *Davis v. Monroe Cty. Bd. of Educ.*, 119 S. Ct. 1661 (1999) states in dictum, "In fact, as we have previously noted, courts should refrain from second guessing the disciplinary decisions made by school

administrators. *New Jersey v. T. L. O.*, supra, at 342-343, n. 9."[3] *Davis v. Monroe Cty. Bd. of Educ.*, 119 S. Ct. 1661, 1674 (1999)"  This stray comment in *Davis* was made by the majority of the Court in response to the dissent. In *Davis*, the Court was confronted with Title IX allegations that the school district had ignored reports of sexual harassment of a student by another student. The 11th Circuit held that the Plaintiff had not stated a cause of action against the school district under Title IX. The Supreme Court disagreed and held that a school district could be liable for a private cause of action where it acted with deliberate indifference to known acts of harassment during its programs or activities that was so severe, pervasive and objectively offensive that it effectively barred the victim's access to an educational opportunity or benefit. The dissent argued that this holding would open school districts and other educational institutions to pervasive "second guessing" and require expulsion of all students who were accused of sexual harassment. The majority, in response to the dissent, replied:

> Likewise, the dissent erroneously imagines that victims of peer harassment now have a Title IX right to make particular remedial demands. See post, at 34 (contemplating that victim could demand new desk assignment). In fact, as we have previously noted, courts should refrain from second guessing the disciplinary decisions made by school administrators. New Jersey v. T. L. O., supra, at 342-343, n. 9.

> School administrators will continue to enjoy the flexibility they require so long as funding recipients are deemed "deliberately indifferent" to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances. The dissent consistently mischaracterizes this standard to require funding recipients to "remedy" peer harassment, and to "ensure that . . . students conform their conduct to" certain rules. Title IX imposes no such requirements. On the contrary, the recipient must merely respond to known peer harassment in a manner that is not clearly unreasonable. This is not a mere "reasonableness" standard, as the dissent assumes.
> *Davis v. Monroe Cty. Bd. of Educ.*, 119 S. Ct. 1661, 1674 (1999)

---

[3] Citing, *New Jersey v. T. L. O.*, 105 S. Ct. 733 (1985) which was an unreasonable search and seizure case that relaxed the standard for searches in schools to a reasonableness standard short of probable cause.

The *Davis* Court went on to find that the Plaintiff had adequately plead a Title IX case and reversed the holding of the 11th Circuit.

Rice also relies upon *Plummer v. Univ. of Hous.*, 860 F.3d 767 (5th Cir. 2017). In *Plummer,* two students, a male and a female who were boyfriend and girlfriend, videotaped the male as he was having sexual contact with another female in his dorm room while intoxicated. The female then widely distributed the video on social media. The University of Houston disciplined the boyfriend and girlfriend proportionately. There were other witnesses who then saw the boyfriend having sex with the complainant in the dorm shower when she was obviously passed out. The plaintiffs sued the university under Title IX claiming their suspensions were not supported by the evidence. The 5th Circuit affirmed the dismissal of plaintiffs' case because the evidence was so overwhelming, there was little doubt that the plaintiffs violated the student code of conduct. With regard to "second guessing" the 5th Circuit enunciated its position as follows:

> "It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking in wisdom or compassion." Wood v. Strickland, 420 U.S. 308, 326, 95 S. Ct. 992, 43 L. Ed. 2d 214 (1975); see also Davis ex rel LaShonda D. v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 648, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999) ("[C]ourts should refrain from second-guessing the disciplinary decisions made by school administrators."). "A university is not a court of law, and it is neither practical nor desirable it be one." Flaim v. Med. Coll. of Ohio, 418 F.3d 629, 635 n.1 (6th Cir. 2005) (citation omitted). ***Ultimately, courts must focus on "ensuring the presence of 'fundamentally fair procedures to determine whether the misconduct has occurred.'"*** Id. at 634 (quoting Goss v. Lopez, 419 U.S. 565, 574, 95 S. Ct. 729, 42 L. Ed. 2d 725 (1975)). *Emphasis added, Plummer v. Univ. of Hous.,* 860 F.3d 767, 772-73 (5th Cir. 2017)

Federal Courts all over this country, have embraced the *Yosef* standard of "erroneous outcome" and "disproportionate punishment" caused by gender bias as a violation of Title IX. These cases relied upon by Rice regarding "second guessing" do not attack or undermine that long line of cases. They merely point out that in the educational setting, there should be some balancing of the educational institutions limitations and interests in providing a safe environment for learning with administering discipline for sexual misconduct fairly. When gender bias leads to an erroneous

outcome, courts have not been shy in pointing out that the investigative process was questionable and the result dubious. When there are allegations based on facts that these shortcomings were driven by gender bias, a Title IX violation has occurred. (See citations supra under "Other Title IX Cases)

**F.**     **Klee's First Amended Complaint Satisfies the threshold of Twombly/Iqbal.**

Klee stands on the allegations and facts plead in his First Amended Complaint. A summary of that pleading would not demonstrate the sufficiency of Klee's complaint any more than the Complaint itself. We would simply respectfully remind this Court that the standard is "plausible" not "probable" and that for a Title IX violation to have occurred gender bias need only be "a motivating factor", not the sole cause or only motivation. Klee has copies of recorded statements and correspondence that support all the quotes of statements in his Complaint made by the Rice investigators, EC (with the exception of the first recorded interview of EC that has been lost), Klee, and all witnesses interviewed. Indeed, Rice has not taken issue with the factual allegations in Klee's complaint. Rice simply argues that they are insufficient. We trust that when this Court reads Klee's complaint as a whole and, as it must, engages in all reasonable inferences assuming the facts plead are true, it will find that Klee has sufficiently plead a Title IX violation that supports his claims for damages. However, should this Court find Klee's complaint deficient in any respect, Klee requests that the Court afford Klee an opportunity to amend and cure those deficiencies.

## CONCLUSION AND PRAYER

For the reasons stated herein, Plaintiff requests that the Court deny Defendant's Motion to Dismiss or alternatively grant leave to file a Second Amended Complaint to cure any deficiencies found by the Court.


**[SIGNATURE ON THE FOLLOWING PAGE]**

Respectfully submitted,

**MIKE KERENSKY, PLLC**

By: _/s/ Michael W. Kerensky_                    .
    Michael W. Kerensky
    SDOT Bar No: 4446
    SBOT Bar No. 11331500
    The Lyric Centre
    440 Louisiana, Suite 2300
    Houston, Texas 77002
    713-228-5100 office
    713-228-6138 fax
    mike@kerenskylawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was filed in accordance with the protocols for e-filing in the United States District Court for the Southern District of Texas, Houston, Division on May 1, 2020, and therefore has been served on the attorney-in-charge for Defendant, Lorinda Holloway & Scott D. Schneider, 111 Congress Avenue, Suite 1400, Austin, Texas 78701, in accordance to such e-filing protocols.

    _/s/ Michael W. Kerensky_                    .
    Michael W. Kerensky

Exhibit 1



**Lisa DeLaTorre**
Director, Student Judicial Programs

October 24, 2017

Senhica Klee
**Via email: Senhica.M.Klee@rice.edu**

Dear Senhica,

As you know, I have been conducting an investigation into allegations against you, specifically that you may have committed sexual assault and otherwise violated the Rice University Code of Student Conduct (Code) and Rice University Title IX Policy and Procedures Prohibiting Sexual Assault and Other Gender-Based Misconduct Involving Students (Sexual Misconduct Policy) through your behavior on the night of September 4, 2016, and into the morning of September 5, 2016. The behavior of concern was described to you in the letters I sent you on September 20, 2017, and October 6, 2017. In addition to the detailed letters, you were also given the opportunity to review the materials contained in your disciplinary file, including audio recordings, and you did so on September 25 and 26, and October 11, 2017.

In the course of my investigation I have spoken with you, the reporting student (E.C.), and four other students, including two who were at your apartment with E.C. on September 4, 2016. When making a decision in this matter I considered all of the information gathered in those meetings. I have considered text messages and Facebook messages provided by you, E.C., and the witnesses. I have considered the written statement from E.C., and your written statements from September 28 (response) and October 9 (second response). In short, I have considered all the information available to me.

**I. Decision**

The information available to me supports a decision, more likely than not, that you engaged in sexual acts with E.C. without her consent, acts, which under the Rice University Sexual Misconduct Policy, amount to sexual assault. Accordingly, I find you In Violation of the Code section II.B.1.a., and the Sexual Misconduct Policy (contained within the Code). Additionally, the information available to me (including your admission) supports a finding, more likely than not, that you made alcohol available to underage underclassmen, that you served them alcohol, that you encouraged them to drink alcohol, and that you purchased alcohol for them at a TABC licensed establishment. Accordingly, I find you In Violation of sections II.B.1.o., and II.B.1.p., of the Code. Based on the information available to me, and looking at the big picture of your behavior, I find that your behavior fell below the expectations of civility and respect placed on all students, as described in the Code.

Finally, I decline, at this time, to reach a finding as to whether you deliberately misled me or withheld information during the process. While I remain concerned about your pattern of only talking about each additional sexual act after I confronted you with my existing knowledge of the act, a finding on this charge is unnecessary at this time. The other violations will result in a long suspension, and a finding on this charge would not alter that.

**II. Factual findings**

When we met on September 7, 2017, you described to me your recollections of the night of September 4-5, 2016. Your recollection of that night is summarized in detail in my September 20, 2017, letter to you. That letter also contains a detailed summary of the report from E.C.

### A. You served, provided, and made alcohol available to underage students

In your Response, you admitted that you were responsible for violating the Code section relating to alcohol (II.B.1.o. and p.), and you explain, "I had alcohol that was present while individuals under the legal drinking age were also present . . . . I picked up beer and wine from a local H.E.B. and, once we were at my apartment, I did not stop anyone from taking beverages of their own." You were referring to

the gathering that you had at your off-campus apartment that night from about 9 p.m. until about 11:30 p.m., where the only three guests were the reporting student E.C. (an underage freshman), Georgia (an underage freshman), and Madeleine (an underage sophomore). Information from the three underclassmen who were at your apartment that night gives a different picture of the use and presence of alcohol at your apartment that night. Far from simply, "not stop[ping] anyone," the women all described that you repeatedly offered beer and wine, and encouraged the women to drink.

Regarding the notion that you encouraged the women to drink, and that you purchased beers for Georgia and E.C. at Valhalla, you wrote in your second response, "All claims being made about me in the new letter are false. I did not provide alcohol to any of these women at any point beyond what I claimed responsibility for in my initial response letter." Of course, in our meeting on September 7, 2017, you admitted to buying the alcohol for your apartment, and buying beer for at least one under age student at Valhalla, an on-campus bar. Available information supports a finding that the group arrived at Valhalla just before midnight, and you purchased the beer for E.C. sometime shortly thereafter, and certainly before 12:30 a.m.

Your second response is dedicated largely to providing information for the purpose of undermining the credibility of E.C., and her friend Georgia. You describe circumstantial evidence that supports the notion that E.C. and Georgia each possess a fake identification, and that they each used those IDs in October 2017 to gain entry to bars. You explain that you are sharing this information with me because this behavior "calls into question" Georgia's credibility and character, and "calls into question" E.C.'s character: "Why is the Reporting Student out illegally entering bars and drinking when it is her claim that drinking is what led to the events in this case?" To clarify, E.C. is not claiming that drinking alcohol led to these events; she is claiming that your behavior toward her was inappropriate, caused her pain, and was without her consent. In short, she is not complaining about alcohol, she is complaining about your behavior.

While Rice does not support students' possession of false identification, your assertions are not relevant to the charges at issue. As a reminder, at issue is whether you violated the Code of Student Conduct through your behavior that night. Alleged subsequent misbehavior on the part of other students does not make more or less likely whether you violated the Code on September 4-5, 2016, nor does it somehow negate your admitted violations. Furthermore, Texas law provides for amnesty from disciplinary consequences for students who, in good faith, report being the victim of, or are a witness in, a case of sexual misconduct. Accordingly, I decline to consider your report of possession of false ID and underage drinking in any capacity in this investigation.

**B. Absence of true choice**

In response to the charge that you violated the Code and the Sexual Misconduct Policy, in your first response you said only:

> "I absolutely did not do this. I did not at any point penetrate E.C.'s anus with my penis and consent was given for sticking my fingers into her anus."

In your second response you said only:

> "At no point did I take advantage of the Reporting Student and at no point did I think she was intoxicated. The Reporting Student gave consent."

Despite your base assertions that you had consent for penetrating E.C.'s anus, your description of the events in our September 7 meeting supports a finding that she did not consent. Your first written response explains that you gave various and conflicting accounts of the night in our meeting on September 7, 2017, because you were thinking back and trying to remember the events of a night more than one year prior, and because you felt "shocked" by the allegations. Despite being given the opportunity to review E.C.'s written statement, and despite the time you took to write your written response to the charge letter, you have never clarified which of your various accounts of the night most accurately reflects your recollection of the events of the evening. Considering all the information

available to me about that night, a preponderance of the evidence (the standard of proof Rice uses for all discipline cases) supports a finding that consent was not present that night. Several points, both information you communicated in our September 7, 2017, meeting, and information from E.C., support this conclusion.

First, you told us on September 7, 2017, that there was no conversation about what activities you two would engage in in the car. When I asked if you talked about it before you got in the car, you said, "I mean, I'm not sure if there was any reference to like, sorry to sound ignorant or something, like specific sexual positions or something like that? I mean, I think it was just kind of clear." This statement causes me concern that you misunderstand the meaning of "consent," because by your own description you seemed to presume consent was present before you even left the bar.

Second, E.C. reported that the order of the acts that occurred is unclear to her, but she recalled various acts of sexual touching and activity. Specifically she wrote, "Then I was lying down and he was on top of me. He was not wearing a condom. I felt the tip of his penis touch my vagina and I heard him say over and over again, 'I just want to be inside of you right now, I really want to be inside of you so badly'. [sic]" She continued, "Maybe I didn't know what was happening but I felt his penis start to go inside of my vagina just a tiny bit. Maybe it was just touching. I realized he wasn't wearing a condom and freaked out. I told him he needed to put on a condom on. He kept saying he wanted to be inside of me, and so I decided it would just be easier to have sex with him than to listen to him go on, and on. He seemed so insistent that it seemed like something I should agree to."

Taken together, these two descriptions show E.C. did not have true choice regarding the sexual activity. That is, you two were in the back seat/cargo area of your car at about 2 a.m. Your car was parked in the parking lot of the Shepherd School, which was essentially deserted because of the time of night. E.C. had never before engaged in sexual intercourse, and while drunk and naked, was lying underneath you. She felt your bare penis partially penetrate or at least touch the outer portion of her vagina. During this time, you repeatedly told her that you "want to be inside" her. E.C.'s direction to you to put on a condom was not an expression of her active and voluntary agreement to participate in sexual intercourse with you. Rather, it was her way to seek protection from all the potential consequences of unprotected sexual intercourse, since your penis was already partially penetrating, or at least touching the outside of, her vagina.

In our meeting, you expressed that sexually penetrating another person is a serious matter: "before I did anything as serious as penetration . . . I asked if she was a virgin." Both you and the reporting student recall a conversation where she communicated that she thinks the concept of virginity is a social construct and not a big deal. Importantly, nothing about E.C.'s opinion on the importance of sexual virginity is the same as giving consent for sexual intercourse or other sexual acts. They are two different conversations. Based on the information available to me, I find your behavior violated the Code of Student Conduct, and amounts to "sexual assault," under the Sexual Misconduct Policy.

### C. Absence of resistance is not consent

E.C. reported to me that you engaged in anal intercourse with her, that is, that you used your penis to penetrate her anus, without her consent. She wrote:

> My face was pressed up against the window of the car as he slammed his penis into my vagina over and over again. Suddenly I started to feel very intense pain in my anus. I was too drunk to fully discern what was happening, but at this point he had started having anal sex with me.

You deny that you penetrated her anus with your penis; in fact, when we met on September 7, 2017, you first told me you two only engaged in vaginal sex.

Then, I asked you if any part of your body penetrated any other part of her body. Only then did you tell me that you two engaged in oral sex, and you volunteered, "**the only other thing I would have done** is used my fingers to penetrate her vagina as part of foreplay." Even when I asked you about

penetrating any other part of her body, you did not mention penetrating her anus with your fingers.

Finally, after giving you two prior opportunities to disclose that you penetrated E.C.'s anus that night, I specifically asked you whether any part of your body penetrated her anus. Only then, when it was clear that I knew you penetrated her anus that night, did you tell me about your recollection of that act. You described:

> we did a 69 position. Um, she was giving me oral sex while I was licking her vagina. And I had two of my fingers in her – her rectum or something like that . . . . And she did not at any point stop me. So – and actually in the midst of that, I – I actually do explicitly remember like, 'Does that feel good? Does that feel good?'

To be clear, E.C. reported that you penetrated her anus with your penis, while she was on her hands and knees, and you were behind her. In contrast, you describe that you only penetrated her anus with your two fingers, but not your penis. By your own description, you penetrated E.C.'s anus with your two fingers without her consent, while you two were engaged in mutual simultaneous oral sex ("69"). By your description, during "69," you first penetrated her anus with your two fingers, and *then* "in the midst of that" you asked her, "Does this feel good?" *while* your two fingers were in her anus. By your description, you asked this question while you were engaged in performing oral sex on her, an act that seems factually impossible given your description of her position over your body. I note that because neither you nor E.C. mentioned it, I presume that when penetrated her anus (whether with your two fingers as you describe, or your penis as she describes) you did so without the aid of an artificial personal lubricant.

As highlighted above, you told me in our meeting that you think sexually penetrating another person is serious, and yet here, by your own description, you penetrated E.C.'s anus with your two fingers, without first asking whether she wanted you to do that, and without first securing her consent to do so. By your description, by the time you penetrated her anus you were already aware that she was sexually inexperienced, you were aware that sexually penetrating someone was a serious act, and you had already assured E.C. that you believed her sexual inexperience—her virginity—to be a big deal.

You described that after you inserted your two fingers into her anus, you asked her if it felt good, that she responded, "Mmm hmm, mmm hmm, mmm hmm," and that you specifically remember her making those affirmative noises. Even if your description is an accurate account of this set of events, you digitally penetrated E.C.'s anus without her consent. Specifically, *first* you penetrated her anus with your two fingers, *then* you asked how it felt. Nothing about her words or actions—by your own description—communicated that you had consent. Even if, for the limited purpose of discussion on this specific act, I were to assume she consented to the vaginal intercourse, your actions of penetrating her anus without first securing her consent to do so violated the Sexual Misconduct Policy.

In summary, and all by your own account of the evening: *you knew* sexually penetrating someone was a serious act; *you knew* E.C. was sexually inexperienced and you assured her you thought her virginity was a big deal; *you* penetrated E.C.'s anus without first asking her. And in your meeting with me you explained, "I was not holding her down in any way. So like had she wanted to get up and move around or leave or do something or swat me away, she could have." This statement demonstrates your misunderstanding of consent. As the Sexual Misconduct Policy explains, consent is not present "because the other person is silent or does not resist sexual contact; again, consent must be communicated by clear actions or words." That E.C. did not "swat" you away does not establish that you had her consent. Based on the information available to me, I find your behavior violated the Code of Student Conduct, and amounts to "sexual assault," under the Sexual Misconduct Policy.

**D. Final sexual act; you fell short of the expectations of civility and respect**

E.C. reported to me that after the activity in the parking lot concluded, you each re-dressed, and got back in the front seats so you could drive her to the location on Rice's inner loop nearest her dorm. She reported to me that you asked her to perform oral sex on you while you drove. Your recollection is

slightly different; you said that you asked her to perform oral sex once you had moved the car and parked at the new location near her dorm. Based on your descriptions of where you parked and where you dropped her off, this was approximately one half (.5) mile drive, which takes three minutes to complete (according to Google maps). In summary, after spending approximately 90 minutes parked in the Shepherd School lot, during which time you penetrated E.C.'s mouth, vagina, and anus, and engaged in various sexual acts in at least three different positions, you requested that she perform additional oral sex on you before she left your car that night: "'Oh, like do you wanna give me head a little bit more or something like that before you leave?'" You said that her initial response was that she said "Now?" or words to similar effect, a question that demonstrated her hesitance. You told me that you pushed the issue: "I egged it on a little bit. Like, yeah, you know, just with words."

This is another sexual act that by your own description, may have taken place with the absence of true choice. She describes that you pulled your penis out of your pants while driving and asked her to suck it. You describe that you think you were already parked, but that you think you had to encourage her to perform the act ("egg it on a little bit"). This behavior, "egging" her on to perform an additional sexual act on you, demonstrates you were not concerned about consent or E.C.'s true choice to engage in sexual activity with you. A preponderance of the evidence demonstrates that this particular behavior fell short of the expectations on all students to behave with civility and respect.

### III. Credibility assessments

In the Rice disciplinary process, as we investigate and adjudicate cases, I start by believing. I start by believing the reporting student's story, and I start by believing the responding student's story. I work to believe each student's story as far as I can. And then, if those stories come into factual conflict with one another, I work to resolve the conflicts by seeking out other information, such as witness statements, or other information that will help me determine which conflicting story to believe. This approach means that some factual conflicts do not need to be resolved, for instance when both students' stories, though factually not identical with each other, support a finding that the behavior at issue violated (or did not violate) the Code of Student Conduct. For instance, here I do not need to resolve the conflict as to whether you penetrated her anus with your fingers or penis that night, because by both students' accounts, the anal penetration occurred without consent.

Here, E.C. explained that she does not remember the exact order of all the various sexual positions and acts because she was intoxicated, but her recollection of how the vaginal intercourse happened has been clear and consistent throughout the process. Her recollection of the pain in her anus that night, and the lingering pain and other after-effects the next morning, was clear and detailed.

In contrast, you have offered various accounts of the facts of the night, including how many condoms you used, when you applied the condom(s) in relation to which sexual act or position, where and how you disposed of the condom(s), when the conversation about abortion took place in relation to the vaginal intercourse, etc., and you have not resolved the conflicts between your various stories. Your various and conflicting reports of the timing of the events is significant; at one point in the meeting you explained that the conversation about abortion took place before the intercourse, and you used that conversation as support for the notion that the intercourse was consensual. Later in the meeting, however, you said the abortion conversation was after all the sexual acts in the parking lot were over.

The charge letter explained the conflicts between your various versions of the night, and explained that your inability to give a coherent narrative of the events of the night caused me concern that perhaps you were being deliberately misleading, or were withholding information from me. In your response you stated that you were having a difficult time remembering because the event at issue was more than a year ago. Since we first met on September 7, 2017, you have had more time to think back to the night. You have had time to review the file materials, including the written statement E.C. submitted, and the summaries of two witness interviews.

In your written statements, composed after you reviewed the file materials, and with enough time for you to be thoughtful as you wrote, you made the bare statements: "I absolutely did not do this" and

"The Reporting Student gave consent." Even after this review, you have not clarified which of the many accounts you gave in our meeting is your best recollection. Put another way, you still have not given a clear account of your best recollection of that night. You have left me to sort through which of your various and conflicting accounts to believe. This leads me to believe that even you are not clear what you are saying happened that night. When I weigh this against the coherent and detailed account of the night from E.C., and when I consider the additional information gathered from the four student witnesses, I find the information from you is not as credible as E.C.'s detailed account of certain events.

## IV. Sanctions

Having found you In Violation for sexually assaulting an 18 year old freshman undergraduate when you were a 25 year old professional masters graduate student, and for serving alcohol to underage students in your home and at a bar, I must now contemplate appropriate sanctions. Your behavior on September 4-5, 2016, taken as a whole, shows an evening-long effort to gather several underage women, provide and serve them alcohol, and ultimately, sexually assault one of them. The uncontested facts show that you hosted and provided alcohol for a party in your home, while you were a 25 year old professional masters student, and your guests were three underage women—two freshmen and a sophomore. At the time of this party, the freshmen women—one of whom you sexually assaulted later that night—had just finished their second week of college.

I am concerned that you particularly set out to take advantage of their lack of experience. Statements from the three women indicate they viewed you as holding a superior position of social status and power, due to your status as a professional masters student, compared to their own undergraduate status.

Your behavior is unacceptable within an academic community, and is not tolerated at Rice. Based on what the information shows happened more likely than not, your misconduct necessitates your separation from the University. To be clear, any one of these behaviors, on its own, would necessitate a long separation from the university. Taken together, the facts of the night show your premeditated efforts to gather young, underage undergraduates, encourage them to drink alcohol, and then eventually you sexually assaulted one of them. To be clear, you provided alcohol to *all three* of the underage women, and encouraged all three of them to drink; any one of these women was potentially at risk of being the target of your later perpetration. Based on your behavior, which seems to have been a premeditated course of conduct, resulting in sexual assault under the code, I find it appropriate to impose a suspension of six semesters, effective immediately. To be clear, you are suspended for at least the following semesters (and any summers or other terms in between these semesters): 1) Fall 2017, 2) Spring 2018, 3) Fall 2018, 4) Spring 2019, 5) Fall 2019, 6) Spring 2020. I will consider a request from you for readmission for Fall 2020.

Another way to view your behavior that night would be to consider that when you provided alcohol to the three women in your apartment, and again to two of the women at Valhalla, several hours passed between the time you finished providing the alcohol, and your perpetration of the sexual assault. Considering the passage of time, one could, when reviewing these facts, view your behavior of providing alcohol to the three women as a separate set of behaviors from the sexual assault. Even viewing your behavior in that way, I still find that six semesters of separation is the appropriate sanction. Specifically, even viewed as separate events, your violations of the alcohol policy and other alcohol violations warrant a separation of at least two semesters. Your perpetration of nonconsensual sexual contact and activity on E.C. warrants a separation of at least four semesters. All told, this is a total of six semesters separation for your behavior that night.

Put another way, there are two different ways to look at your behavior when considering appropriate sanctions: was your behavior a single, premeditated course of action, with the aim of getting the women drunk in order to later perpetrate a sexual assault? Or, was it instead a series of unrelated bad behavior: providing alcohol and encouraging the underage women to drink in your apartment, later buying them alcohol at a TABC licensed establishment, and later still committing a sexual assault against

one of them, hours after you served her the first illegal drink? Regardless of which view one takes of your behavior over the course of the night, an appropriate sanction for your behavior is a long separation from Rice, for you to reflect on your past behavior, and work on improving your judgment, so that you are able to meet the expectations Rice has for its students if you ever seek to return.

### A. During your suspension

During your separation period from Rice, you are not permitted to be on campus for any reason whatsoever. The purpose of a suspension is to give the student time away from the University to reflect deeply about the reasons for Rice using the sanction of disciplinary suspension. Please keep in mind that while on disciplinary suspension, students may not run for, or hold, any elective or appointed office in any official Rice organization. Participation in student activities on and off campus and use of Rice facilities, including but not limited to the student center, the colleges, the playing fields, the recreation center, and the computer labs, are reserved for enrolled students. Any violation of these expectations may delay or otherwise impact your request for readmission.

Accordingly, this letter serves as notice pursuant to Texas Penal Code section 30.05 that beginning Tuesday, October 24, 2017, at 2 p.m. your presence on Rice campus (including your presence in or near the Shepherd School, or any of the colleges, or any public areas of campus) for any purpose is forbidden by Rice University. If you violate these instructions the University, including its law enforcement officers, will respond to your unauthorized presence by seeking your arrest. If you feel you need access to campus for some reason, you must request—in writing and 24 hours/one full business day (whichever is longer) in advance—and receive approval from the Office of Student Judicial Programs by emailing sjp@rice.edu. You should not interpret an invitation to campus **by any other office** to override this warning. Any violation of these terms will be taken very seriously. To be clear, this means you are specifically forbidden from being on campus for any reason, even, for instance, for attending events on campus that might otherwise be open to other members of the public.

### B. Necessary steps for readmission

Readmission will not automatically be granted based on the passage of time. You will have to provide a strong case that you have received relevant counseling and education to address the concerning behavior and have made strides in your life that show you are ready to be trusted to return to Rice and live up to the high expectations Rice has for its students. Under these facts, Rice is justified in saying the bar will be high and the burden will be on you to meet it. If you are allowed to return to Rice, I may impose disciplinary probation or other restrictions for some portion or all of your remaining time at Rice. Whether the reporting student remains enrolled at Rice upon your request for readmission will be a factor in the decision of whether you are permitted to return.

When you are ready to be considered for readmission, you should send a petition to Student Judicial Programs (sjp@rice.edu). As you draft your petition requesting readmission you will need to address how you spent your time away from Rice, as well as the troubling behavior that led to your separation. Specifically, before Rice can approve your readmission, I will need to be satisfied that you understand why your behavior was unacceptable, and how it impacted others. You will need to be able to articulate what you did during your time away to address any underlying issues that gave rise your troubling behavior. Finally, you will need to be able to demonstrate to me that you have a plan in place to prevent these problems from arising again.

### V. Other procedural information

You have 10 business days from the date of this letter to appeal the decision. Any appeal should be limited in page length to eight pages (the number of pages of this decision letter) and addressed to the dean of graduate and postdoctoral studies, matsuda@rice.edu, cc'ed to sjp@rice.edu, and ugdean@rice.edu. Failure to follow these instructions for your appeal may impact consideration given to your appeal. **Disciplinary sanctions are not stayed during the appeal; your suspension begins immediately, even if you choose to appeal.** This means you are prohibited from having any involvement

in any Rice activities, on or off campus, including any production, rehearsals, performance, lessons, tutorials, etc. While more information about appealing a decision is available in the Rice University Code of Student Conduct, the bases for appeal are outlined below:

F. APPEALS. Decisions can be appealed by the student charged and, in some cases, by the reporting student.

1. Bases for appeals. If an appeal is not based on one of these reasons, the appellate official may dismiss the appeal, at the official's discretion:

a. to determine whether the decision by the University Court, College Court, or Student Judicial Programs was reached fairly in the light of the charges and information available;

b. to consider new information that might have altered the result but was unknown to the University Court, College Court, or Student Judicial Programs, and could not have been reasonably discovered at the time of the adjudication;

c. if the information submitted to the University Court, College Court or Student Judicial Programs did not support the decision; or

d. if the sanctions imposed were inappropriate.

Sincerely,

Lisa DeLaTorre
Director, Student Judicial Programs

CC:     Graduate and Postdoctoral Studies
        Dean of Undergraduates
        Shepherd School of Music
        Title IX Coordinator
        Student Judicial Programs

# Exhibit 2

Code of Student Conduct

## I. APPROACH OF THE CODE

**A. PURPOSE.** As an academic community within a larger civil community, it is necessary for Rice University to articulate and enforce standards of behavior. These standards are not intended only to prohibit misbehavior and to punish violations but also to educate about behavior and character traits that the community wishes to promote or discourage; to protect community members from harm or unwarranted interference; to hold individuals and groups responsible for their actions and the consequences of their behavior; and to cultivate an environment conducive to our community's educational purpose. In short, Rice expects its students to behave—at all times—reasonably, respectfully and responsibly.

This Code is not a substitute for criminal or civil judicial proceedings and it is not intended to restrict or discourage any complainant from using criminal or civil justice systems. Disciplinary action under this Code does not preclude sanctions or remedies under criminal or civil laws. Rice University and individual complainants or victims may, wholly apart from this Code, refer suspected criminal law violations to the criminal justice system, pursue available remedies through civil court proceedings, and avail themselves of other forms of dispute resolution.

The information contained in this Code is intended to aid efforts to ascertain the facts of a disciplinary matter or allegation and to reach a just decision. The Code is not intended to—and does not—confer any contractual rights on any individuals involved. Circumstances can differ greatly between matters, and the Director of Student Judicial Programs may make necessary adjustments to the procedures in a particular matter in order to reach a timely and just decision.

**B. PHILOSOPHY.** The life and work of a Rice University student should be based on integrity, responsibility, and consideration and respect for others. In all activities each student is expected to be respectful of the rights and interests of the community and of others in the community and to be personally honest. Rice University, through appropriate policies and rules, expects mature and responsible behavior of its students and holds students responsible for behavior that violates the standards and expectations of the community. All students are expected to conduct themselves in a manner compatible with the University's function as an educational institution and with the rights of all members of the University community to attend, make use of, and enjoy the facilities and benefits of the University without undue interruption or disruption.

By entering Rice University, students accept several responsibilities: to respect the safety, dignity, and welfare of all persons in the University community and their guests, to refrain from misusing or harming property which belongs to the University or members of this community, to maintain an atmosphere conducive to education and scholarship, and other responsibilities as outlined in the Student Handbook and University policies. The University specifically emphasizes the expectation for students to behave respectfully in all interactions with other members of the community, including other students, faculty, and staff in every department of the University.

Failure to fulfill these responsibilities and expectations may result in the suspension of specific privileges, the withdrawal of the student's privilege of attending the University, or the imposition of other sanctions.

The remainder of this Code explains in more detail the mechanisms and procedures for maintaining and enforcing Rice University's standard for non-academic conduct. The Code explains the several bodies and officials that investigate and potential violations. It also provides examples of conduct that violates the Code, as well as the sanctions that may be imposed for Code violations. Also included is an explanation of the procedures typically used in adjudicating misconduct allegations and appeals.

**C. THE CONDUCT SYSTEM.** Rice University advocates student self-governance and imposes as few rules as possible; however, as in any community, certain expectations for behavior and conduct are necessary.

This Code, including the philosophy discussed above, applies to the non-academic conduct of all Rice University undergraduate students, transfer students, graduate students, professional students, visiting students, Class III students, Second Degree students, those auditing classes, and any other category of Rice University students, from the time they arrive on campus for orientation until they have graduated, permanently withdrawn, or resigned from the University. Academic conduct is addressed by the University's Honor Code, though the two systems may overlap at times and the processes under this Code can be used to effectuate Honor Code sanctions; suspensions for Honor Code violations are also disciplinary suspensions. Certain other areas and departments of the University (such as the library, parking and traffic enforcement, and Housing and Dining) also maintain additional rules and regulations that students are responsible for observing. Any department or office may refer a violation of University rules or policies to the student disciplinary system.

This Code applies to behavior on or off campus, including that which affects the University community's reputation, safety, or security. Student organizations and clubs are also subject to this Code and may be sanctioned under this Code. All enrolled students are subject to Rice University policies, rules and regulations, including this Code, whether they are on or off campus. All prospective students and guests of Rice University students are subject to Rice University policies, rules and regulations whenever they are on the Rice University campus or attending a Rice University function (even those away from the campus). Anyone may report a potential violation of the Code.

This Code and non-academic disciplinary actions are implemented by a system composed of several officials and bodies: the individual College Courts, the College Magisters, the University Court, the Judicial Affairs Committee, the Director, the Associate Dean over the Office of Student Judicial Programs (Associate Dean), the Dean of Undergraduates, and the Dean of Graduate and Postdoctoral Studies. This Code remains in effect throughout the calendar year; it is not limited to the academic year.

The College Courts and University Court may enact their own procedures for implementing this Code, with the approval of the Magister or Director as appropriate, as long as such procedures are fair, reasonable, and not inconsistent with this Code. The

Director and the Magisters may enact their own practices for implementing this Code as long as such practices are consistent with the principles and purposes of this Code.

The Dean of Undergraduates has general authority over the student disciplinary system. The Dean of Undergraduates and the Associate Dean provide consultation as needed to the Director of Student Judicial Programs, the Magisters, University Court, and others involved in the Rice conduct system. Student Judicial Programs is the primary administrative office concerning matters under the Code of Conduct, and the Director is the primary disciplinary official administering the disciplinary process under this Code. All powers and authority given to the Director under this Code may be exercised by the Dean of Undergraduates and the Associate Dean.

The Magisters, the Director, the Associate Dean, the Dean of Undergraduates, and the Dean of Graduate and Postdoctoral Studies may appoint designees in their discretion.

Provisions of this Code may be reviewed and amended at any time by the Dean of Undergraduates and the Associate Dean of Undergraduates, and are effective when approved by both. In addition, the Dean of Undergraduates will make, from time to time, a report to the Rice University Board of Trustees about the administration of the Code.

**D. OFFICIALS WHO ADMINISTER THE CODE OF CONDUCT.** Rice University conduct officials and bodies are not designed to and should not be expected to function as courts of law. The procedures are designed to treat all matters as individually and informally as possible and strive for fairness and reasonableness in all considerations. When feasible and appropriate, disciplinary cases will be referred to the student adjudicatory bodies, such as University Court and the College Courts.

    1. **Associate Dean of Undergraduates.** The Associate Dean oversees Student Judicial Programs, coordinates the behavior and conduct systems at Rice, and is responsible for cooperation among the offices. The Associate Dean chairs the Consultation and Assessment Team, which convenes relevant offices and officials regularly to coordinate responses to behavioral matters, including coordinating disciplinary matters but also non-disciplinary behavioral matters. The Associate Dean has the authority to administer the Code when necessary. The Associate Dean decides when mandatory assessments will be required for students. The Associate Dean also assists with the non-judicial resolution of behavioral matters as necessary and coordinates responses when cases have both significant disciplinary and non-disciplinary aspects.

    2. **Student Judicial Programs.** Student Judicial Programs (SJP) is the primary conduct office of the University, and the Director of SJP is the primary conduct official. The Associate Director may serve as designee of the Director. SJP receives information and complaints concerning potential violations of the Code and decides which body, if any, will investigate and consider a matter. Decisions issued by bodies under this Code are recommendations to SJP, to be implemented and enforced under its authority.

a. SJP may assume authority over a matter directly rather than refer it to University Court or another body. These matters may include (but are not limited to):

    i. matters where personal privacy is of a special concern (including but not limited to sexual misconduct or sex discrimination allegations);

    ii. matters that require complicated, sensitive, or extensive investigative activities;

    iii. matters that are particularly serious and may, if substantiated, reasonably be foreseen to subject a student to suspension or expulsion from the University or other severe penalty;

    iv. matters where the student charged or the complainant or the University Court requests that SJP consider the matter; or

    v. other matters as appropriate and at the discretion of the Director.

b. SJP may also assume authority in times when the University Court docket is congested and requires assistance, including where there is a need to timely adjudicate allegations against graduating seniors before graduation can occur.

c. SJP may remove or refer matters already before the College Courts to the University Court.

3. **University Court.** The University Court is an adjudicatory body of undergraduate students, composed of four officers, one representative from each college, and two new student representatives.

a. Membership: The officers are elected by and from the membership of the court, except for the Chair, who is nominated by the court and elected through campus-wide undergraduate elections. The college representatives are selected by their colleges; the method of selection is determined by each college. The new student representatives are appointed by the officers in the fall. If vacancies occur, the Chair, with the approval of the SJP, may appoint members to fill them.

b. Types of cases University Court hears: The University Court may hear matters referred to it by SJP. The University Court may decline to hear a matter, in which case the matter is returned to SJP. Violations of college rules (College Infractions) are handled by the colleges as specified below. However, the College Courts or Magisters may (with the consent of SJP) refer matters to the University Court.

c. Student ombuds: For each case handled by University Court, the Chair designates an ombuds from the membership of the court. The ombuds monitors the meeting and process in a judicial matter before the University Court. The ombuds's duties include informing the student charged of what to expect at the meetings and to answer any questions the student may have. However, the ombuds does not act as an advocate at the meeting.

The ombuds is responsible for pointing out any procedural errors and advising the student charged if grounds for appeal arise. Otherwise, the ombuds should be an impartial observer of the University Court.

d. Decisions and sanctions: Decisions and sanctions issued by University Court are recommendations to SJP, to be implemented and enforced under its authority.

4. **College Courts.** College Courts are adjudicatory bodies that may be established and operated by the Colleges. The College Chief Justice is head of the College Court and may act for the Court when permitted by the College Court procedures. If established and operational, a College Court has authority over certain infractions occurring on the College grounds or at the College's functions. These are College Infractions, and a student charged with such infractions will usually have a meeting before the College Court or other proceedings as determined by the College.

A College Court may choose to refer matters otherwise within its authority to the College Magister, SJP, or University Court (with SJP's consent).

Appeals from actions by the College Courts or other College actions are handled by the Magister, with a final appeal to SJP; appeals to the Dean of Undergraduates are not available for these matters.

In instances where the Housing and Dining Department believes that a student has caused damage to a building or other University property, the Department may send a bill for the damage to the student's college. The College Court may assume responsibility for the matter and may investigate and adjudicate the behavior of a particular student or students to pay such damage. The College Court may also refer handling of the matter to SJP, the Magister, or to the University Court (with SJP's consent).

When a student fails to fulfill college sanctions or damage assessments duly imposed by the College Court, the College Chief Justice or Magister may ask SJP to take steps to enforce the sanction, including by placing a hold on the student's account until the sanction is fulfilled.

5. **Magisters.** College Magisters are appointed by and derive their authority from the President of Rice University, and report to the Dean of Undergraduates. They are responsible for all aspects of student life in the Colleges, including the responsibility to support and advise the College Court. The Magisters may appoint designees as necessary.

a. Magisters' authority over matters within the College: Magisters may assume authority over any matter within their College whenever the health (including psychological health) and/or safety of a student is at issue, provided they have consulted with the Associate Dean and any other necessary and appropriate treating professionals regarding the issue. It is expected that the Magister, Associate Dean, and any other relevant professional staff members will work as a team to communicate and resolve the issue. When a Magister assumes authority over such matters,

the Magister will, at the same time, inform the Associate Dean of the name of the student and the actions taken by the Magister (e.g., proscribing a student's privileges or movement in the College or mandating an assessment). To ensure continuity, the Magister may, after his or her initial action, refer the matter to SJP for implementation, follow-up or tracking of the student's compliance.

b. Magisters and the College Court: Magisters may bring matters to the attention of the College Court. Magisters may also assume jurisdiction over matters before the College Court, or refer matters before the College Courts to SJP or University Court (with SJP's consent). Magisters may hear appeals from decisions by the College Court.

c. Magister's Rustication: Magisters have the authority to summarily rusticate a student—socially or from the College—who is a member of that Magister's College. Magister's Rustication is a social action apart from sanctions described in this Code and derives from the Magister's role in making decisions for the welfare of the College and its students. It involves revocation of some or all of the privileges of living within the college system. It may be imposed only by the Magister but may be recommended to the Magister by other University officials, including SJP.

d. Magister's ban on a member of another College: Magisters have the authority to summarily ban a student who is a member of another College from the grounds and activities of the Magister's College.

e. Effect of a Magister's Rustication or ban on an SJP investigation: A Magister's Rustication does not prohibit investigation, charges, or sanctions by SJP even if the investigation arises from the same behavior that gave rise to the Magister's Rustication. In that case, if SJP finds the student "in violation" of the Code, SJP may take the rustication or ban into consideration when determining appropriate sanctions.

f. Appeals of Magister's Rustication or ban: Appeals from a Magister's decision to rusticate or ban a student may be made directly to the Dean of Undergraduates.

g. Administration of Magister's Rustications and bans: The Magisters will notify SJP when a student is rusticated or banned. Under its authority, SJP may also add prohibitions or proscriptions, including those that affect a student's participation in academic and non-academic Rice activities.

## E. IMMEDIATE AND INTERIM ACTIONS BY THE ASSOCIATE DEAN AND STUDENT JUDICIAL PROGRAMS.

1. **Immediate Actions.** In addition to the other roles and responsibilities described in this Code, the Associate Dean and SJP (through the Director or other professional staff) may, either on a final or interim basis, immediately expel or suspend a student or proscribe the student's privileges or movement on campus.

The suspension, expulsion, or proscription may issue on any of the following bases:

> a. to ensure the safety and wellbeing of members of the University community or preservation of University property;
>
> b. as a response to a Title IX concern;
>
> c. to ensure the student's own safety or wellbeing;
>
> d. to maintain the reputation of the University;
>
> e. if the student poses a threat of disruption or interference to an individual or to normal University operations; or
>
> f. for other reasons specified in other sections of the Code.

The Director may implement a period of disciplinary probation and/or other restrictions as a condition of any readmission after a separation, except as otherwise determined by an appeal decision.

2. **Interim Separation or Suspension.** The Associate Dean and Director may interimly separate or suspend a student pending further disciplinary action under the Code. Interim separation or suspension may be used when the behavior of a student meets any of the criteria in section I.E.1. and as part of an interim action in cases alleging Title IX concerns. The action is taken pending further action under the Code.

Interim suspensions may also be put in place when a student has withdrawn from the University before processes under the Code could be initiated or completed; in these cases, the interim suspension must be resolved before the student can return to Rice from the withdrawal.

Often, acute behavioral situations will manifest in multiple ways and include both conduct and psychological or other non-conduct behavioral aspects. In those situations, the response will be coordinated by the Associate Dean. The non-conduct aspects will be the primary initial focus for action. Conduct matters may be resolved after the non-conduct matters; the interim separation may be used in these circumstances to help ensure all aspects of the concerning behavior are addressed.

Interimly separated or suspended students must leave the University, including residential colleges, upon receipt of notice of the action or in the manner described in the notice. Participation in student activities on and off campus and use of Rice facilities, including the student center, the colleges, the playing fields and recreational facilities, and computer labs is not allowed.

3. **Appeal of Immediate and Interim Actions.** The student involved may appeal immediate and interim actions, including an interim suspension and expulsion, within 10 days, to the Dean of Undergraduates or Dean of Graduate and Postdoctoral Studies (as appropriate), who will decide the appeal within seven days of the appeal. During the appeal, the interim action(s) will remain in effect except as provided by SJP or the Associate Dean.

4. **Mandatory Assessments and Evaluations.** The Associate Dean of Undergraduates (either directly or through the Director or the professional staff of SJP) may require a student to receive an assessment or evaluation from the Rice Counseling Center, Student Health Center, or other appropriate provider. This may be done in conjunction with the sanctions for a student found in violation of this Code, but should not be viewed as a sanction.

The Associate Dean may also require an assessment or evaluation of any student when, in his or her judgment, the behavior of the student is cause for concern, regardless of whether the student has been found in violation of the Code. If appropriate, after an assessment or evaluation is completed under this section, the Director, Associate Dean, Dean of Undergraduates, or Dean of Graduate and Postdoctoral Studies may require that the student participate in necessary further assessment, treatment, education or follow-up, or can take other action if necessary to protect the health, safety, or welfare of any member of the Rice community.

## II. CONDUCT

**A. STANDARD OF CONDUCT.** Students are expected to govern their conduct by standards of considerate and ethical behavior so as not to harm or discredit themselves, the University, or any other individual. Moreover, just as the learning environment does not end at the classroom door, neither is the exercise of individual responsibility, civility, and honor limited to the academic domain. In all disciplinary matters, the primary question is whether the student involved met (or failed to meet) the expectations Rice has for its students, as described throughout this Code and in other University policies, regulations and statements.

Rice University reserves the right to take official notice of criminal convictions of, and accusations against, a student, whether the crime is committed on or off campus. This may then result in appropriate sanctions, including potentially expulsion from the University.

Some matters may involve allegations of violations of both Rice University rules or regulations and civil or criminal law. In these instances, proceedings concerning possible Code violations may progress on campus without regard to off-campus proceedings. Proceedings under this Code may be carried out prior to, simultaneously with, or following civil or criminal proceedings. The University does not presume to advise students accused of criminal law violations. Rice University provides no sanctuary from the consequences of illegal acts.

**B. PROSCRIBED CONDUCT.** The central standards for adjudication under the Code are the expectations for student behavior and conduct that are set out in this Code, the Student Handbook, and other University polices, regulations and statements. In addition, the following are specific examples of acts and behaviors that fall short of these expectations and are therefore unacceptable within the University community. This list is not all-inclusive.

Additional rules exist in the Student Handbook, the Rice Alcohol Policy, the Rice Honor Code, the General Announcements, Housing Agreements, and the policies and rules published by the University and administrative departments. Those rules and policies may be enforced by the procedures under this Code and the authority of this Code, by the Director, the Associate Dean, the Dean of Undergraduates, and the Dean of Graduate and Postdoctoral Studies.

### 1. University Violations (Class I).

a. Mental or Bodily Harm, Reckless Action or Disregard: Intentionally inflicting or attempting to inflict mental or bodily harm on any person, including on the charged student; taking any reckless action, or showing reckless disregard, from which mental or bodily harm could result to any person, including to the charged student. This includes, but is not limited to, actual or attempted behavior that includes

i. physical abuse of all types, verbal abuse, threats, intimidation, harassment, coercion,

ii. sexual assault, other forms of sexual misconduct, relationship violence, stalking, and sexual harassment and other forms of gender-based misconduct,

iii. physically restraining any person (including but not limited to restraint by rope, handcuff, plastic tie, duct tape or other types of restraint),

iv. driving while intoxicated or under the influence (whether on or off campus),

v. use or distribution of dangerous substances (whether legal or illegal),

vi. failure to provide aid or report a student or staff member in an emergency situation to RUPD, REMS, or other appropriate officials, and/or

vii. other conduct that threatens or endangers the physical or mental health or safety of any person.

b. Violations of Published University Policies, Rules or Regulations, and Agreements: This includes but is not limited to the Rice Title IX Policy And Procedures Prohibiting Sexual Assault And Other Gender-Based Misconduct Involving Students, Sexual Harassment Policy, the Rice Weapons Policy, Housing and Dining Policies, and other housing agreements with Rice University.

c. Violations of Criminal Law.

d. Property Violations: Attempted or actual theft of property or services and/or damage to property of the University, a member of the University community, or any business or person that is located on University premises, or knowing possession of stolen property.

*Revised August 17, 2017*                                                            9

e. Fire Safety Violations: including but not limited to creating a fire safety hazard in any University building, setting false fire alarms.

f. Possession of Weapons or Other Dangerous Devices: possession of weapons, including all firearms (including legally registered ones), compressed air-guns, pellet guns, BB guns, clubs, illegal knives, other bladed weapons (including those intended for ceremonial or decorative uses), dangerous chemicals, or explosive devices (including fireworks) of any description. None of these items may be possessed in the residential colleges and none may be possessed on campus (other than as permitted in writing by the Chief of Police, as part of official ROTC activities conducted under supervision, and as allowed by Texas law) except as registered and stored at the Rice University Police Department. Students should also be aware of, and act in compliance with, Rice University's Weapons Policy and Texas state law.

g. Disruption/Obstruction: Obstructing or interfering with teaching, research, administration, disciplinary proceedings, or other University functions or activities. This includes on-campus or off-campus functions and also includes authorized non-University activities occurring on campus.

h. Discrimination: Intentional discrimination against a person on the basis of race, color, religion, national origin, sex, age, disability, veteran status, sexual orientation or gender identity, except where such distinction is required by law.

i. Unauthorized Entry or Trespass: Unauthorized entry (whether forcible or otherwise) to any building, structure, construction site or facility, including an individual's room and/or unauthorized entry to or use of University grounds.

j. Manufacture, Distribution, Sale, Offer for Sale, Possession, or other Unauthorized Use of Dangerous or Controlled Substances. This includes marijuana, other illegal or dangerous drugs, and unauthorized possession, distribution, sale, offer for sale, or use of prescription drugs.

k. Unauthorized Use of Parking Permits, University ID Cards, or Meal Cards.

l. Misuse of University Property or Equipment, including misuse of University Purchasing Cards.

m. Misuse or Abuse of Computational Facilities, including:

  i. unauthorized entry into a file to use, read, or change the contents, or for any other purpose;

  ii. unauthorized transfer of a file;

  iii. unauthorized use of another individual's identification and/or password;

iv. use of computational facilities to interfere with the work of another;

v. use of computational facilities to send obscene, abusive, harassing or threatening messages or to engage in stalking behavior or to repeatedly send unwanted email to individuals;

vi. use of computational facilities, including the Rice network facilities, to download or possess child pornography;

vii. use of computational facilities to interfere with the normal operation of the University's computing systems;

viii. use of computational facilities for file sharing or downloading in violation of copyright laws; or

ix. violation of policies of University computational facilities or networks.

n. Falsification of Records; Giving False Information; Use or Possession of False Identification Documentation:

i. Altering, tampering, forging, or knowingly using falsified documents or records (including Rice parking permits and identification cards as well as false or fictitious state-issued identification);

ii. being party to falsification;

iii. giving or providing false statements, written or oral, and/or providing false information during any University proceeding or to any University administrator or official (including to SJP);

iv. using false identification or identification that is not one's own to deceive University officials, including University police;

v. possession of false identification documentation.

o. Violations of the Rice University Alcohol Policy, including without limitation:

i. intentionally circumventing the spirit and/or purpose of the Alcohol Policy;

ii. violations by an organization, group or an individual hosting an event;

iii. use or possession of a false driver's license or other type of identification (including wrist bands) in order to procure or consume alcohol;

iv. providing false or misleading information on the event registration form, or failing to include important event information on the event registration form.

p. Alcohol Violations, including without limitation: public intoxication, minor in possession, driving while intoxicated, minor driving under the influence, and other alcohol related violations.

q. Unauthorized Access to University Records: regardless of where such records are located.

r. Unauthorized Access: Unauthorized possession, duplication, or use of keys or access devices to any University premises, facilities or equipment, or unauthorized entry to or use of any University premises or property.

s. Unauthorized Use of the Rice University Name or Logo.

t. Failure to Comply or Identify: Failure to comply with a direction of University officials or law enforcement officers acting in the performance of their University duties and/or failure to identify oneself to these persons when requested to do so.

u. Hazing and/or Abusive Affiliation: Any act, whether on or off campus, which endangers the mental or physical health or safety of a student, or which encourages or leads to conduct that otherwise violates the Code or Rice policies, or which a reasonable person would perceive is purposefully demeaning or humiliating to the students who are the object of the conduct, or which destroys or removes public or private property, for the purpose of membership in, affiliation with, and/or association with a group, including pressuring students to engage in hazing conduct. Consent of the participants or objects of the hazing conduct is not a defense to a charge of hazing. The individual student(s) conducting the hazing, the group(s) associated with the hazing, the group's leadership, or others with knowledge of the planning of hazing activity and who do not notify SJP may all face sanctions under the Code. Students should also be aware that Texas state law also criminalizes hazing, as defined in the Texas Education Code § 37.151-37.152.

v. Disorderly Conduct: Disorderly, lewd, or indecent conduct; breach of peace.

w. Privacy Violations, including but not limited to:

> i. Public disclosure of private information: publication or dissemination—in official or quasi official publications and without a legitimate university interest—of an individual's private information that might reasonably cause harm, shame or humiliation. Examples of forums in which this type of violation can occur are: college governments minutes, college social media sites, and publications of colleges, university-affiliated organizations, teams and clubs. Responsibility for any alleged violation may apply to the individual, the college, the organization, team or club, and/or the officers.

> ii. Creating, Storing, or Sharing/Distributing Unauthorized Surveillance, Photography, or Recordings:

*a*. Making unauthorized audio, video, or photographic images of a person in a location in which that person has a reasonable expectation of privacy, including (but not limited to) shower/locker rooms, residence hall rooms, and restrooms;

*b*. Making audio, video, or photographic images of a person in a manner that is meant to cause harm or embarrassment to the subject;

*c*. Unauthorized recording of administrative, faculty, or judicial meetings;

*d*. Storing, sharing, and/or other distribution of any such audio, video or images by any means.

x. Abuse of the University Judicial System: including but not limited to:

i. failure to appear before a judicial body or University official when requested;

ii. falsifying, distorting, withholding, or misrepresenting information before a judicial body or University official;

iii. disruption of or interference with the orderly conduct or with the progress of a judicial proceeding;

iv. knowingly instituting a judicial proceeding without cause;

v. attempting to discourage an individual's proper participation in or use of the judicial system or retaliating against an individual for participating in or using the judicial system;

vi. attempting to influence the impartiality of a witness, student participant, University official, or member of a judicial body in connection with a judicial proceeding;

vii. harassment and/or intimidation (verbal or physical or electronic) of a University official or member of the judicial body or witness before, during, or after a judicial proceeding;

viii. influencing or attempting to influence another person to abuse the judicial system.

y. Commercial Use of Class Materials: Sale of class notes or other course-generated material for commercial collection or commercial purpose.

z. Failure to Fulfill Sanctions Imposed in an Earlier Proceeding.

aa. Repeated College Infractions or Failure to Fulfill College Infraction sanctions.

bb. Aiding and Abetting in Any of the Above Violations.

2. **College Infractions.** A College Infraction involves inappropriate behavior within the Colleges and on their grounds, which, though inappropriate, does not

rise to a Class I disciplinary violation because it is relatively minor and primarily involves violation of College rules.

College Infractions by themselves are not considered disciplinary violations on students' disciplinary records. Charging a student with a College Infraction does not necessarily mean the student will not be charged with a Class I violation. Behavior that amounts to a College Infraction and a Class I violation may be addressed through both systems. Nothing about going through the College Infraction system prohibits SJP from addressing the behavior if it is later revealed that the matter should have been treated as a Class I violation; in that case, the matter will be handled using Class I procedures. Some examples of College Infractions include:

a. Unauthorized Use of Property or Services Within the Colleges and Their Grounds.

b. Disorderly Conduct: Disorderly, lewd, or indecent conduct; breach of peace on college grounds or at college functions.

c. Failure to Comply or Identify within College Boundaries or at a College Function.

d. Public Intoxication within College Boundaries or at a College Function.

e. Violating College Rules: College rules are available from the College governments.

f. Unauthorized Possession or Consumption of Alcoholic Beverages on College Grounds or at College Functions.

g. Abuse of College Judicial System.

h. Destruction of College Property.

i. Aiding and Abetting in Any College Infraction.

## III. TITLE IX POLICY AND PROCEDURES PROHIBITING SEXUAL ASSAULT AND OTHER GENDER-BASED MISCONDUCT INVOLVING STUDENTS.

Rice University is committed to providing access to education, free from gender-based discrimination, for all students, regardless of gender, sexual orientation, or gender identity. Title IX of the Higher Education Amendments of 1972 prohibits discrimination on the basis of sex in education programs and activities. Consistent with Title IX, the University does not tolerate sex discrimination, including sexual misconduct and relationship violence. "Sexual misconduct" is the umbrella term federal regulators use to categorize behavior that includes sexual assault, unwanted sexual contact, and sexual harassment. While all these behaviors are abhorrent and damaging, Rice views sexual assault as particularly so and will sanction that behavior most severely. "Relationship violence" is the term federal regulators use to categorize behavior that includes intimate partner violence, stalking and similar behavior. All sex discrimination, including sexual misconduct and relationship violence, is harmful, violates the rights and dignity of those affected, and violates Rice standards, federal law, and possibly State of Texas criminal law.

*Revised August 17, 2017*                                                                 14

In a manner respecting the dignity and intrinsic human worth of the individuals, the University will address all occurrences of sex discrimination that are reported to Rice. Rice encourages students to seek all remedies to these behaviors that they choose, in each venue or process that they choose. Rice will investigate occurrences reported to it, stop and appropriately sanction anyone who has engaged or is engaging in prohibited behaviors, and take steps to prevent these behaviors from reoccurring. Rice recognizes the trauma these behaviors can induce, and is committed to addressing the needs of both complainants and students responding to such allegations. To read the full text of the Title IX Policy and Procedures Prohibiting Sexual Assault and Other Gender-based Misconduct Involving Students, please follow this link.

## IV. SANCTIONS

**A. PHILOSOPHY OF SANCTIONS: CORRECTIVE AND EDUCATIONAL.** Sanctions are intended to be not only punitive, but also corrective and educational, while protecting the safety of the community and its members. Students found to have violated the Code should be challenged to evaluate their behavior and reflect on their actions and its effect on the community.

In matters handled by an adjudicatory body where a student is found to have violated the Code, that body will recommend sanctions to the Director. Except for in a Magister's Rustication, which is appealed as described in I.D.5.f., SJP may impose a different sanction than recommended. In determining an appropriate sanction, SJP may consider sanctions that the student has received for prior academic or disciplinary violations, and other factors as appropriate. The Magister (in the case of College Infractions or Magister's Rustications) or SJP (in all other cases) accepts and implements the sanctions.

When a student receives a sanction listed in B.1-6 below, a notation of the sanction will appear on the disciplinary record; expulsions will be reflected on the official Rice transcript.

The circumstances giving rise to a complaint under this Code may also result in a Magister's rustication, in addition to any disciplinary sanctions that may be imposed under this Code. A Magister's decision to rusticate is separate from the decision to investigate complaints under the Code.

**B. TYPES OF AVAILABLE SANCTIONS.** The following are specific examples of available sanctions for violations of this Code, including violations of the Title IX Policy and Procedures Prohibiting Sexual Assault and Other Gender-based Misconduct Involving Students; this list is not all-inclusive and the sanctions may be imposed in any combination.

> 1. **Expulsion.** Permanent Separation from the University. Under this Code, this penalty can be imposed only by the Director, the Associate Dean of Undergraduates, the Dean of Undergraduates, or the Dean of Graduate and Postdoctoral Studies.

> 2. **Disciplinary Suspension.** Suspension may be for a specified time or until specified conditions are met.

Suspended students must leave the University within the timeframe specified by SJP. While suspended, students cannot attend classes, live on campus, or access any private areas of the residential colleges. Participation in student activities on and off campus and use of Rice facilities, including the student center, the colleges, the playing fields and recreational facilities, and computer labs, is limited to enrolled students.

Readmission following disciplinary suspension requires approval of SJP. Readmission after the term of the suspension is not automatic and may be denied, for example, when the specific terms of the suspension have not been fulfilled. Readmission from suspension may be accompanied by additional requirements to ensure the safety, success and wellbeing of the student.

3. **Loss or Suspension of Privileges.** A student may be prohibited from attending particular functions, public parties or private gatherings, or other locations or events where alcohol is served or consumed (whether on or off campus), or prohibited from consuming alcohol on campus, or being on campus under the influence of alcohol. When recommended by University Court, or implemented by SJP, the specific behaviors restricted will be explained to the student.

A student may also be prohibited from entering a particular campus area, facility, residence, or college by SJP; this is effectively a judicially proscribed "rustication." In that case, a student is prohibited from living on campus and participating in college life or activities, and other prohibitions as appropriate. Although this particular sanction must be initiated by SJP, the availability of these University-level sanctions does not affect the Magisters' ability to rusticate members of their colleges, or ban members of other colleges, as described in I.D.5. of this Code.

4. **Disciplinary Probation.** A written notice from SJP that further violations may result in suspension or other serious sanction, and that the student may not host private gatherings (per section (D)(2)(a) of the Rice Alcohol Policy), may not host or serve alcohol at public functions or parties (per section (D)(1) of the Rice Alcohol Policy), or be a candidate for or hold elective or appointed office in any University organization during the term of the probation. The term of the probation may be a specified period of time or remain indefinite. For students on disciplinary probation for a semester-specific amount of time, the probation remains in effect until the beginning of the first semester subsequent to the probation semester(s). Students on disciplinary probation may be required to meet regularly with appropriate University officials.

5. **Written Reprimand.**

6. **Fines or Equivalent Work Penalty.** Fines imposed by the College Courts will be paid to the College; all other fines will be collected by SJP and are payable to the University. The nature and terms of an equivalent work penalty, when used, will be specified by SJP.

7. **Restitution.** Restitution in money, or in kind, to the University, College, or individual for a loss caused by the student or organization found in violation.

8. **Required Community Service or Work Assignment**. The student (or organization) is required to engage in service to the community, an agency, an institution, or the University, or to participate in special educational programs or projects. At the discretion of SJP a corresponding work assignment may be substituted for or added to a monetary fine.

9. **Mandatory Educational Session/Counseling**. The student will be required to complete an educational program or counseling program.

10. **Mandatory Written Apology**. The student or group will be required to write an appropriate letter of apology, which must be approved by the Chair of the Court, Magister, or Director (as determined by the judicial official or body considering the matter).

11. **Discretionary Sanctions**. Additional educational activities, work assignments, such as community service, and any other related discretionary sanctions.

**C. SANCTIONS FOR COLLEGE INFRACTIONS.** A student found to have committed a College Infraction may be subject to a monetary fine, restitution, and loss or suspension of privileges within the Colleges (other than rustication) for a specified time. Fines for College Infractions will be paid to the College.

**D. RESULT OF FAILURE TO FULFILL IMPOSED SANCTIONS.** A student's failure to fulfill sanctions imposed may result in further proceedings and additional sanctions, including suspension or expulsion from the University. This is in addition to the imposition of any holds and in addition to the original sanctions.

**E. SJP HOLDS.** SJP may place a hold(s) on a student's account with the Office of the Registrar for not completing required sanctions, for nonpayment of college fines or other assessments after college judicial action, for not completing the Honor Council orientation required of incoming students, for not affirming the intent to follow the Honor Code, Code of Conduct, and Alcohol Policy, for not cooperating with the judicial process under this Code, for having pending Honor Council or Code of Student Conduct allegations, and for other causes as necessary.

In general, students with holds placed by SJP may not register for classes, receive copies of their transcripts or grades, have their transcript released to other parties, or, in some instances, graduate. A hold placed by SJP is an administrative action authorized by the Director and is not a disciplinary sanction under the Code.

**F. MEDICAL AMNESTY.** Any student may bring an intoxicated or drug-impaired person to Rice University Health Services or seek assistance from the Rice Emergency Medical Services or the Rice University Police Department. Neither the student who is impaired nor the student assisting the impaired student will face disciplinary action under this Code for the possession, use, or provision of alcohol (see exception below) or the possession or use of other drugs, so long as the student(s) receiving the amnesty

completes a mandatory follow-up with their Residential College Magister or the Magister's designee or the Dean of Undergraduates or the office's designee. The designee in either case may be the Rice University Counseling Center or the Student Wellbeing Office.

The amnesty does not apply to other prohibited conduct, including but not limited to, providing hard alcohol to persons under 21, assault, violence, property damage, or the distribution of dangerous substances, whether legal or illegal.

Failure by a student, organization, or college to call REMS or RUPD when faced with an alcohol- or other drug-related emergency is a serious violation and may be sanctioned with rustication or loss of privileges, suspension, or expulsion.

To receive amnesty, a student must initiate a request for assistance before being confronted by Rice for possible alcohol or drug violations. Students may receive amnesty on more than one occasion. Because cooperation is crucial during emergency responses, any interference with REMS, RUPD, or others trying to provide care to an injured person is unacceptable and will be severely sanctioned. An intoxicated or drug-impaired student who is belligerent toward emergency responders will not receive amnesty.

**G. AMNESTY IN RELATION TO REPORTED INCIDENTS OF SEXUAL ASSAULT.** A student who, in good faith, reports being the victim of, or a witness to, an incident of sexual assault will not face disciplinary action under this Code for misconduct in relation to the incident. This amnesty does not apply to a student who reports the student's own commission of sexual assault or assistance in the commission of a sexual assault.

## V. PROCEDURES

**A. CHARGES, JUDICIAL BODY MEETINGS, AND CONSIDERATION BY JUDICIAL OFFICIALS.** The procedures used in a University Court or College Court meeting or by SJP are not those used in court cases and are not intended to create contractual rights, including any rights to due process as that phrase is used in courts of law. Formal rules of evidence and jurisprudence do not apply. The procedures under this Code are not adversarial processes but rather procedures for determining the facts regarding a charge and arriving at a fair and informed resolution of a charge. Decisions by adjudicatory officials and bodies in matters under this Code are based on whether a preponderance of the evidence supports the finding; i.e., whether the information shows the student is more likely than not to have committed the behavior at issue.

All parties have a duty to bring all pertinent information concerning the matter to the attention of the investigating individual or body so that an informed and fair decision can be made. Students are expected to be honest, respond to questions, and be forthcoming with relevant information. Students who withhold information or who are not truthful during the investigation may be charged with Abuse of the University Judicial System under this Code.

SJP, or the Magister in the case of College Infractions, may assume authority over a matter when either the student charged or the complainant so requests or at SJP's or the

Magister's discretion. Examples of situations that may lead to SJP assuming authority are listed in section I.D.2., above.

1. **Notifying the University of a complaint.** A person wishing to make a complaint about a student's behavior should contact SJP as soon as practical after the event occurs. When practical and appropriate, SJP will meet with the complainant in person. SJP may ask the complainant to submit a written statement.

2. **Which body will adjudicate the matter.** When a complaint is brought to SJP, SJP determines whether the matter can appropriately be investigated by University Court, considering all the circumstances. If so, SJP may ask the student whose behavior is at issue for his or her preference as to who will adjudicate the matter, SJP or University Court. When appropriate and practical, SJP will refer matters to University Court, or resolve the matter in SJP, in accordance with the student's preference.

Unless the matter is being heard by University Court at the request of the student, at any time before the University Court holds a meeting on the merits of a charge, either the student charged or the complainant may request that the Director assume authority over the matter. When such a request is made, the Director may assume authority over the matter.

3. **Meetings with SJP.** Students may be asked to meet with SJP staff members a number of times, both before charges are decided on and after any charges, as part of an investigation and part of the adjudication process. Students are expected to be not only honest, but also forthcoming and responsive to questions. Students are further expected to be respectful and civil. SJP may record the meetings; in such cases, the staff member will tell the student the meeting is being recorded.

4. **Charges.** As soon as practical, SJP, University Court, or College Court (whichever has authority over the matter) will conduct an investigation to determine if there is sufficient information suggesting a potential violation to proceed. If there is sufficient reason to proceed, the student charged will be notified. If the matter is adjudicated by SJP, the student will be notified of the charge(s), and the student will have an opportunity to respond to the charge(s) verbally and/or in writing, as described in section V.C. of this Code.

5. **University Court proceedings.** Judicial proceedings before University Court will be conducted according to its Constitution, Bylaws, and Investigation, Hearing, and Appeal Procedures, provided they are consistent with the principles of this Code. University Court will consult with SJP and have the Constitution, Bylaws, and Investigation, Hearing, and Appeal Procedures approved by SJP by October 15 of each academic year.

6. **Preliminary meeting before a College Court.** For matters before a College Court, if the student requests it or the College Court considers it useful, the College Court may hold a preliminary meeting. At that meeting, the student charged may accept responsibility for the charged behavior and accept the College Court's recommended sanctions. If the student does not accept

responsibility for the behavior charged and/or the recommended sanction, the matter will be more fully investigated, and adjudicated, by the College Court or, where appropriate, referred to another judicial official or judicial body.

7. **Procedures for allegations of sexual misconduct or stalking and relationship violence.** Notwithstanding other procedures in this Code, in cases involving allegations of sexual misconduct (sexual assault, unwanted sexual contact, sexual harassment) or stalking or relationship violence, SJP or other offices will conduct an investigation, and SJP may charge a responding student under this Code. These charges may result regardless of the complainant's desire to pursue a disciplinary investigation. The Rice Title IX Policy and Procedures Prohibiting Sexual Assault and Other Gender-Based Misconduct Involving Students explains in greater detail when this might occur. Such disciplinary investigations serve to protect the individual complainant and the broader Rice community.

SJP will make every effort to complete an investigation as promptly as possible (with a goal of completion within 60 calendar days), but the investigation timeline will vary from case to case depending on the complexity of the particular factual situation. SJP will notify the complainant and responding student, as well as a Title IX official, if it appears the investigation will require more than 60 days. If an investigation is ongoing during school breaks or between school years, Rice will endeavor to continue the investigation during the break unless doing so would compromise the process.

**B. THE STUDENT IN UNIVERSITY COURT OR COLLEGE COURT PROCEEDINGS.** A student charged and called before University Court or a College Court may:

1. receive a statement specifying the nature of the alleged violation within a reasonable time before a meeting;

2. receive a postponement of the meeting if the request for postponement is reasonable;

3. ask that the University Court or College Court summon witnesses or require presentation of relevant documents or other information, offer information, and argue in support of her or his position;

4. have a student ombuds present as a procedural guide and an impartial observer of the proceedings;

5. have a support person (who must be a member of the University community or the student's immediate family) present for moral support. Other than to consult with the student charged, the support person may not participate in the proceedings;

6. not have legal representation present in any meeting, though students may consult an attorney outside of the meeting setting;

7. challenge the fairness or objectivity of a voting member of the court, if done before a meeting begins or any factual information is considered. A challenged member may disqualify herself or himself and will be replaced by another member. Otherwise, the Director will determine whether the challenge is valid, and, if so, the challenged member will be replaced by another member;

8. know the outcome of any disciplinary meeting and her or his right to appeal; and

9. appeal the outcome.

**C. THE STUDENT IN SJP PROCEEDINGS.** Students may be requested to meet with SJP before and/or after the student is charged with violations of the Code of Student Conduct. A mandatory meeting with SJP may occur to discuss concerns brought to SJP; it does not necessarily mean that the student will be charged with violations of the Code. A student who is charged with a violation(s) of the Code will be notified, before the decision, of:

1. The information available to SJP that enters into the decision to charge the student;

2. The specific sections of the Code the student is accused of violating;

3. The specific alleged behavior that causes concern that the student may have violated the Code;

4. The student's opportunity to review the disciplinary file, by appointment;

5. The student's opportunity to submit a response to charges, along with any additional information the student wants considered;

6. The general procedural steps in the disciplinary process, including the student's ability to appeal, as applicable.

In exceptional circumstances these notifications may be only communicated verbally.

**D. PRIVACY.** All participants involved in a matter under this Code are expected to keep the matter private in order to maintain the integrity of the proceedings, and to respect the dignity of the individuals involved. Students should keep in mind that under certain circumstances, sharing such private information might be a violation of this Code. Authorized members of the University administration, faculty and/or staff, with a need to know, may have access to information regarding disciplinary proceedings and results. The University may also be required to release such information in response to duly issued subpoenas in criminal, civil or administrative proceedings. Students are encouraged to seek support from the Student Wellbeing Office, Rice Counseling Center, and others in their support network.

**E. RECORDS.** Documents pertaining to matters involving Class I violations will be kept in the office of SJP for a period of ten years after the student graduates (or after the student's final separation from the University). Sanctions described in IV.B. will be recorded on an internal disciplinary record, which remains confidential and accessible by members of the Rice administration and faculty, such as SJP and the appropriate Magisters, only on a need-to-know basis.

The official Rice University transcript will indicate any expulsion.

**F. APPEALS.** Decisions can be appealed by the student charged and, in some cases, by the complainant.

1. **Bases for appeals**. If an appeal is not based on one of these reasons, the appellate official may dismiss the appeal, at the official's discretion:

a. to determine whether the decision by University Court, the College Court, or SJP was reached fairly in the light of the charges and information available;

b. to consider new information that might have altered the result but was unknown to University Court, the College Court, or SJP, and could not have been reasonably discovered at the time of the adjudication;

c. if the information submitted to University Court, the College Court or SJP did not support the decision; or

d. if the sanctions imposed were inappropriate.

2. **Procedures for appeal.** Except as otherwise noted, a student eligible to appeal and who wishes to appeal must do so, in writing, within 10 business days of the date of the written notification of the decision. The student appealing should explain the basis of the appeal in writing. The judicial official or body may respond in writing. Normally there are no oral presentations during the appeals process; the appellate decision is made based on the written presentations and the record of the proceedings. An oral presentation may be made if the person deciding the appeal believes an oral presentation would be helpful. Students should limit the page length of their appeal statement to five standard letter–sized pages or less. The path of appeals varies based on the decision-maker.

3. **Appealing a University Court decision.** All appeals from a decision by University Court are made to the Director of SJP. The timelines (notwithstanding V.F.2) and additional procedures for appealing a University Court decision may be specified in the University Court's procedures. A second appeal, to the Dean of Undergraduates, is available when the sanction involved is suspension or expulsion.

4. **Appealing a College Court decision.** All appeals from the College Courts are handled by the Magister. A second appeal to the Director of SJP is allowed.

5. **Appealing a Magister's decision.** All appeals from a decision of the Magister are handled by the Director of SJP, except decisions by a Magister to rusticate. A

Magister's decision to rusticate a student may be appealed only to the Dean of Undergraduates. There is no further appeal.

6. **Appealing a decision by SJP.** Matters decided by SJP may be appealed to Dean of Graduate and Postdoctoral Studies (for graduate students), or to the Dean of Undergraduates (for undergraduate students and any other category of student). There is no further appeal.

7. **Judicial Affairs Committee recommendations.** When SJP takes action based on the recommendations or findings of a Judicial Affairs Committee, the student(s) may appeal to the Dean of Undergraduates or Dean of Graduate and Postdoctoral Studies (as appropriate). There is no further appeal.

8. **Result of appeal.** If an appeal is found meritorious, the Magister, Director, Dean of Undergraduates, or Dean of Graduate and Postdoctoral Studies may decrease or increase the sanction, or refer the matter back to the official or body that originally adjudicated the matter with instructions for reconsidering the original determination or sanction, as appropriate.

9. **Decisions are final pending appeal.** Decisions made in disciplinary matters are final, pending the appeal process. Sanctions other than rustication by a College Magister may be set aside by SJP, on petitions from the sanctioned student and at its discretion, until the appeal process is resolved. Only the Dean of Undergraduates may set aside a Magister's Rustication during the appeal process.

**G. UNAUTHORIZED WITHDRAWAL AND RESIGNATION.** A student charged under the Code, or where a charge is imminent, who leaves the University without permission to withdraw will be considered to have resigned and is no longer considered a student. Students who withdraw with or without permission while charged or where a charge is imminent may be placed on interim separation until the charge is resolved.

A student may resign from the University by notifying the Dean of Undergraduates or Dean of Graduate and Postdoctoral Studies (as appropriate) in writing. Resignation means the student is no longer a student at Rice, and will not return to Rice. A resignation becomes effective when accepted by the Dean of Undergraduates or Dean of Graduate and Postdoctoral Studies (as appropriate). In general, if a student is under investigation for a potential Code of Student Conduct violation or has charges pending under the Code, those proceedings will terminate upon acceptance of the resignation by the appropriate Dean.

Students who resign under any of these circumstances are generally not considered for readmission except under extraordinary circumstances and with permission from the appropriate dean.

**V. INTERPRETATION.** Any question of interpretation regarding this Code will be referred to the Associate Dean or his or her designee for final determination.

**VI. AGREEMENT.** By virtue of their status at Rice University, students agree to be bound by the Code of Student Conduct and any amendments that may be enacted from

time to time, as well as by other Rice policies including the Rice Alcohol Policy and the Rice Honor Code. This obligation is emphasized each time students register for classes but the agreement to be bound exists even when an electronic affirmation is not executed. This Code applies to all matters where the behavior occurs on or after August 11, 2017.

Exhibit 3



**Seiichi P. T. Matsuda**
Dean of Graduate and Postdoctoral Studies
E. Dell Butcher Professor of Chemistry
Professor of BioSciences

February 9, 2018

Mr. Senhica Klee S01255681
2101 E. Harvard Ave, #108
Denver, Colorado 80210

Dear Mr. Klee,

I am writing to conclude your appeal of a decision made by the Student Judicial Programs (SJP) office on October 24, 2017, which determined that you violated Rice University's Code of Student Conduct, Title IX Policy and Procedures Prohibiting Sexual Assault and Other Gender-Based Misconduct Involving Students, and alcohol policy. You received a sanction of suspension from Rice University for at least six semesters as described in the October 24, 2017 letter from SJP. In my previous letter dated December 26, 2017, I have already informed you that I reviewed your appeal and concluded that your conduct at issue violated the Code of Student Conduct and Rice's Title IX and alcohol policies and that I would be upholding the sanction previously determined by SJP. My earlier letter was intended to allow you time to make alternative plans for the near future as you awaited a more detailed explanation, which is now contained in this letter.

## I.    Review of Your Appeal

Your appeal is governed by section V.F. of the Code of Student Conduct (Code). An appeal must be based on one of the four grounds provided in V.F.1. of the Code. Your appeal does not state specifically which of the grounds are the basis of your challenge. I have chosen to review your appeal broadly, with all four permissible grounds in mind. I have given you wide latitude in challenging Rice's October decision while also remaining within Rice's practice of using appeals to address issues of material error rather than simply engaging in a new adjudication of the case. Most of your arguments appear to focus on a perceived lack of fairness in the disciplinary process, that the evidence does not support the decision, and that your sanction is too severe for the conduct involved.

In reviewing your appeal, I have considered whether a preponderance of evidence supports the findings that you are challenging, that is, whether the evidence shows more likely than not that you committed the misconduct alleged. In conducting this review, I have considered the entire record in this case. And, as you specifically requested, I reviewed this matter with an open mind. I

Mr. Senhica Klee                                2                                February 9, 2018

would have done so even without your urging, as that is my role in providing a fair disciplinary process. The facts in this case, however, do not support many of your views and appeal arguments.

In the following explanations, my reasoning sometimes differs from that of SJP. This is not a criticism of SJP.  In the end, I also conclude that a preponderance of the evidence established that you violated Rice's general standard of conduct, the Code, Rice's Title IX policy and its alcohol policy.  I also conclude that your violations are serious and warrant a serious sanction, and I have decided to leave in place the sanction decided by SJP.

## II.   Rice's General Standard of Conduct

Membership in this university community is a privilege that is conditioned, in part, on abiding by the community's rules. Students are expected to conduct themselves with integrity, responsibility, honesty and respect toward one another. This is the basic standard for Rice students. For this reason, our Code discusses this expectation at length, well before it provides examples of some violations:

The life and work of a Rice University student should be based on integrity, responsibility, and consideration and respect for others. In all activities each student is expected to be respectful of the rights and interests of the community and of others in the community and to be personally honest. Rice University, through appropriate policies and rules, expects mature and responsible behavior of its students and holds students responsible for behavior that violates the standards and expectations of the community.  All students are expected to conduct themselves in a manner compatible with the University's function as an educational institution and with the rights of all members of the University community to attend, make use of, and enjoy the facilities and benefits of the University without undue interruption and disruption.

By entering Rice University, students accept several responsibilities: to respect the safety, dignity, and welfare of all persons in the University community.... The University specifically emphasizes the expectation for students to behave respectfully in all interactions with other members of the community....

Failure to fulfill these responsibilities and expectations may result in the suspension of specific privileges, the withdrawal of the student's privilege of attending the University, or the imposition of other sanctions.

Subsequent details in the Code expound on this general standard of conduct.

Similarly, other Rice rules and policies also expand on this general standard, such as when Rice's Title IX policy states this community's definition of "consent" for sexual behavior as being "an active, ongoing, and voluntary agreement by each participant to engage in sexual activity or sexual contact, communicated by clear actions or words." Like the general standard of conduct, this may be a higher standard than exists in the wider society but it is the standard adopted for this community, and the Title IX policy (in section C) specifically recognizes this: "Rice generally expects its students to comply with a higher standard of conduct and mutual respect than that required by law."

Mr. Senhica Klee                                3                                February 9, 2018

Rice's alcohol policy also explains that the university expects students to engage "safe, responsible behavior toward alcohol. All students are personally responsible for their behavior, and all students should, under Rice's Culture of Care, consider themselves responsible for the safety of themselves and all fellow students."  One of the more dangerous alcohol behaviors mentioned in the policy is taking "sexual advantage" of anyone whose judgment is impaired by alcohol.

The graduate student section of our General Announcements also discusses these principles in stating: "The University expects all Rice students to exercise personal responsibility over their actions. Their behavior should reflect a respect for the law and for their contractual obligations, a consideration for the rights of others, and shared standards of considerate and ethical behavior." Students are also required to respect the safety, dignity and welfare of other community members.

Thus, as a member of the Rice University community, you are expected to uphold Rice's general standard of conduct, not merely to avoid the Code's twenty-eight specific examples of misconduct, which serve to further explain the general standard.  Your behavior relating to alcohol as well as your sexual conduct must be measured not only against the Code's list of prohibitions but also Rice's general standard of conduct.  In considering your appeal I have asked myself whether you failed to meet the general standard of conduct as well as whether you violated specific prohibitions in our rules.

## III.    Overall Conduct and My Unwillingness to Isolate Alcohol Misconduct

A central argument in your appeal is that you should be punished only for the alcohol misconduct that you committed but not for your sexual conduct toward E.C. following this alcohol misconduct.  Essentially, you ask me to divide your actions into two categories and to focus on whether each of these violated specific prohibitions in our rules. This approach would have me ignore the interconnection of your various behaviors on September 4-5, 2016, and to ignore the general principles and expectations discussed above.  Instead, I view your conduct that evening in its totality, and viewed in this manner I find that it fell far short of Rice's general standard and violated the Code and Rice policies.

You, SJP, and I all agree that you violated Rice's alcohol policy, as well as the Code and state laws, by providing alcoholic beverages to three underage students the night of September 4, 2016.  It is worth reviewing the facts relating to your alcohol conduct, many of which are either uncontested or easily established:

a. You invited three young women to party with you at your apartment (you claim you intended the party to occur at another student's apartment but I am persuaded that Michael Hewitt's involvement had already been ruled out as early as the drive back to the dorm from the studio party).

b. You were well aware that the other three students were not of legal drinking age.

Mr. Senhica Klee                                        4                                February 9, 2018

c.  While the students went back to campus to prepare for the party, you searched for an open liquor store and then settled for a grocery store, where you purchased a "thirty-rack" of beer (not a mere six-pack) to offer to the underage women.  Obtaining alcohol to provide to underage persons was your first instance of violating the alcohol policy and state law.

d.  You served the women one bottle of wine that you had on hand. Serving this wine was the second instance of an alcohol policy and state law violation.

e.  You also provided beer to the women and encouraged them to drink, or – if I give more credence to your account – you freely permitted them to take beer from your refrigerator and consume it in your apartment while you were present.  Either way, this was the third instance in which you violated the policy and state law.

f.  You encouraged the idea of playing drinking games and went as far consulting online resources for drinking game rules.  This shows you were not just a passive observer of underage students consuming alcohol but a willing, encouraging participant.

g.  After consuming wine and beer in your apartment, you invited the women to join you in the swimming pool and loaded your backpack with numerous beers (several beers by your account, or as many as seven according to one of the witnesses).  This was the fourth instance of violating the alcohol policy and state law.

h.  While the women were in the pool, you went back upstairs to reload your backpack with beer. This is the fifth instance.

i.  When the drinking ended at your apartment, it is unclear how much of the wine and how many of the thirty cans had been consumed by the women. It is safe to say it was a significant quantity given that eighteen- and nineteen-year-olds are not permitted to have any alcohol.

j.  The evening of drinking at your apartment was apparently not enough for you so you suggested continuing the evening at a club or bar.

k.  When drinking at an off-campus bar proved impractical, you suggested that the underage students come with you to Valhalla, the campus graduate pub, where you provided more beer to Georgia Belmont; this was another violation of the policy and law.

l.  You also bought a beer for you and one for E.C., or you bought only one beer that you and E.C. shared. This purchasing and providing of beer to underage persons was yet another violation of Rice policy and state law.

m.  In other words, from the time you left the studio party earlier that evening, through the time that you and E.C. engaged in sex in your car, you *repeatedly* provided alcohol to E.C. and her friends *for several hours in several locations*. By every account, you were solely responsible for providing every drink of illegal alcohol that the women consumed that night.

If I were to view your alcohol-related conduct in isolation, these facts are already highly prejudicial toward you. But your conduct did not occur in isolation.  It was part of a larger set of actions that evening. Viewing these actions as a whole and measuring them against the university's general standard of conduct provides a more accurate assessment of your conduct.  You were a

E-mail matsuda@rice.edu • Office 713-348-4002 • Fax 713-348-4806 • Rice University Graduate and Postdoctoral Studies–MS 13
P.O. Box 1892 • Houston, TX 77251-1892 • graduate.rice.edu

Mr. Senhica Klee                                    5                                    February 9, 2018

graduate student who invited three underage women, two of whom had only begun college life a few days before, to a party at your home where you illegally and repeatedly served them beer and wine. You knew they were underage.  After drinking at your apartment you drove them to a bar and illegally procured and provided more beer to two of these underage students, and then you had sex with one of them in the back of your car in a nearby parking lot. Your appeal asks me to separate your alcohol misconduct from the sexual activity that immediately followed, but the two behaviors are not separate.  You joined these various actions by following your alcohol misconduct with sexual relations with one of the students, making your conduct intertwined and making this case quite serious.

A holistic view also makes me believe that your actions were aimed at increasing your chances of having sex with one of the women that night.  This is quite contrary to Rice's general expectations as well as its Code and alcohol policy.  Though you already had wine on hand, you supplemented this with a thirty-rack of beer.  You then provided drinks in your apartment, at the pool, and (at your suggestion) at a licensed establishment – all in violation of the law and university rules.  It is important to note that you provided *all the alcohol* the women drank that evening.  This opportunistic aspect is further supported by your own appeal, in which you explain that you knew early in the evening E.C. was attracted to you:

Throughout the night, [E.C.] sent the clear message to me that that was her desire [to "hook up"].  She did it in a flirtatious manner and I reciprocated.  From the beginning of the night, [E.C.] positioned herself within the group, communicated with me within the group, and physically made it clear that she was attracted to me.

The facts lead me to believe that you repeatedly provided E.C. with alcohol that night to increase the potential of having sex with her later.  This may explain why you paid for E.C.'s beer at Valhalla but had Georgia Belmont pay for her own.  I believe you were doing exactly what our expectations and rules warn you not to do – attempting to take sexual advantage from alcohol.

Viewed from an overall perspective, I conclude that you violated Rice's general standard of conduct and specific violations of the Code. Instead of respecting the safety, dignity, and welfare of all students, your actions were deliberate, repeated, and attempted to take advantage of other students. Your conduct establishes your violation of Code sections II.B.1.o. and II.B.1.p. and Rice's alcohol policy.  This misconduct justifies a protracted suspension from the community. I therefore find no reason to overrule or modify the overall sanction of at least a six-semester suspension, which I view as appropriate in these circumstances.

If, for the sake of argument, I were to dissect your conduct and consider only the alcohol misconduct, I would still view the alcohol violations as sufficiently severe and would view them as justifying the overall sanction already received.  Your appeal suggests that you do not view your alcohol misconduct as particularly serious.  In my judgment, the facts above reveal that it was serious. SJP appears lenient in interpreting your actions as constituting only two violations; your conduct appears to me to represent a multitude of violations and a pattern of actively and repeatedly disregarding state law and Rice community standards.  Far from a more minor alcohol policy violation (such as when a student provides a beer to an underage classmate while hanging out), your

E-mail matsuda@rice.edu • Office 713-348-4002 • Fax 713-348-4806 • Rice University Graduate and Postdoctoral Studies-MS 13
P.O. Box 1892 • Houston, TX 77251-1892 • graduate.rice.edu

misconduct became very serious when you used alcohol to gain sexual advantage over a fellow student.  Even if I were to examine only your alcohol misconduct, I would nevertheless conclude there is no reason to overrule or modify the sanction of at least a six-semester suspension.

Before leaving the issue of alcohol misconduct, I must address several related points.

First, I want to make clear that the reason I am upholding your sanction is not because you were – at twenty-five years old – markedly older that the three women or that you were a graduate student and they were undergraduates. The violation is not based on being significantly older or more experienced, but in providing alcohol to those who are prohibited from accessing it and in linking that conduct to sexual advantage.  Additionally, my conclusions are not changed by the suggestion that the reporting student might have been willing to engage in sex with you even in the absence of alcohol; we will never know that with certainty because your misconduct did not allow that choice to occur in the absence of illegal alcohol.

Second, your appeal argues that the women interviewed by SJP conspired with each other in recalling and shaping facts about your conduct around alcohol.  Based on the descriptions of the women's discussion, I heavily discounted the witness statements of Georgia Belmont and Madeline Lyon on these alcohol points.  But this did not materially affect my conclusions because the facts necessary to support my findings are confirmed by you or sufficiently established even if I disregard Belmont's and Lyon's testimonies.  You still emerge as someone who actively and repeatedly thwarted the rules and law in this area and violated the Code and law.

Third, you also argue that the women "were prepared to purchase alcohol on their own had I not already purchased it."  This argument does not reveal any material error in SJP's determination. You provided alcohol to students you knew were not of age and who could not have obtained the alcohol without themselves violating state law and Rice policy.  Your argument does not exonerate you or alter the fact that *you were the instrumentality* that enabled the illegal drinking. What might have occurred without your involvement cannot be known, but the mere possibility that the women might have obtained alcohol some other way cannot excuse your *actual* disregard of rules and law.

## IV.    Issues of Sexual Conduct and Consent

I have already concluded that your overall conduct constitutes violations of Rice rules and warrants the sanction already received.  Nothing further is necessary to support this result.

In this section IV, however, I address some of your appeal points about your sexual conduct because you raise arguments that merit a response and because the specifics regarding your sexual conduct actually buttress, rather than undermine, the conclusions and sanction in this case.  Because the consent issues vary at different points in the sexual encounter, I have divided my discussion into two parts.

E-mail matsuda@rice.edu • Office 713-348-4002 • Fax 713-348-4806 • Rice University Graduate and Postdoctoral Studies-MS 13
P.O. Box 1892 • Houston, TX 77251-1892 • graduate.rice.edu

## A. Vaginal Intercourse and Oral Sex

You maintain that you had E.C.'s consent for the sexual activity that occurred that night. As explained, your activity in continuously supplying E.C. alcohol that night makes it impossible to examine your sexual activity in isolation.

Had you not been supplying alcohol the entire evening, there are facts that could be used to argue the idea of consent. These include:

a.  E.C. agreed to leave Valhalla with you to find a more private location.

b.  She sent a text message to her friends saying, "I think I'm gonna hook up with him."

c.  You both related that E.C. voluntarily climbed into the back area of your car with you.

d.  There is no indication that you used force to constrain her in your vehicle or in the situation.

e.  The campus parking lot was walking distance from E.C.'s residential college.

f.  After expressing some initial reservations about sexual intercourse, E.C. agreed to "do other fun adult stuff instead," in order to continue the evening.

g.  You and E.C. had extensive conversations about virginity and abortion while in your car and before intercourse occurred, suggesting her coherence.

h.  Later in the encounter E.C. stated, "OK", "We can have sex."  She also stated that you then asked for confirmation, "Are you sure, are you sure?" and she confirmed, "I said yes."

i.  She stated that she tried to guide your penis into her vagina.

j.  It is uncontroverted that she received oral sex from you and twice provided you oral sex.

k.  There is no suggestion that you forced E.C. into oral sex. While someone might criticize you as boorish for asking for oral sex as you drove E.C. back to her residential college, you apparently asked and she acquiesced, even if her unexpressed motives might have been anything but sexual.

l.  Both Madeline Lyon and Georgia Belmont related that, though they believed E.C. was "drunk" that night, they explained that she was able to make decisions for herself.  Madeline even concocted a story about an ill roommate as an excuse for her and Georgia to leave E.C. alone with you.  Later, Madeline laughed (in a text message) in response to E.C.'s message saying she was going to hook up with you.  Neither friend raised an alarm about E.C.'s wellbeing or attempted to locate her or forestall any sexual interaction between you and E.C.

Make no mistake, E.C. maintains she was too drunk to understand what was happening.  You argue at length that E.C. could not have had more than five drinks that night.  Even five drinks could have been enough to undermine her ability to give a meaningful consent.  It is difficult to know in this case.  There is no scientific standard for these situations. We do not know precisely how much E.C.

Mr. Senhica Klee                                         8                                 February 9, 2018

consumed and what other factors were involved which might have affected her ability to process alcohol and make decisions.

In a vacuum (i.e., in the absence of all the alcohol that you provided), this mix of facts might have been argued to establish consent to vaginal intercourse and oral sex. But the facts do not exist in a vacuum; they are part of a larger context and the reliability of some of these facts (such as those relating to E.C.'s action) is undermined by the presence of significant amounts of alcohol. Because some of these behaviors might be created or influenced by the presence of illegal alcohol (all of which you provided), I decline to view these facts as establishing consent.

### B. Anal Sexual Activity

Equally important, the facts regarding consent for anal penetration are not as open to debate and weigh more heavily against you.

It is clear that the reporting student denies consenting to anal sex of any kind ("never at any point did I consent to anal sex"). She alleged that while you were behind her engaging in vaginal intercourse you switched to anal sex without consulting her. You deny placing your penis in her anus (transcript of your initial interview at line 2593) and deny that you ever engage in anal sex (line 2622). The record does not allow me to conclude that penile penetration occurred, because E.C.'s account on this point does not appear sufficiently reliable. In discussing these details, she concedes that she had difficulty discerning what was happening and that the "exact order of sexual acts that occurred that night is unclear to me."

However, in your September 9 interview, while you were denying having anal intercourse with E.C., you admitted that you placed two fingers in her anus during oral sex. You said you inserted your fingers, *then asked* her if it felt good. Until the SJP investigation, E.C. was not even aware of your digital penetration. After learning of your statement, she stated, "he never asked me and didn't tell me he was doing it" (Recording of October 5 at 0:56:30). Later in the interview she confirmed that she would have said no to anal sex if you had asked her (at 1:25:00).

Both accounts establish that E.C. did not use any words to signal consent to your digital penetration or to any other form of anal sex. Your account establishes there was no discussion prior to your insertion of your fingers. You claim she approved of your conduct *after* you had already engaged in it, but this does not comply with Rice's consent standard. You needed her consent beforehand, by "clear action or words," and the lack of objection or expression of displeasure cannot substitute for obtaining the consent required by our rules. Your statements confirm that there were no "words" exchanged about digital penetration.

The only other way words of consent could have been given for anal penetration is if her statement about having "sex" encompassed *all* forms of sex. You argue this on page 7 of your appeal, and it must be what you meant in your first written response when you stated, "consent was given for sticking my fingers into her anus." Quite frankly, I cannot accept this argument. Under Rice's standard, a student should not assume a comprehensive permission even from someone who

Mr. Senhica Klee                                        9                                February 9, 2018

is a regular sexual partner.  You and E.C. were not regular partners and had never before engaged each other sexually. As you sat in your car, you and E.C. had just conversed in detail about her virginity, making it highly unlikely, in light of this sexual inexperience, that agreeing to "sex" meant agreeing to every manner of sex.  In making other arguments, you point out that you asked her to confirm her consent before intercourse, so I am incredulous that you interpreted her brief "yes" as authorizing you to engage in all forms of sex.

Your conduct also contradicts an argument that her single statement gave you permission for every sexual act. For example, prior to climaxing you asked her if you could ejaculate on her. You certainly felt it necessary to ask her permission for that act, and you accepted her "no" and refrained. And during the drive back to her room you also felt it necessary to ask her if she would give you oral sex again, reflecting that there were sexual activities that required additional agreement. But there were no discussions or specific permissions about anal penetration.

I then considered whether there were clear "actions" to indicate consent to anal penetration. It is difficult to imagine how she would have communicated this consent through action in this situation. It would have been difficult, due to physical positioning, for her to see or appreciate what you were about to do.

I do not believe that any of her words or actions communicated consent to this specific activity.  The facts lead me to believe you proceeded in this activity without first discussing it with her.  Applying the preponderance of evidence standard to the record, I conclude that you did not have her consent for the digital anal penetration and that your actions in this regard violated Code section II.B.1.a. and Rice's Title IX policy.

Therefore, even analyzing the sexual activity in isolation leads to a conclusion that you violated the Code and Title IX policy.  Your violation further bolsters my overall decision of misconduct and justifies a serious sanction.

## V.  Other Arguments of Bias and Unfairness

Having considered the central issues in this case, it now remains to consider your numerous appeal arguments that SJP and the disciplinary system were biased against you or were otherwise unfair. For the reasons that follow, I do not agree with your arguments and do not find in them a basis for altering my conclusions and my decision to uphold the sanction in this case.

a. The written statements and recordings do not demonstrate a bias against you.  The Rice staff was very respectful toward you in the investigative meetings, and the conduct of Ms. DeLaTorre was quite professional.  You were not berated or badgered during questioning but instead treated respectfully.  You were allowed to ask Ms. DeLaTorre questions. You were provided a Title IX navigator, Ms. Everett, to assist you in accessing Rice services and resources and in understanding the process, and there is nothing to indicate that she failed to serve you competently. You do not assert that Ms. Everett said or did anything specific to this case that revealed a bias against you or compromised your efforts to defend yourself.  The

record does not reflect a bias on her part. You contend you were not given access to the same resources as E.C., but you do not state what resources you were denied or not offered; without this explanation I cannot determine how, if at all, this aspect of your argument might affect my decision and I therefore reject your argument.

b.  You argue that when you appeared in the SJP offices for your initial interview, it was "not until sometime into the interview" that you were informed of the subject of the interview. But the record of your first interview indicates that Ms. DeLaTorre revealed at the outset the subject matter of the interview, saying that she had received a report from an undergraduate student that you had violated the Code, and she gave you the date on which the conduct occurred.  You and she then discussed the events of September 4-5, 2016; you both appeared to be on the same page in this discussion.  You did not seem confused.  Instead you explained the events of that evening, including that "some sexual things took place." You seemed to be sufficiently aware of the subject matter and the identity of the reporting student.

c. You vigorously assert that E.C. must have briefed the other witnesses about the issues before they were interviewed by SJP and that they collaborated in framing their presentation of facts.  I am not persuaded by this argument to alter my conclusion.  First, like SJP, I did not place any importance or usefulness on Olivia Lerwick's interview. Olivia was not present at the party in your apartment or the activity at Valhalla or later in your car. Olivia's only information about that night was gathered from others. Your case was not adversely affected by anything Olivia offered in her interview. Second, I discounted the statements of Madeline Lyon and Georgia Belmont, based on E.C.'s comments that she had some discussions with these two witnesses before they were interviewed by SJP and that the two women had openly discussed their recollections of that night (though we do not know the extent or effect these discussions may have had on any specific recollections). Third, most of the pivotal facts in this case are corroborated by your own testimony or are facts on which I have placed more credibility on E.C.'s account than on yours.  Had this been a case where critical facts needed to be corroborated through recollections of Madeline and Georgia, I would have a greater concern about their pre-interview discussion. But this is not such a case; the result in this case does not rest on facts that Madeline or Georgia may have discussed with each other.

d.  You object to statements made by Ms. DeLaTorre to E.C. on November 10 (after the SJP decision in this case) about how Ms. DeLaTorre stood behind her decision and how the University stands behind the decision she made. I do not agree that this reveals some type of bias by Ms. DeLaTorre or Rice.  Ms. DeLaTorre is the administrative official Rice has authorized to investigate these cases and make findings. It stands to reason that she would believe in, and stand behind, her decisions. As long as her decision remains the university's official decision and is not superseded by an appeal decision, Rice obviously stands behind the SJP decision.  And I expect that, upon its implementation, the university will stand behind my decision as the one made by its duly authorized official. I do not agree that Ms. DeLaTorre's statements on November 10 reveal a bias against you or against accused students generally.

e.  You argue that you did not engage in predatory behavior because E.C. found you attractive and was favorably disposed to "hook up" with you even before she began drinking on the night of September 4, 2016.  Accepting her statement at face value, it does not exonerate

Mr. Senhica Klee                                11                          February 9, 2018

your behavior.  E.C. was free to change her mind about you at any point in the evening. Rather than focus on E.C.'s thought of you at the beginning of the night, I have focused on your actions to determine if you violated Rice's community rules.  My decision does not require me to determine if you were predatory, though I do believe that your behavior was at minimum opportunistic.

Similarly, you resent SJP's suggestion that your actions that night were premeditated.  Again, my decisions do not require a determination about premeditation; I simply review and judge the actions that you took, whether or not you planned them in advance.

f.  You devote significant discussion to contesting the meaning of the Uber driver's comments or the insinuation that there was early suspicion of your motives and actions on September 4, 2016. I did not place any credence on what the Uber driver said or how his statements were intended.  Those statements and your arguments about them are inconsequential to the outcome of this appeal.

g.  Similarly, you are not aided by your argument that the women were not truly surprised to find they were the only guests at your party.  My decision does not rely on this detail, although I note that your argument seems to contradict your own statement that you tried to arrange other guests or that you had encouraged the women to invite others. In any event, this issue is inconsequential to the outcome of this appeal.

h. You raise the absence of a recording of E.C.'s first SJP interview (on August 24, 2017) and argue this absence shows unfairness and disadvantages you in understanding why E.C. waited an entire year before bringing her allegation.

As part of my review, I requested a written explanation from Ms. DeLaTorre about the missing recording. She informed me that the recording of E.C.'s first interview exists but is only one second long.  SJP did not realize until recently that the recorder had either failed to operate or had not been operated properly.  They realized this when preparing the recordings for your review as part of this appeal.  Ms. DeLaTorre explained that the recordings are actually created as memory aids for SJP officials as they review and decide cases; she and Ms. Garza do not listen to each recording but listen only as necessary.  In this case, shortly after the August 24 interview, E.C. provided a detailed written statement that made it unnecessary to review the recording, which was accessed for the first time when it was being prepared for your use (a student facing a disciplinary proceeding is permitted to review any recordings that have been made in the case).  The abnormally short recording constitutes a procedural mistake, but it does not appear to be deliberate and I am not persuaded it is material.

You assert that the August 24 recording could have illuminated why E.C. waited an entire year before bringing this accusation forward. This is possible, but this topic was sufficiently covered at the end of E.C.'s interview on October 5, 2017 (for which there is a full recording); E.C. explained that she spent some of the intervening year being confused about her rights in the situation, as well as trying to somehow excuse what she believed to have been anal intercourse.  She also explained that she tried to compartmentalize the events of that night but continued to feel the situation was unresolved.  She wrote in her response to your appeal that she spent the intervening year attempting to cope with the situation in various ways but

E-mail matsuda@rice.edu • Office 713-348-4002 • Fax 713-348-4806 • Rice University Graduate and Postdoctoral Studies–MS 13
P.O. Box 1892 • Houston, TX 77251-1892 • graduate.rice.edu

found that the passage of time made things worse for her.  I find her response to your appeal consistent with statements she made on October 5.  The response confirms the October 5 statements, which satisfied me that there was nothing suspicious about the delay in reporting and there was nothing about the timing of her report that undermined its credibility.

The absence of the August 24 recording is not a procedural error warranting reversal of SJP's decision. An error must have a material effect on the outcome of a case for it to warrant a change or reversal.  It is not enough to argue that things may have been learned from the missing recording. In this instance, more explanation of the one-year delay may have been illuminating, but the subject was sufficiently discussed in E.C.'s other interview (and her appeal response). E.C. was unable to accept what she believed had occurred.  Her explanation addresses the delay in reporting and reflects her inexperience at time of this episode.  I do not see a need or basis to change the outcome of this case based on the lack of a complete August 24 recording or the timing of E.C.'s report. For my purposes, the necessary facts are established in the existing record.

i. You also argue that the sexual conduct in this case consisted of mutual sex acts "all of which were received by each of us with the same level of gratification and pleasure. At the same time, there was no indication of displeasure." Of course, E.C.'s complaint against you contradicts this claim, but I pause on this argument only to reiterate that, in this community, the lack of objection or lack of expression of displeasure cannot substitute for obtaining clear consent.

j. Finally, to the extent that I have not specifically addressed other arguments made in your appeal, I state for the record that I did not find these arguments persuasive and/or I did not see them as impacting the determinations I have made in this letter; arguments not addressed here are therefore rejected.


## VI.  Appropriateness of the Sanction

After finding in sections III and IV that you violated Rice's general standard of conduct, the Code of Student Conduct and Rice policies, I now confirm the appropriateness of the sanction of at least a six-semester suspension. You argue that this is out of proportion and that you should be sanctioned only for the violations involved in providing alcohol to three underage students.  As stated, I view your alcohol misconduct in this case as inextricably combined with your sexual behavior and view your overall conduct as a very serious matter.  I also determined that you engaged in sexual misconduct in violation of the Code and our Title IX policy because you did not obtain the requisite consent before proceeding with anal penetration. The violations are quite serious and I see no rationale or compelling argument for reducing the overall sanction. Though the sanction will significantly impact you, it does not follow that the sanction should be reduced. Responding to one of your appeal arguments, my decision about the sanction would not have been changed by character evidence attesting to your good behavior outside of this case; I have assumed your good character for all other purposes, and I make determinations only about your actions on September 4-5, 2016. I am not persuaded of a need or a basis to change the sanction, and therefore I determine that the sanction shall remain in place as explained in SJP's letter of October 24, 2017.

E-mail matsuda@rice.edu • Office 713-348-4002 • Fax 713-348-4806 • Rice University Graduate and Postdoctoral Studies-MS 13
P.O. Box 1892 • Houston, TX 77251-1892 • graduate.rice.edu

Mr. Senhica Klee                                    13                              February 9, 2018

## VI.   Conclusion

The following summarizes my findings in this appeal:

1.  I have viewed your conduct as a whole, and I conclude that your conduct failed to meet Rice's general standard of conduct and violated Rice's Code, Title IX policy and alcohol policy. I also conclude that the severity of your misconduct justifies a suspension of at least six semesters.

2.  Even if I had considered only the alcohol related misconduct, I would view as sufficiently supported SJP's findings that you violated sections II.B.1.o. and II.B.1.p. of the Code and Rice's alcohol policy by deliberately and repeatedly providing alcohol to underage students.  I would view your conduct as justifying a sanction of a suspension of at least six semesters.

3.  An analysis of the specific sexual conduct does not exonerate you but instead establishes a clear violation in that you failed to secure consent for anal penetration.  I uphold the previous finding that your actions in this regard violated Code section II.B.1.a. and Rice's Title IX policy.

4.  Your violations of Rice's Code and policies were quite serious and warrant a serious sanction.  I uphold the sanction of a suspension of at least six semesters.

It is unfortunate that both you and the reporting student have been greatly affected by the conduct in question and are likely to be affected for some time to come.  I hope that this experience will lead you to consider more carefully the decisions you make in these contexts, and that you will learn from these events.

Sincerely,

Seiichi Matsuda
Dean of Graduate and Postdoctoral Studies